*Execution Copy*

## ASSET PURCHASE AND PROCESSING AGREEMENT

THIS ASSET PURCHASE AND PROCESSING AGREEMENT (this "Agreement") is dated as of July 29, 2009, by and between the Bankruptcy Estate of Chemetco, Inc., 3574 Chemetco Lane, Hartford, IL 62048 ("Seller"), and Industrial Asset Disposition, LLC, a California limited liability company.

## BACKGROUND

On November 13, 2001, Chemetco, Inc., an Illinois corporation, filed a Voluntary Petition under Chapter 7 of the United States Bankruptcy Code. The Bankruptcy Court of Southern District of Illinois ("Bankruptcy Court") has appointed Laura K. Grandy as Trustee ("Trustee") of the bankruptcy estate. Prior to filing for bankruptcy, Chemetco, Inc. engaged in the ownership and operation of a copper processing plant located in Hartford, Illinois. Pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. Section 363, the Trustee has determined it is in the best interest of the bankruptcy estate to offer for sale certain assets related to the copper processing plant and the Buyer desires to purchase said assets pursuant to the terms and conditions herein contained.

As used in this Agreement, the terms set forth in Exhibit A shall have the meanings ascribed to them in that Exhibit unless the context otherwise requires.

NOW THEREFORE, IN CONSIDERATION OF THE PREMISES AND MUTUAL REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS HEREIN CONTAINED, THE PARTIES HERETO, INTENDING TO BE LEGALLY BOUND, AGREE AS FOLLOWS:

## SECTION 1.
## PURCHASE AND SALE OF ASSETS

1.1     Purchased Assets.

(a)     Subject to the terms and conditions hereof Seller shall assign, sell and transfer, to Buyer, and Buyer shall purchase, all of Seller's right, title and interest in, those assets set forth below:

      i.     miscellaneous stainless steel, iron and other metal bearing materials located on the Smelter Site, including the metal contained in or comprising part of the buildings on the Smelter Site, to the extent not already sold by Seller ("Scrap Assets"); and

      ii.     the real property commonly known as 3574 Chemetco Lane, Hartford, IL, comprised of *approximately 41.1 acres,* and the real property adjacent thereto lying west of Old Alton Road, comprised of approximately 162.79 acres together with all buildings, facilities and other improvements thereon and all easements, privileges and all appurtenances pertaining thereto, legally described on the attached Schedule 1.1 (collectively, the "Smelter Site"); and

*Execution Copy*

       iii.      the real property lying east of Old Alton Road and both north and south of New Poag Road, comprised of approximately 143.76 acres, together with all buildings, facilities and other improvements thereon and all easements, privileges and all appurtenances pertaining thereto, legally described on the attached Schedule 1.1 ("NPR Property").

      (b)    All of the assets to be sold, assigned and transferred hereunder by Seller to Buyer as more fully described in Section 1.1(a) above, are hereinafter called the "Assets."

      1.2    Assets Excluded from Purchase.  The Excluded Assets are not included in the sale to Buyer and are specifically excluded from the terms of this Agreement.  Notwithstanding anything herein to the contrary, Seller retains the right to access the Smelter Site following the Smelter Transfer Date and the NPR Property following the NPR Transfer Date upon reasonable notice to Buyer to retrieve the Excluded Assets and finalize the administration of the Seller's bankruptcy estate.

      1.3    Rights of Tenant Farmer.  The parties hereto acknowledge that Seller shall have the right to contract, in writing or otherwise, with a tenant farmer for purposes of farming all or any part of the Smelter Site and NPR Property so long as Seller has legal title to the Smelter Site and NPR Property.

      (a)    Any such tenant farmer shall be permitted to continue farming the Smelter Site through the end of the crop year containing the Smelter Transfer Date.  Seller shall be entitled to all proceeds from the sale of crops by a tenant farmer during the crop year containing the Smelter Transfer Date and all years prior thereto.

      (b)    Any such tenant farmer shall be permitted to continue farming the NPR Property through the end of the crop year containing the NPR Transfer Date.  Seller shall be entitled to all proceeds from the sale of crops by a tenant farmer during the crop year containing the NPR Transfer Date and all years prior thereto.

**SECTION 2.**
**PURCHASE PRICE AND PAYMENT; ASSUMED LIABILITIES**

      2.1    Deposit; Financial Information.

      (a)    As of the date hereof, Buyer has paid to Seller the sum of $100,000.00.  Buyer shall within ninety (90) days of the Court Approval (unless such time period is extended by the Trustee) pay to Seller an additional sum of $400,000.00 (which amount together with the $100,000.00 already paid shall be the "Deposit") to be held by Seller in an interest bearing account for the benefit of Seller which amount shall be applied to the Smelter Purchase Price.

      (b)    Buyer shall provide Seller with written evidence that demonstrates Buyer has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under this Agreement, such information should include, without limitation, the

following: (i) Buyer's current financial statements (audited, if any); (ii) contact names and numbers for verification of financing sources; (iii) evidence of internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and (iv) any such other form of financial disclosure or credit-quality support information or enhancement acceptable to Seller, in Seller's discretion, demonstrating Buyer has the ability to close the contemplated transaction ("Financial Information"). Seller, in Seller's sole and absolute discretion shall determine whether the Financial Information adequately demonstrates Buyer's financial ability to close the contemplated transaction and assures Buyer's future performance under this Agreement.

2.2     Purchase Price.  The purchase price for the Assets shall be as follows:

(a)     *Scrap Assets.*  The purchase price for the Scrap Assets shall equal eighty percent (80%) of the Scrap Revenue ("Scrap Purchase Price") and shall be paid in accordance with Section 3 below.

(b)     *Smelter Site.*  The purchase price for the Smelter Site shall equal Seven Million Dollars ($7,000,000.00) ("Smelter Purchase Price") and shall be paid from the Processing Revenue in accordance with Sections 4.4(a)(iii) and (iv) below.

(c)     *NPR Property.*  The purchase price for the NPR Property shall equal Five Million Thirty One Thousand Six Hundred Dollars ($5,031,600.00) ("NPR Purchase Price") and shall be paid from the Processing Revenue in accordance with Section 4.4(b)(iii) below.

2.3     Excluded Liabilities.  **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, BUYER SHALL NOT, BY VIRTUE OF BUYER'S PURCHASE OF THE ASSETS OR OTHERWISE, DIRECTLY OR INDIRECTLY ASSUME OR BE RESPONSIBLE FOR ANY LIABILITIES OR OBLIGATIONS OF SELLER, OR ANY OF SELLER'S RESPECTIVE AFFILIATES OR PREDECESSORS OF ANY NATURE WHATSOEVER (THE "EXCLUDED LIABILITIES") WHETHER LIQUIDATED OR UNLIQUIDATED, KNOWN OR UNKNOWN, ACTUAL OR INCHOATE, ACCRUED, CONTINGENT OR OTHERWISE, AND WHETHER ARISING FROM FACTS EXISTING OR EVENTS OCCURRING PRIOR TO, ON OR AFTER THE DATE OF THIS AGREEMENT.**

2.4     Compliance with Internal Revenue Code Section 1060.  Seller shall provide to Buyer and Buyer shall provide to Seller all information for Part I of U.S. Treasury Department Form 8594 which will enable Buyer and Seller to make, in a timely manner, all filings (including supplemental filings) deemed appropriate by either Seller or Buyer pursuant to Section 1060 of the Code.  All information provided by Seller and Buyer in compliance with this Section 2.3 shall be complete and accurate in all respects. Seller shall provide to Buyer and Buyer shall provide to Seller any filing made by such party pursuant to Section 1060 of the Code within ten (10) days of such filing.  Seller or Buyer, upon written request of the other (made upon advice of counsel for the requesting party), shall, within twenty (20) days of the making of such request, file an initial filing (or a supplemental filing) on U.S. Treasury Department Form 8594 pursuant to the requirements of Section 1060 of the Code.

*Execution Copy*

2.5    <u>Title to Assets</u>. Subject to terms and conditions herein contained, Seller shall transfer the Assets to Buyer, free and clear of any right, or interest, that subsists in a third-party and that constitutes a claim, lien, charge or liability attached to and binding upon any Asset being transferred, including, but not limited to, a mortgage, judgment lien, mechanic's lien, lease, or security interest pursuant to 11 U.S.C. § 363 (f).

## SECTION 3
## REMOVAL AND SALE OF SCRAP ASSETS

3.1    Within thirty (30) days of Court Approval and approval of all applicable Regulatory Agencies, Buyer shall begin to demolish and market the Scrap Assets, including by-products from the demolition of the buildings, including steel I beams, copper wire, old breakers, transformers and motors; provided, however, the motors and equipment necessary to operate and maintain the water systems on the Smelter Site shall not be removed or sold without the Seller's express written approval; provided further, until such time as Seller has granted said approval Buyer shall maintain the operational status of the motors and equipment necessary to operate and maintain the water systems. Seller shall approve all sales of Scrap Assets. Notwithstanding the foregoing, the structure supporting the Furnaces shall be kept in place until the Furnaces have been removed unless Seller otherwise authorizes the removal of the supporting structure. Following removal of the Furnaces or as otherwise authorized by the Seller, the structure supporting the Furnaces shall be torn down and sold in accordance with above.

3.2    Any additional funds required to satisfy any Regulatory Agency shall be the responsibility of Buyer.

3.3    The Scrap Revenue shall be distributed by the Seller as follows: (a) 20% to Buyer; and (b) 80% to Seller.

3.4    All demolition and sale of Scrap Assets shall be completed within 120 days of Court Approval unless mutually extended by the parties hereto.

## SECTION 4.
## PROCESSING AND SALE OF SCRUBBER SLUDGE AND SLAG

4.1    Although not being purchased by Buyer hereunder, Seller hereby grants to Buyer the exclusive right to process and/or sell the Scrubber Sludge and Slag pursuant to the terms herein and subject to the final approval of the Seller.

4.2    Buyer shall be responsible for the construction and installation of a facility to process the Slag and Scrubber Sludge on the Smelter Site ("<u>Processing Facility</u>") for purposes of recovering copper, zinc, lead, tin, nickel and other materials ("<u>Recovered Materials</u>") from the Slag and Scrubber Sludge.

(a)    The Processing Facility shall be built and the Slag and Scrubber Sludge shall be processed in accordance with all Regulatory Agency guidelines, the Work Plans, and the covenants

of Buyer and Seller herein contained, including without limitation the provisions of Section 4.6 below.

(b)     Buyer shall bear all costs of construction, labor, equipment, marketing, and logistics of the construction of the Processing Facility, the sale of Recovered Materials, the sale of unprocessed Slag and Scrubber Sludge, the development of the Work Plans and any compliance with any Regulatory Agency in exchange for a portion of the Processing Revenue as provided herein.

4.3     Buyer may sell the Scrubber Sludge and Slag in an unprocessed or processed form subject to Seller's prior approval.

4.4     The Processing Revenue shall be distributed by Seller as follows:

(a)     So long as there remains a balance due on the Smelter Purchase Price, the Processing Revenue shall be distributed by the Seller as follows: (i) 5% to Trustee to be held by Trustee pursuant to Section 5.2 below; (ii) 25% to Buyer; (iii) 35% to Seller to be applied to the Smelter Purchase Price; and (iv) 35% to Commerce Bank, N.A. to satisfy its lien against the Slag, which amount shall be applied to the Smelter Purchase Price. Notwithstanding the foregoing, Buyer shall pay to Seller any remaining balance on the Smelter Purchase Price, including any amounts due to Commerce Bank, as of the fifth anniversary of the Court Approval.

(b)     Following payment in full of the Smelter Purchase Price, so long as there remains a balance due on the NPR Purchase Price, the Processing Revenue shall be distributed by the Seller as follows: (i) 5% to Trustee to be held by Trustee pursuant to Section 5.2 below; (ii) 25% to Buyer; (iii) 20% to Seller to be applied to the NPR Purchase Price; and (iv) 50% to Seller, which amount shall not be applied to the NPR Purchase Price. Notwithstanding the foregoing, Buyer shall pay to Seller any remaining balance on the NPR Purchase Price as of the sixth anniversary of the Court Approval.

(c)     At such time as the Smelter Purchase Price and the NPR Purchase Price have been paid in full, the Processing Revenue shall be distributed by the Seller as follows: (i) 50% to Buyer; and (ii) 50% to Seller.

4.5     Notwithstanding anything herein to the contrary, all processing shall be completed as of the seventh anniversary of the Court Approval.

4.6     Any alterations, additions or further improvements to the Smelter Site, including the Processing Facility, shall be the exclusive property of the Seller, shall be approved in advance by Seller and shall be made upon the following conditions:

(a)     Buyer shall protect, indemnify, hold harmless and defend Seller and the Smelter Site from and against any and all claims, damages, liabilities, costs and expenses, including attorney's fees, imposed upon, incurred by or asserted against Seller by reason of any accident, injury to or death of persons, or loss of or damage to property occurring on or about the Smelter Site in the

process of, or in connection with, such construction.  The foregoing indemnity shall specifically apply to those claims asserting negligence on the part of Seller.

(b)     Buyer shall pay all costs for construction done or caused to be done by Buyer on the Smelter Site, and shall protect, indemnify, hold harmless and defend Seller and the Smelter Site from and against (i) any and all claims, damages, liabilities, costs and expenses, including attorney's fees, imposed upon, incurred by or asserted against Seller with respect to such costs and (ii) all mechanic's liens, materialman's liens and laborer's liens arising from such construction and all attorney's fees and expenses which may be incurred by Seller in connection with the removal of such liens.

(c)     Buyer shall require Buyer's contractor or contractors to furnish a performance and payment bond or bonds covering the faithful performance and completion of all construction work on the Smelter Site and the payment of all obligations arising in connection therewith.  Such bond or bonds shall be in such form and written by such insurance companies as are acceptable to Seller in Seller's sole discretion, and shall name Seller and Buyer as co-obligees thereunder.  Buyer shall furnish Seller with such bond or bonds prior to the commencement of any construction on the Smelter Site.  In addition, Buyer shall require Buyer's contractor or contractors to pay any subcontractors or suppliers only in exchange for valid lien waivers.

(d)     Buyer or Buyer's contractors shall perform such construction work in a good and workmanlike manner in accordance with the Work Plans.

(e)     Buyer or Buyer's contractors shall complete all construction within a reasonable time after Seller gives its consent to same.

(f)     Buyer shall ensure that the construction and operation of the Processing Facility shall meet all Legal Requirements and Insurance Requirements.

(g)     At all times during construction of the Processing Facility, Buyer or Buyer's contractors shall keep all portions of the Smelter Site free from dust, loose dirt, debris and equipment as is reasonable.

## SECTION 5.
## ENVIRONMENTAL ISSUES

5.1     Buyer shall, in cooperation with Seller, develop and carry out work plans to govern the clean-up of the Smelter Site, construction of the Processing Facility and processing of the Slag, addressing environmental, health and safety, and transportation issues related thereto, to include without limitation, each of the following components; (i) Health and Safety Plan, (ii) Confined Space Plan, (iii) Industrial Hygiene Plan, (iv) Air Monitoring Plan (v) Waste Management Plan, and (vi) Contingency Plan and Emergency Procedures, as required by any Regulatory Agency (collectively the "Work Plans").  The Work Plans shall comply with the Seal Order, the Interim Order and shall meet all regulatory requirements of all Regulatory Agencies.  The Work Plans shall be approved by

*Execution Copy*

all appropriate Regulatory Agencies, if required by such Regulatory Agency, prior to the sale of any Assets or processing of any Slag and Scrubber Sludge from the Smelter Site.

5.2     Any amounts directed to be held by Trustee pursuant to Sections 4.4(a)(i) and 4.4(b)(i) hereof, shall be held by Trustee in an interest bearing account for the benefit of Seller and Buyer ("Escrowed Funds"); provided, however, in no event shall the aggregate amount of the Escrowed Funds exceed $10,000,000.00. Any costs and expenses associated with any remediation issues raised by any Regulatory Agency during the term hereof shall be paid from the Escrowed Funds. At such time as the EPA has issued all appropriate "no further remediation" letters and said letters have been received by Seller, any remaining Escrowed Funds shall be paid to equally to Buyer and Seller.

## SECTION 6.
## PARTIES' RESPONSIBILITIES

6.1     Seller, shall, at all times during the term of this Agreement, take all commercially reasonable steps to:

(a)     Grant access to the parties and the parties' representatives and agents to the parts of the Smelter Site and NPR Property which are necessary for the efficient operation of the Processing Facility;

(b)     Support the reasonable actions of Buyer to realize the goals of this Agreement on behalf of, and to the mutual benefit of, both parties;

(c)     Advise Buyer in a timely fashion about the reasonable or legally required steps Seller must take to ensure the safe and secure operation of the Processing Facility and to meet other requirements of any Regulatory Agency;

(d)     Provide management, purchasing, sales, personnel, maintenance or any other support as required for the safe and efficient operation of the Processing Facility;

(e)     Collect all Scrap Revenue, Processing Revenue, and any other revenue generated hereunder in a timely fashion;

(f)     To the extent funds are available, make monthly distributions of all Scrap Revenue, Processing Revenue, and any other revenue generated hereunder in accordance with the terms hereof, provided, that Seller may maintain a minimum amount of Scrap Revenue or Processing Revenue to meet the on-going Operating Expenses of the Processing Facility as determined from time to time by Seller;

(g)     Maintain complete and accurate books, records and accounts of all transactions relating to the sales of and revenues from all the Scrap Assets, Recovered Materials, Scrubber Sludge and Slag, all of which shall be open for inspection and audit by the parties.

6.2     Buyer, on its own behalf and on behalf of all its representative and agents, shall, at all times during the term of this Agreement, take all commercially reasonable steps to:

(a)     Maintain that portion of the Smelter Site required to maintain the Processing Facility as a safe and secure workplace;

(b)     Raise the required financing to fund the construction and maintenance of the Processing Facility;

(c)     Design, purchase and construct the Processing Facility, and ensure the Processing Facility is implemented in an efficient manner and in accordance with programs and budgets approved by the parties, including the Work Plans;

(d)     Evaluate the start up, operation and maintenance of the Processing Facility and make recommendations to Seller regarding the on-going operations to ensure that each the Processing Facility produces the highest and best end product value;

(e)     Provide information related to Operating Expenses along with supporting documentation to Seller in a timely manner;

(f)     Provide/employ a full-time representative ("Buyer Representative") to be present at the Smelter Site during all reasonable hours of operation with all reasonable costs of the Buyer Representative to be borne by Buyer and not considered Operating Expenses;

(g)     Provide regulatory compliance for the Processing Facility with all applicable Regulatory Agency;

(h)     To the extent that revenue from operations is insufficient to cover Operating Expenses, finance all Operating Expenses for the first six (6) months of operation of the processing hereunder;

(i)     Not exceed any approved budget by more than ten percent (10%) without the prior consent of Seller, except in relation to an emergency expenditure;

(j)     Provide recommendations regarding management, purchasing, sales, personnel, maintenance and other support as required for the safe and efficient operation of the Processing Facility, as may be requested by Seller;

(k)     Make recommendations regarding regulatory compliance for the Processing Facility and maintenance of the Smelter Site required for the Processing Facility as a safe and secure workplace.

*Execution Copy*

## SECTION 7.
## FURTHER COVENANTS AND RESPONSIBILITIES

7.1     Subject to the approval of Seller, Buyer shall, at all times during the term of this Agreement, take all commercially reasonable steps to:

(a) Manage all the day-to-day operations of the Processing Facility which shall include managing and supervising all personnel and all approved programs and budgets;

(b) Manage the on-going operations of the Processing Facility to ensure that it produces the highest and best end product value;

(c) Carry out all activities required hereunder in accordance with good industry practice, with reasonable care, skill and diligence and in accordance with all applicable laws and regulations;

(d) Maintain complete and accurate books, records and accounts of all transactions relating to the operations of the Processing Facility, which shall be open for inspection and audit by the parties.

(e) Establish a minimum amount of retained earnings to be held by Seller to meet the on-going Operating Expenses associated with the Processing Facility.

7.2     Seller and Buyer Representative shall meet and/or communicate with each other as often as necessary, to review and approve the daily operations of the Processing Facility and allocation of Operating Expenses.

7.3     As often as necessary, but in no event less often than once a calendar quarter, Seller and Buyer shall meet to review and approve the nature and content of the programs and budgets related the Processing Facility.

7.4     The Buyer Representative serves at the pleasure of Buyer and may be removed or replaced by Buyer as determined in Buyer's sole discretion; provided notice of the removal or replacement of the Buyer Representative by Buyer shall be made in writing to the Seller; provided, further, any concerns with the performance of the Buyer Representative by the Seller shall be promptly reported to Buyer.  Buyer and the Seller will work together to resolve such concerns to the mutual benefit of both parties.

## SECTION 8.
## FURTHER OBLIGATIONS OF THE PARTIES

8.1     <u>Bankruptcy Court Approval</u>.  Within ten (10) days of the receipt of the Deposit and Financial Information satisfactory to Seller, in Seller's sole discretion, Trustee shall submit to the Bankruptcy Court a Notice of Intent to Sell requesting the approval of the Bankruptcy Court for the sale of the Assets to Buyer pursuant to the terms herein contained.  Upon receipt of The Bankruptcy Court order approving this Agreement which is final and now applicable, ("Court Approval"),

*Execution Copy*

Trustee shall provide notice of the Court Approval to Buyer. The consummation of the transaction contemplated herein is expressly subject to receipt of the Court Approval.

8.2     Authorizing Action.  At the time of execution of this Agreement by Buyer, Buyer shall deliver to Seller a copy of resolutions duly passed by the shareholders, officers, directors, members and managers, if any, of Buyer authorizing the execution, delivery and performance by Buyer of this Agreement and any other agreements or instruments referred to herein or required in connection herewith.

8.3     Access to Information: Confidentiality.  Seller shall give Buyer and its authorized representatives reasonable access to the books, records, offices and properties related to the Assets and permit Buyer to make such inspections thereof as Buyer may reasonably request.  Buyer acknowledges that certain of the information which may be made available to it is proprietary and includes confidential information.  Buyer shall hold all such information in confidence and shall not disclose it to any person without the approval of Seller; provided, however, that the foregoing restriction shall not apply to any information which is or becomes publicly known or which is lawfully obtained from a third party, or to any disclosure required by law or in connection with the enforcement of Buyer's rights under this Agreement.  If the transactions contemplated hereby are not consummated, Buyer shall return to Seller all documents containing proprietary information and continue to hold such information in confidence.

8.4     Best Efforts.  Each party hereto shall use best efforts to cause to occur the transactions contemplated hereby and to cause all conditions to the performance of the parties hereto that are within its control to be satisfied.  Each party agrees to cooperate fully to manage the operations of and the maintenance of the Processing Facility in a professional manner, in compliance with all Regulatory Agencies and in a manner that maximizes the economic returns to both parties.

8.5     Use of Office Space.  Until the Smelter Transfer Date, Seller shall provide Buyer with the use of an office and a locker room with restroom and showers for Buyer's personnel upon the Smelter Site.  Buyer shall pay for any additional expenses, e.g., towels, soap, uniforms, and office supplies required by Buyer or its personnel.  Buyer shall also be responsible for any improvements to the buildings on the Smelter Site subject to Section 4.6 above.

8.6     Equipment Lease.  Buyer shall lease from Seller the Equipment, except for such Equipment that the parties agree to scrap and sell.  As consideration for the lease of the Equipment, Buyer shall pay to Seller the sum of Five Hundred Dollars ($500.00) per month or part thereof. Upon payment in full of the Smelter Purchase Price and the NPR Purchase Price and the sale of all Slag and Scrubber Sludge and so long as Buyer is not in default under the terms hereof, Buyer may at Buyer's option, purchase the Equipment for a single payment of One Dollar ($1.00).

*Execution Copy*

# SECTION 9.
## REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Seller represents and warrants to Buyer as of the date of this Agreement and during the term hereof:

9.1 <u>Organization and Good Standing</u>. Seller is the debtor in a Chapter 7 bankruptcy proceeding filed in the United States Bankruptcy Court for the Southern District of Illinois, Case Number 01-34066.

9.2 <u>Power and Authorization</u>. This sale is made pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. 363. Upon receipt of the Court Approval, the Trustee will be authorized pursuant to Section 363 of the United States Bankruptcy Code to sell the Assets and sign all necessary documents on behalf of the Seller to accomplish said sale.

9.3 <u>Performance of Covenants</u>. Seller shall have performed or complied in all material respects with all of the agreements, covenants and conditions required by this Agreement to be performed or complied with by Seller.

9.4 <u>Approvals</u>. The Court Approval and approval of all applicable Regulatory Agencies necessary for the consummation of the transactions contemplated hereby shall have been obtained.

9.5 <u>Legal Matters</u>. The transfer shall not violate any order or decree of any court or governmental body of competent jurisdiction. No suit, action, proceeding or investigation, or legal or administrative proceeding shall have been brought or threatened by any person (other than the Buyer or an affiliate of Buyer) that questions the validity or legality of this Agreement or the transactions contemplated hereby.

# SECTION 10.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the date of this Agreement and during the terms hereof:

10.1 <u>Organization and Good Standing</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California, and has all necessary power and authority to carry on its business as presently conducted, to own and lease the assets which it owns and leases and to perform all its obligations under each agreement and instrument by which it is bound.

10.2 <u>Power and Authorization</u>. Buyer has full legal right, power and authority to enter into and perform its obligations under this Agreement and under any other agreements and documents required to be delivered by Buyer hereunder. The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents have been duly authorized by all necessary action. This Agreement has been duly and validly executed and delivered by Buyer and constitutes Buyer's

*Execution Copy*

legal, valid and binding obligation, enforceable against Buyer in accordance with the terms herein. When executed and delivered as contemplated herein, each of the Transaction Documents shall constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the terms therein.

10.3    <u>Performance of Covenants</u>.  Buyer shall have performed or complied in all material respects with all of the agreements, covenants and conditions required by this Agreement to be performed or complied with by Buyer.

10.4    <u>Approvals</u>. The Court Approval and approval of such other appropriate governmental agencies necessary for the consummation of the transactions contemplated hereby shall have been obtained.

10.5 <u>Legal Matters</u>.  The transfer shall not violate any order or decree of any court or governmental body of competent jurisdiction.  No suit, action, proceeding or investigation, or legal or administrative proceeding shall have been brought or threatened by any person (other than the Seller or an affiliate of Seller) that questions the validity or legality of this Agreement or the transactions contemplated hereby.

10.6. <u>Interim Order; Seal Order</u>.  Buyer has received, reviewed and agrees to be bound by the terms of the Interim Order and the Seal Order.

10.7. <u>Financial Information</u>.  The Financial Information provided by Buyer is true, complete and correct in all respects.

10.8. <u>AS IS, WHERE IS</u>.  BUYER ACKNOWLEDGES AND AGREES THAT THE ASSETS ARE BEING SOLD "<u>AS IS, WHERE IS</u>" AND "<u>WITH ALL FAULTS</u>", THAT SELLER HAS NOT MADE AND SHALL NOT BE DEEMED TO HAVE MADE ANY ORAL OR WRITTEN REPRESENTATION OR WARRANTY CONCERNING ANY MATTER RELATING TO THE ASSETS SOLD AND CONVEYED TO BUYER HEREUNDER.

## SECTION 11.
## TRANSFER DATE/CLOSING COSTS

11.1    <u>Time and Place of Transfer</u>.

(a)    Title to the Smelter Site will remain with Seller until the Smelter Transfer Date. Upon payment in full of the Smelter Purchase Price, Trustee shall execute a trustee's deed transferring title to the Smelter Site to Buyer, which deed shall be held in escrow by Trustee until the all the Scrubber Sludge and Slag (whether processed or unprocessed) has been sold.  Upon completion of the final sale of the Scrubber Sludge and Slag the trustee's deed shall be delivered to Buyer.

*Execution Copy*

(b)      Title to the NPR Property will remain with Seller until the NPR Transfer Date.  Upon payment in full of the NPR Purchase Price, Trustee shall execute and deliver to Buyer a trustee's deed transferring title to the NPR Property to Buyer.

11.2      Title/Real Estate Taxes.

(a)      Seller shall, within fifteen (15) days of Court Approval, furnish Buyer with a commitment for title insurance prepared by Chicago Title Insurance Company, showing fee simple, marketable title in the Smelter Site vested in Seller.  To the extent Buyer desires to obtain a title policy for the Smelter Site as of the Smelter Transfer Date, Buyer shall be responsible for all costs associated with said policy.  Seller and Buyer shall prorate real estate taxes on the Smelter Site as of the Smelter Transfer Date.

(b)      Seller shall, within fifteen (15) days of Court Approval, furnish Buyer with a commitment for title insurance prepared by Chicago Title Insurance Company, showing fee simple, marketable title in the NPR Property vested in Seller.  To the extent Buyer desires to obtain a title policy for the NPR Property as of the NPR Transfer Date, Buyer shall be responsible for all costs associated with said policy.  Seller and Buyer shall prorate real estate taxes on the NPR Property as of the NPR Transfer Date.

11.3      Expenses of Seller.  Seller shall pay the following expenses related to the transfer of the Smelter Site and the NPR Property:

(a)      The cost of the title commitment provided by Seller to Buyer with respect to the Smelter Site and the NPR Property; and

(b)      All other expenses incurred by Seller in the course of performing its obligations under Section 11.

11.4      Expenses of Buyer.  Buyer shall pay the following expenses related to the transfer of the Smelter Site and the NPR Property:

(a)      All real estate transfer fees and transfer taxes;

(b)      The fees for filing and recording the deeds;

(c)      The costs of any title policy or lenders policy ordered by or on behalf of Buyer with respect to the Smelter Site and the NPR Property; and

(d)      All other expenses incurred by Buyer in the course of performing its obligations under Section 11.

*Execution Copy*

# SECTION 12.
# TERMINATION AND ABANDONMENT

12.1    <u>Termination</u>. This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time as follows:

(a)    by the Bankruptcy Court or such court having jurisdiction over the Seller's bankruptcy estate;

(b)    by the Seller due to Buyer's failure to satisfy the provisions of 2.1(b);

(c)    by mutual consent of the parties hereto;

(d)    by Seller, if (i) any representation or warranty of Buyer made in or pursuant to this Agreement is untrue or incorrect in any respect, (ii) Buyer breaches the covenants or other terms of this Agreement or (iii) Buyer fails to pay the Smelter Purchase Price in full by the fifth anniversary of the Court Approval or the NPR Purchase Price by the sixth anniversary of the Court Approval.

12.2    <u>Procedure for Termination</u>. A party terminating this Agreement pursuant to Section 12.1 shall give written notice thereof to the other party hereto, and the Deposit shall be applied as provided in Section 12.3, whereupon this Agreement shall terminate and the transactions contemplated hereby shall be abandoned without further action by any party.

12.3    <u>Application of Deposit, Smelter Purchase Price and NPR Purchase Price</u>.

(a)    Seller shall return the Deposit to Buyer if this Agreement is terminated prior to Court Approval by mutual consent of Buyer and Seller or if the Bankruptcy Court does not approve the Agreement. Notwithstanding the foregoing, in the event the Bankruptcy Court does not approve the Agreement as a result of any action or omission by Buyer, then the Deposit shall be retained by the Seller.

(b)    Seller shall retain the Deposit in all other cases where this Agreement is terminated under Section 12.1.

(c)    In the event that this Agreement is terminated after Court Approval but prior to the Smelter Transfer Date or the NPR Transfer Date, any and all portions of the Smelter Purchase Price and the NPR Purchase Price paid by Buyer or deemed to have been paid by Buyer shall be retained by Seller.

12.4    <u>Processing Facility</u>. At any time the Agreement is terminated, the Processing Facility and any other improvements on the Smelter Site or NPR Property shall be the sole property of Seller; provided, however, the extent Buyer desires to purchase the Processing Facility, Buyer may elect to do so. The purchase price of the Processing Facility shall be one-half of the construction costs of the Processing Facility treated as Operating Expenses hereunder.

*Execution Copy*

    12.5   <u>Limitation on Termination.</u>  In the event the Buyer fails to close in violation of this Agreement, the Buyer shall be liable to the Seller for any and all damages, expenses and losses sustained by the Seller as a direct or indirect consequence of the Buyer's breach.  Notwithstanding anything contrary in this Agreement, in the event the Seller is unable, for any reason, to consummate the sale to the Buyer or to execute and deliver any and all closing documents, the Seller's sole liability to the Buyer shall be limited to the return of the Buyer's Deposit.

## SECTION 13.
## MISCELLANEOUS

    13.1   <u>Acknowledgment.</u>  The parties acknowledge that this sale is undertaken pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. 363.

    13.2   <u>Survival of Representations and Warranties.</u>  The representations and warranties made by the parties in this Agreement and in the certificates, documents and schedules delivered pursuant hereto shall survive the consummation of the transactions herein contemplated for a period of two (2) years following the latter of the Smelter Transfer Date and the NPR Transfer Date.

    13.3   <u>Costs and Expenses.</u>  Except as otherwise expressly provided herein, each party shall bear its own expenses in connection herewith, including without limitation, any and all legal and accounting fees, transfer, sales, use, documentary and similar taxes, and recording and filing fees, incurred in connection with the transactions contemplated herein.

    13.4   <u>Public Announcements.</u>  Neither Seller nor Buyer shall make any public announcement or disclosure relating to the transactions contemplated herein without the prior agreement of each other party hereto, provided that each party shall use best efforts to consult with the other in advance of any disclosure required by law, but the agreement of the other parties hereto shall not be required.

    13.5   <u>Notices.</u>  All notices or other communications permitted or required under this Agreement shall be in writing and shall be sufficiently given if and when hand delivered to the persons set forth below or if sent by documented overnight delivery service or registered or certified mail, postage prepaid, return receipt requested, or by facsimile receipt acknowledged, addressed as set forth below or to such other person or persons and/or at such other address or addresses as shall be furnished in writing by any party hereto to the others.  Any such notice or communication shall be deemed to have been given as of the date received, in the case of personal delivery, or on the date shown on the receipt or confirmation therefor in all other cases.

<u>To Buyer:</u>

Industrial Asset Disposition, LLC
c/o Gabriel G. Green
Reeder Lu Green, LLP
2121 Avenue of the Stars, Suite 950
Los Angeles, CA 90067

*Execution Copy*

With a copy to:

Gabriel G. Green
Reeder Lu Green, LLP
2121 Avenue of the Stars, Suite 950
Los Angeles, CA 90067

To Seller:

The Bankruptcy Estate of Chemetco, Inc.
c/o Laura K. Grandy, Trustee
3574 Chemetco Lane
Hartford, Illinois 62048

With a copy to:

Laura Grandy
Mathis, Marifian, Richter & Grandy, Ltd.
23 Public Square
Suite 300
Belleville, IL 62220

13.6    Assignment and Benefit.

(a)    Neither Seller nor Buyer shall assign this Agreement or any rights hereunder, or delegate any obligations hereunder, without prior written consent of the other party. Subject to the foregoing, this Agreement and the rights and obligations set forth herein shall inure to the benefit of, and be binding upon, the parties hereto, and each of their respective permitted successors, heirs and assigns.

(b)    This Agreement shall not be construed as giving any person, other than the parties hereto and their permitted successors, heirs and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions herein contained, this Agreement and all provisions and conditions hereof being intended to be, and being, for the sole and exclusive benefit of such parties, and permitted successors, heirs and assigns and for the benefit of no other person or entity.

13.7    Bankruptcy Court.  All disputes arising out of or relating to this Agreement or any related documents which cannot be settled by the parties shall promptly be submitted to and determined by the Bankruptcy Court having jurisdiction over this transaction.

13.8    Amendment, Modification and Waiver.  The parties may amend or modify this Agreement in any respect with approval of the Bankruptcy Court.  Any such amendment, modification, extension or waiver shall be in writing.  The waiver by a party of any breach of any

*Execution Copy*

provision of this Agreement shall not constitute or operate as a waiver of any other breach of such provision or of any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.

13.9    Governing Law. This Agreement is made pursuant to, and shall be construed and enforced in accordance with, the laws of the State of Illinois (and United States federal law, to the extent applicable), irrespective of the principal place of business, residence or domicile of the parties hereto, and without giving effect to otherwise applicable principles of conflicts of law.

13.10    Section Headings and Defined Terms. The section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement. The terms defined herein and in any agreement executed in connection herewith include the plural as well as the singular and the singular as well as the plural, and the use of masculine pronouns shall include the feminine and neuter. Except as otherwise indicated, all agreements defined herein refer to the same as from time to time amended or supplemented or the terms thereof waived or modified in accordance herewith and therewith.

13.11    Severability. The invalidity or unenforceability of any particular provision, or part of any provision, of this Agreement shall not affect the other provisions or parts hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions or parts were omitted.

13.12    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original; and any person may become a party hereto by executing a counterpart hereof, but all of such counterparts together shall be deemed to be one and the same instrument.

13.13    Entire Agreement. This Agreement, and the agreements, exhibits, schedules and certificates referred to herein or delivered pursuant hereto, constitute the entire agreement between the parties hereto with respect to the purchase and sale of the Assets and supersede all prior agreements and understandings. The submission of a draft of this Agreement or portions or summaries thereof does not constitute an offer to purchase or sell the Assets, it being understood and agreed that neither Buyer nor Seller shall be legally obligated with respect to such a purchase or sale or to any other terms or conditions set forth in such draft or portion or summary unless and until this Agreement has been duly executed and delivered by all parties.

13.14    Trustee. It is hereby acknowledged and agreed that any provision herein applicable to the Trustee shall apply to the Trustee, not individually but solely in her representative capacity as Trustee of the Bankruptcy Estate of Chemetco, Inc.

13.15    Interpretation. This Agreement shall be construed as jointly drafted by the parties and according to their fair intent of the language as a whole and not for or against any one party.

*[signature page to follow]*

*Execution Copy*

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement, under seal, all as of the date first above written.

*SELLER:*

**CHEMETCO, INC.**

By: _____

Laura K. Grandy, Trustee of the Bankruptcy Estate, Case No. 01-34066, duly authorized

*BUYER:*

**INDUSTRIAL ASSET DISPOSITION, LLC**

By: _____

Name: Elliott G. Stegin
Its: Managing Member

*Execution Copy*

Schedule 1.1
Legal Description

<u>Smelter Site</u>: Title commitment to govern.

<u>NPR Property</u>: Title commitment to govern.

*Execution Copy*

Schedule 1.2
Excluded Assets

i.  all Scrubber Sludge and Slag located on the Smelter Site, consisting of approximately thirty thousand (30,000) to fifty thousand (50,000) tons of Scrubber Sludge and approximately nine hundred thousand (900,000) tons of Slag, various and sundry feed stocks, "in-process" materials (i.e. materials contained within or around the existing processing equipment) and sediments and dusts associated with environmental clean-ups; and

ii.  Cupro, pot slag and furnace dust; and

iii.  The Furnaces to be sold to a third party by separate contract ("Furnace Purchaser"); provided, however; in the event the Furnace Purchaser fails to purchase the Furnaces, Buyer is hereby granted an option to purchase the Furnaces from Seller upon at least the same terms as Furnace Purchaser; and

iv.  Books and records (and filing cabinets containing same) of Seller located throughout the site and computer systems, including the Wang computer system and AS computer system, and office equipment related to said records.

Schedule 8.6
Leased Equipment

See attached.

Schedule 8.6

| Building | Sq. Ft. | Original Built | Original Cost | Equipment in Building |
|---|---|---|---|---|
| **Main Office Building** | 9,600 sq. ft | 1970<br>Addition 1975<br>Addition 1986 | $276,934.00<br>$133,560.00<br>$113,869.00 | Office furniture<br>consisting of<br>desks, file cabinets,<br>conference tables, chairs,<br>credenza, computers,<br>refrigerators<br>shelf units<br>3 - locker rooms w/lockers |
| | | Total original cost $524,363.00 | | security cameras & alarm system<br><br>telephone system<br>(for offices and thru out plant) |
| **Plant Office Building** | 4,600 sq. ft. | 1987 | $328,568.00 | Office furniture<br>consisting of desks,<br>file cabinets, conference tables,<br>chairs, copier, fax machine<br>printers, computers, safe,<br>engineer tables, blue print<br>files<br>refrigerator |
| **Truck Scale** | | Last repaired 2007 | $5,000.00 | |
| **Scale Office** | 195 sq. ft | | $3,500.00 | |
| **Receiving Building<br>& Lab** | 5,400 sq. ft | 1974<br>Morgan building | $276,044.00<br>$1,800.00 | spectrometer |
| **Mobile Shop Building** | 4,400 sq. ft | 1995 | $102,000.00 | Equipment consisting of<br><br>Air compressor<br>Lubrication system<br>Shelving<br>Tool Crib<br>Diesel fuel tanks<br>gas tank<br>used oil tank<br>portable diesel fuel tank<br>welders |

Schedule 8.6

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | pressure washer |
|  |  |  |  | gas heaters |
|  |  |  |  | cutting torch |
|  |  |  |  | cutting torch and cart |
|  |  |  |  | portable scale |
| **Storeroom Building** | 5,000 sq. ft | 1973 | $112,000.00 | Shelving & subflooring |
| **Brick Shop Building** | 3,600 sq. ft | 1995 | $164,593.00 | Alarm system |
| **Maintenance/Zinc Buildin** | 59,000 sq. ft | 1972 | $2,000,000.00 | Equipment consisting of |
|  |  |  |  | 2 zinc presses |
|  |  |  |  | 2 supersac loaders |
|  |  |  |  | 1-10 ton Crane Mfg. S/N 623 |
|  |  |  |  | 1-10 ton Crane Mfg. S/N 624 |
|  |  |  |  | 60 gallon air compressor |
| **Mobile Equipment** |  |  |  | 863 bobcat |
|  |  |  |  | Hyundai 290 Excavator |
|  |  |  |  | Cat 966F Wheel loader |
|  |  |  |  | Hyster 50 forklift |
|  |  |  |  | Clark forklift |
|  |  |  |  | Tennant sweeper |
| **Shower trailer w/lockers** |  |  |  |  |
| **Norweco septic system** |  |  |  | 2 sytems |
| **Yard Scale** |  |  |  |  |

*Execution Copy*

# EXHIBIT A
## DEFINITIONS

As used in the Asset Purchase and Processing Agreement the following terms shall have the following meanings unless the context otherwise requires:

Agreement" shall have the meaning ascribed to such term in the Background paragraphs.

"Assets" shall have the meaning ascribed to such term in Section 1.1(b).

"Bankruptcy Court" shall have the meaning ascribed to such term in the Background paragraphs.

"Buyer Representative" shall have the meaning ascribed to such term in Section 6.2(f).

"Buyer" shall have the meaning ascribed to such term in the Background paragraphs.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Court Approval" shall have the meaning ascribed to such term in Section 8.1.

"Deposit" shall have the meaning ascribed to such term in Section 2.1(a).

"Equipment" shall mean that certain machinery and equipment owned by Seller, physically located on the Smelter Site, and described on Schedule 8.6.

"Escrowed Funds" shall have the meaning ascribed to such term in Section 5.2.

"Excluded Assets" shall mean all other assets of Seller not otherwise identified herein as an Asset, including, specifically, but without limitation, those assets on Schedule 1.2.

"Financial Information" shall have the meaning ascribed to such term in Section 2.1(b).

"Furnace Purchaser" shall have the meaning ascribed to such term in Schedule 1.2.

"Furnaces" shall mean three (3) Metallo-70 ton gas top blown rotary converters (TBRC's), including the tilt gear boxes, the support rings, the connection rings, the Rothe Erde bearings, the tilt bearings, the Rollstar tilt gear boxes, the pedestals, and the Montan oil feed associated with each TBRC, an additional spare part connection ring and any scrap steel cut therefrom.

"GAAP" shall mean Generally Accepted Accounting Principles.

"Insurance Requirements" shall mean the provisions of any insurance policy covering or applicable to the Assets, including the Smelter Site and the NPR Property, and the Processing Facility, or any part thereof, and all requirements of the issuer of any such policy.

"Interim Order" shall mean that certain order entered into between the Trustee, the Illinois Environmental Protection Agency, the State of Illinois, the United States Environmental Protection Agency and the United States of America in the Federal District Court of Southern Illinois, Case Nos. 00-670-DRH and 00-677-DRH (consolidated) CJRA Track C on September 16, 2008, a copy of which is attached hereto as Exhibit B.

"Legal Requirements" shall mean (i) the provisions of this Asset Purchase and Processing Agreement and all other agreements entered into by Buyer with respect to the Assets and (ii) any law, statute, code, act, zoning requirement, ordinance, order, rule, regulation or other requirement of any governmental authority having jurisdiction, which now or at any time may be applicable to the Assets, including the Smelter Site and the NPR Property.

"NPR Property" shall have the meaning ascribed to such term in Section 1.1(a)(iii).

"NPR Purchase Price" shall have the meaning ascribed to such term in Section 2.2(c).

"NPR Transfer Date" shall mean the date upon which title to the NPR Property shall pass from Seller to Buyer, which date shall be the date the NPR Purchase Price has been paid in full.

"Operating Expenses" shall mean operating expenses incurred by Seller and Buyer from and after Court Approval that are directly related to (i) demolition, removal and sale of Scrap Assets; (ii) the operation and maintenance of the Processing Facility; (iii) the processing of the Scrubber Sludge and Slag, including, but not limited to loading, hauling, conveying, crushing, screening, grinding, physical separation, chemical separation, solid-liquid separation, power, consumables (reagents), drying and packaging and all other expenses, including waste disposal costs, as determined under GAAP; (iv) Smelter Site costs, including without limitation, real estate taxes, insurance coverage, maintenance and upkeep; (v) personnel and administration costs, including trustee's fees and any applicable tax excluding income tax; (vi) the marketing and selling of the Recovered Materials, including, but not limited to shipping, insurance, and all other selling expenses as determined under GAAP; (vii) environmental compliance costs; (viii) health and safety costs; and (ix) mutually agreed upon charges by the parties from time to time.  The capital costs associated with the locating, construction and installation of the Processing Facility shall be considered an Operating Expense, but shall be amortized and reimbursed by the Seller to the Buyer from the Processing Revenue over a reasonable period of time agreed to by Buyer and Seller.

"Processing Facility" shall have the meaning ascribed to such term in Section 4.2.

"Processing Revenue" shall be the gross revenue from the sale of the Scrubber Sludge, Recovered Materials (hereinafter defined) and Slag (to the extent such Slag has not been processed) net of the Operating Expenses.

"Recovered Materials" shall have the meaning ascribed to such term in Section 4.2.

"Regulatory Agency" or "Regulatory Agencies" shall mean any one or all applicable governmental agencies, including without limitation the United States Environmental Protection Agency, the Illinois Environmental Protection Agency and the Occupational Safety and Health Administration.

"Scrap Assets" shall have the meaning ascribed to such term in Section 1.1(a)(i).

"Scrap Purchase Price" shall have the meaning ascribed to such term in Section 2.2(a).

"Scrap Revenue" shall be the gross revenue from the sale of the Scrap Assets net of the Operating Expenses.

"Scrubber Sludge" shall mean, in general, material recovered from the dust collection system operated in conjunction with the Seller's former copper processing plant.

"Seal Order" shall mean that certain Seal Order pursuant to Section 34 of the Illinois Environmental Protection Act filed with the Court on December 8, 2001, a copy of which is attached hereto as part of the Interim Order (Exhibit B).

"Seller" shall have the meaning ascribed to such term in the Background paragraphs.

"Slag" shall mean, in general, material recovered from the copper processing plant as a liquid, transported outside the processing buildings and placed in appropriate stockpiles where it has cooled, by air or water, and solidified.

"Smelter Purchase Price" shall have the meaning ascribed to such term in the Background Paragraph 2.2(b).

"Smelter Site" shall have the meaning ascribed to such term in Section 1.1(a)(ii).

"Smelter Transfer Date" shall mean the date upon which title to the Smelter Site shall pass from Seller to Buyer, which date shall be the later of (i) the date the Smelter Purchase Price has been paid in full and (ii) the date that all the Scrubber Sludge and Slag (whether processed or unprocessed) has been sold.

"Trustee" shall have the meaning ascribed to such term in the Background paragraphs.

"Work Plans" shall have the meaning ascribed to such term in Section 5.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:                       )                  In Proceedings Under
                                    )                  Chapter 7

CHEMETCO, INC.,            )
                                      )                  BK 01-34066

           DEBTOR.            )

ORDER APPROVING AND CLARIFYING THE
ASSET PURCHASE AND PROCESSING AGREEMENT

       This matter having come before the Court pursuant to a Motion to Approve Asset Purchase and Processing Agreement ("Motion") between Debtor and Industrial Asset Disposition, LLC ("Buyer") dated July 29, 2009 ("Purchase Agreement") and the Illinois Environmental Protection Agency and Commerce Bank having requested clarification thereto, the Court finds as follows:

       1.        On July 29, 2009, the Trustee entered into the Purchase Agreement with Buyer to sell to Buyer certain real property owned by Debtor and defined in the Motion as the Smelter Site, the real property adjacent to the Smelter Site lying, the New Poag Road Property, and certain other assets defined as Scrap Assets, subject to this Court's approval of the Purchase Agreement ("Court Approval"). The Purchase Agreement further grants Buyer the exclusive right to process and/or sell the Scrubber Sludge and Slag pursuant to the terms of the Purchase Agreement.

       2.        Since the filing of the bankruptcy, the Trustee has met with numerous groups to arrive at the best solution to reclaim the metals from the slag and scrubber sludge located at Chemetco. Until now, none of those groups has been willing to invest the funds necessary to develop the technology needed to arrive at a solution that will result in substantially cleaning the site while realizing some monetary value from the metals. The Trustee believes the Purchase Agreement will provide a solution to reclaiming the metals from the recyclable metal bearing materials, the proceeds of which will contribute to the elimination of several environmental problems on this site, thereby reducing threats to the public health, welfare and the environment.

1

APP.0001

Case 3:09-cv-00679-NJR-DGW   Document 198-2   Filed 07/18/13   Page 28 of 73   Page ID #980
Case 3:09-cv-00086-DRH-DGW   Document 31-1   Filed 07/14/13   Page 2 of 4   Page ID #982

Case 01-34066-kjm    Doc 1157    Filed 09/21/09    Page 2 of 4

3.      The Illinois Environmental Protection Agency has requested clarification of certain terms in the Purchase Agreement, which the Trustee and the Illinois Environmental Protection Agency have agreed can be clarified as follows:

a.      The clause "remediation issues" contained in Section 5.2 of the Purchase Agreement refers to those matters requiring corrective action or response or remedial activities as a result of occurrences of non-compliance with Work Plans or ARARs during the performance of processing or other activities authorized by the Purchase Agreement, such as spills of materials.  It was not the intent of the Buyer or the Trustee to include in this definition any environmental remediation issues previously existing on the real property caused by or amplified by a prior owner or occupier of the real property.

b.      The purpose of the Escrowed Funds is to secure performance of the Buyer in any remediation required as a result of occurrence during the performance of the Purchase Agreement. The Buyer's performance will be further secured by performance bonds as may be necessary initially until such time as the Escrowed Funds are sufficient to provide adequate financial assurance to the Illinois Environmental Protection Agency.  The Buyer has also agreed to purchase an environmental insurance policy in the amount of $10,000,000.00.

c.      The clause "all appropriate no further remediation letters" was not a specific reference to a "No Further Remediation Letter" pursuant to Section 58.10 of the Environmental Protection Act but rather a generic reference to any appropriate closure or termination letter issued by an agency with jurisdiction over the remediation in question. The Escrowed Funds will remain in escrow until all appropriate closure or termination letters have been issued by the appropriate agency, be it the Illinois Environmental Agency or the U. S. Environmental Protection Agency.

2

d.      Notwithstanding the foregoing, the Buyer and the Trustee have agreed to amend the Purchase Agreement to provide that any Escrowed Funds (as defined in the Purchase Agreement) remaining after the termination of the Agreement for whatever reason and after those funds have been used to remediate any new environmental non-compliance conditions caused by the Buyer or Trustee subsequent to this Order, shall be used to remediate any environmental problem or condition existing on the site prior to the filing of this bankruptcy proceeding.

e.      As used in the Purchase Agreement, EPA shall mean either the Illinois Environmental Protection Agency or the U. S. Environmental Protection Agency or both as appropriate.

f.      The Illinois Environmental Protection Agency seeks clarification as to what is done with the Operating Expenses (as defined in the Purchase Agreement). The Operating Expenses are paid by the Trustee to the appropriate creditor to whom the Operating Expenses are due. The Operating Expenses reduce the gross revenue collected by the Trustee to arrive at the Processing Revenue which is then distributed to the appropriate parties pursuant to the terms of the Purchase Agreement.

g.      With respect to the remaining requests for clarification raised by the Illinois Environmental Protection Agency, it is the intent of the Seller and is provided in the Purchase Agreement that no action to be taken by the Buyer in the Purchase Agreement may be taken until this Court approves the Purchase Agreement and until all applicable Regulatory Agencies, including the Illinois Environmental Agency and the U. S. Environmental Agency, have approved the actions to be taken, whether such approval shall take the form of Work Plans, Consent Decrees or such other documents as may be required by the applicable Regulatory Agency.

4.      For purposes of clarifying the position of Commerce Bank ("Bank"), it is acknowledged by the Trustee and the Bank that the Bank has a secured claim of $5,000,000.00

3

APP.0003

which shall be paid according to the formula provided in the Purchase Agreement, as well as from such other assets of the Debtor that are excluded from the sale contemplated under the Purchase Agreement upon which the Bank has a valid lien, and the balance of the Bank's claim shall be treated as a general unsecured claim.

IT IS THEREFORE ORDERED that the Asset Purchase and Processing Agreement between Chemetco and Industrial Asset Disposition, LLC, dated July 29, 2009, as clarified by this Order, is hereby approved.  The Motion is hereby granted.

Counsel for the moving party shall serve a copy of this Order by mail to all interested parties who were not served electronically.

ENTERED: September 21, 2009

/s/ Kenneth J. Meyers
UNITED STATES BANKRUPTCY JUDGE-2

Approved as to form and content:

/s/ Laura K. Grandy
Laura K. Grandy, Trustee

/s/ Daniel C. Nester
Daniel C. Nester, Attorney for Commerce Bank

/s/ Elliott G. Stegin
Elliott G. Stegin
Industrial Asset Disposition, LLC

/s/ James L. Morgan
James L. Morgan, for Lisa Madigan Attorney
General for State of Illinois

/s/ Greg Sukys
U.S. Department of Justice
U.S. Environmental Protection Agency

4

APP.0004

Case 3:09-cv-00670-NJR-DGW   Document 198-2   Filed 07/18/13   Page 31 of 73   Page ID
Case 3:11-cv-00886-DRH   Document 31-1   Filed 10/17/11   Page 5 of 41   Page ID #983
#983

Case 01-34066-kjm    Doc 1157-1    Filed 09/21/09    Page 1 of 1

# Notice Recipients

| District/Off: 0754-3 | User: tf | Date Created: 9/21/2009 |
|---|---|---|
| Case: 01-34066 | Form ID: pdf900 | Total: 8 |

**Recipients of Notice of Electronic Filing:**

| tr | Laura K Grandy | LGrandy@mmrg.com |
|---|---|---|
| intp | United States Trustee | USTPRegion10.es.ecf@usdoj.gov |
| ust | United States Trustee | USTPRegion10.es.ecf@usdoj.gov |
| aty | Mathis Marifian Richter &Grandy Ltd | Lgrandy@mmrg.com |
| aty | Laura K Grandy | LGrandy@mmrg.com |

TOTAL: 5

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| cr | United States Environmental Protection Agency | 9 Executive Dr | Fairview Heights, IL 62208 |
|---|---|---|---|
| 1242314 | Illinois Environmental Protection Agency | 1021 North Grand Avenue East | P.O. Box 19276 | Springfield, Illinois 62794-9276 |
| 1221202 | Industrial Process Equipment Group | 2800 Locust St | St Louis MO 63103 |

TOTAL: 3

APP.0005

Case 3:00-cv-00670-NJR-DGW   Document 198-2   Filed 07/18/13   Page 32 of 73   PageID
Case 3:11-cv-00036-DRH   Document 31-1   Filed 10/17/11   Page 6 of 42   Page ID #86
#984

Case 01-34066-kjm    Doc 1157-1    Filed 09/21/09    Page 1 of 1

## Notice Recipients

District/Off: 0754−3                     User: tf                          Date Created: 9/21/2009
Case: 01−34066                          Form ID: pdf900                    Total: 8

**Recipients of Notice of Electronic Filing:**
tr          Laura K Grandy              LGrandy@mmrg.com
intp        United States Trustee       USTPRegion10.es.ecf@usdoj.gov
ust         United States Trustee       USTPRegion10.es.ecf@usdoj.gov
aty         Mathis Marifian Richter &Grandy Ltd          Lgrandy@mmrg.com
aty         Laura K Grandy              LGrandy@mmrg.com

                                                                            TOTAL: 5

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
cr          United States Environmental Protection Agency        9 Executive Dr        Fairview Heights, IL 62208
1242314     Illinois Environmental Protection Agency      1021 North Grand Avenue East       P.O. Box
            19276       Springfield, Illinois 62794−9276
1221202     Industrial Process Equipment Group       2800 Locust St        St Louis MO 63103

                                                                            TOTAL: 3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | IN PROCEEDINGS UNDER |
| | ) | CHAPTER 7 |
| CHEMETCO, INC., | ) | |
| | ) | BK 01-34066 |
| Debtor(s). | ) | |
| | ) | |

<u>**MOTION TO CLARIFY THE ASSET PURCHASE AND PROCESSING AGREEMENT**</u>

COMES NOW Laura K. Grandy, the Trustee in the above-referenced bankruptcy proceeding, and for her Motion to Clarify the Asset Purchase and Processing Agreement states as follows:

1.      On July 29, 2009, the Trustee entered into the Asset Purchase and Processing Agreement ("Purchase Agreement") with Industrial Asset Disposition, LLC ("IAD") to sell certain real property owned by the Debtor and defined in the Purchase Agreement as the Smelter Site and the NPR Property, and certain other assets defined as Scrap Assets, subject to this Court's approval of the Purchase Agreement (the "Court Approval"). The Purchase Agreement further grants IAD the exclusive right to process and/or sell the Scrubber Sludge and Slag pursuant to the terms of the Purchase Agreement. Defined terms used herein and not otherwise defined shall have the meaning given to such terms in the Purchase Agreement.

2.      The Purchase Agreement assumes that the Trustee would consult regularly with IAD on many aspects related to the processing and/or sale of the Scrubber Sludge and Slag. The Purchasing Agreement provides for the distribution of the Processing Revenue according to a certain formula. The Processing Revenue was defined as the gross revenues from the sale of the Scrubber Sludge, Recovered Materials and Slag, net of the Operating Expenses. The Operating Expenses included all costs of operation as well as the costs associated with the location, construction and installation of the Processing Facility. While IAD is obligated to fund the Processing Facility, IAD is at all times entitled to recover the costs associated with the location, construction and installation of the Processing Facility.

3.      The Trustee and IAD reviewed and investigated numerous processes to recover the copper, zinc, lead, tin, nickel and other materials and valuable metals from the Slag, Scrubber Sludge and other by-products from the copper smelter process (referred to in the Purchase Agreement as "Recovered Materials"). Ultimately, it was decided that the process developed by the employees of Paradigm Minerals and Environmental Services, LLC ("Paradigm") would result in significantly all of the Slag and Scrubber Sludge and other by-products being processed, thereby leaving significantly smaller amounts of waste to be disposed of from the Smelter Site. This

APP.0007

combination, the Trustee believes, will result in the highest and best distribution to the creditors of this case. Paradigm has agreed to charge the bankruptcy estate a flat fee of 30% of the gross revenue from the sale of Recovered Materials (ie revenue before Operating Expenses) pursuant to a Processing Agreement to be entered into between Paradigm and/or its affiliate and the Trustee (the "Processing Agreement"). In exchange for said payment, Paradigm will absorb all capital costs associated with the location, construction and installation of the Processing Facility as well as all operating expenses associated with the Processing Facility (except for personnel and administrative costs, specifically related to the bankruptcy estate including Trustee fees and applicable taxes). Elliott Stegin is the majority owner of Paradigm. Elliott Stegin is also the majority owner of IAD. The purpose of this Motion is to clarify the allocation of expenses and payment of same related to the Processing Facility. Therefore, for purposes of the Purchase Agreement, the definition of Operating Expenses shall include the foregoing payments to Paradigm. The purpose of this motion is also to authorize the Trustee to enter into the Processing Agreement with Paradigm and/or its affiliates on such terms as the Trustee deems appropriate.

4.    The Purchase Agreement also sets forth numerous instances in which the Trustee and IAD would discuss issues and make decisions related to the Processing Facility. It was and remains the intention of the parties that the Trustee would have authority to make said decisions without coming back to the Court to approve each decision related to the operations of the Processing Facility. The purpose of this Motion also is to clarify that the Trustee has the authority to make said decisions so as to allow the process to operate smoothly and efficiently. In order for this process to succeed, the liquidation of the assets through the Processing Facility needs to proceed in a responsive, business-like atmosphere. It will be impossible to come back and ask the Court to approve each decision necessary to maintain the day-to-day operations of the bankruptcy estate under the Purchase Agreement and Processing Agreement.

WHEREFORE, the Trustee prays that this Court approve the clarification set forth above, to establish and allow the Trustee to pay the processing fee of 30% of the gross revenue from the sale of Recovered Materials to Paradigm or its affiliate pursuant to the Processing Agreement entered into between Paradigm and/or its affiliates and the Trustee on such terms as the Trustee deems appropriate, and to make all decisions necessary to facilitate the operations of the Processing Facility as they relate to the Purchase Agreement and the Processing Agreement.

Dated this 9th day of March, 2010.

/s/ Laura K. Grandy, Trustee

Mathis, Marifian, Richter & Grandy, Ltd.
23 Public Square, Ste. 300

Page **2** of **3**

APP.0008

Case 3:09-cv-00670-NJR-DGW Document 198-2 Filed 07/18/13 Page 35 of 73 Page ID
Case 3:11-cv-00836-DRH Document 31 198-2 Filed 07/18/13 Page 3 of 45 Page ID
#987

Belleville, IL  62232
(618) 234-9800
(618) 234-9786

### CERTIFICATE OF SERVICE

    I, LAURA K. GRANDY, hereby certify that on this 9th day of March, 2010, I forwarded a copy of the foregoing instrument by U.S. Mail or electronic Mail to Tim Ruppel, Assistant U.S. Trustee, Becker Building, Room 1100, 401 Main Street, Peoria, IL 61602; all parties requesting notification via ECF; and to all creditors set forth on the matrix.

                                      _/s/ Laura K. Grandy_____

APP.0009

Case 01-34066-kjm    Doc 1528    Filed 05/04/10    Page 1 of 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | IN PROCEEDINGS UNDER |
| | ) | CHAPTER 7 |
| CHEMETCO, INC., | ) | |
| | ) | BK 01-34066 |
| Debtor(s). | ) | |

<u>ORDER</u>

This matter having come before the Court pursuant to a Motion to Clarify the Asset Purchase and Processing Agreement and the Court having reviewed said Motion and being fully advised of the premises;

IT IS ORDERED that the Motion is hereby GRANTED.

Counsel for the moving party shall serve a copy of this Order by mail to all interested parties who were not served electronically.

ENTERED: May 4, 2010

/s/ Gerald Fines
_____
UNITED STATES BANKRUPTCY JUDGE

APP.0010

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re: | ) IN CHAPTER 7 PROCEEDINGS |
| | ) |
| CHEMETCO, INC. | ) BK 01-34066 |
| | ) |
| Debtor. | ) |

### MOTION TO PAY SECURED CREDITOR AND ALLOCATE FUNDS

Comes now Donald M. Samson, trustee, and files this motion to pay secured creditor and allocate funds and in support thereof shows as follows:

1. On December 1, 2010, Donald M. Samson, trustee, filed a notice of trustee's intent to sell approximately 4,000 metric tons of scrubber sludge and 3,500 metric tons of mixed fines free and clear of liens. No objections were filed within the notice period thereby authorizing the trustee to sell said materials within the parameters set forth in the notice.

2. Pursuant to said notice the trustee has entered into an agreement with H & H Metals to sell approximately 3,500 metric tons of mixed fines. The estate and H & H Metals are in the process of arranging shipping and loading of the materials.

3. The trustee is negotiating with several metal purchasers for the sale of the approximately 4,000 metric tons of scrubber sludge and anticipates entering into a sales agreement shortly.

4. On April 15, 2011, Donald M. Samson, trustee, filed a notice of trustee's intent to sell approximately 120 tons of furnace cleanup. No objections were filed within the notice period, thereby authorizing the trustee to sell said materials within the parameters set forth in the notice.

5. The trustee has entered into an agreement with Aurubis A.G. to sell said furnace cleanup within the parameters set forth in the notice and said materials have been shipped to Aurubis A.G..

6. Laura K. Grandy, the prior trustee, entered into an asset purchase and processing agreement with Industrial Asset Disposition, LLC (IAD), dated July 29, 2009, as amended by the order approving and clarifying the asset purchase and processing agreement entered by the U.S. Bankruptcy Court on May 4, 2010.

7. The asset purchase and processing agreement as amended sets forth a formula for allocation and distribution of the proceeds of the sale of materials sold pursuant to the agreement.

8. The anticipated revenues from the sales of the mixed fines, scrubber sludge and furnace cleanup is estimated at approximately $3.5 million. The exact revenues will depend on the measured amounts sold and final assays to determine the percentage of copper and tin in the materials.

9. The formula provides for payment of expenses from the sale proceeds to arrive at the processing revenue:

   a)   Operating expenses to buyer - 30%

   b)   Estate's unreimbursed operating expenses and trustee fees including reserve for future expenses to insure funds for on-going operating expenses.

APP.0011

10.  The resulting processing revenue is then allocated as follows:

      a)        Escrow for future environmental clean up – 5%

      b)        Payment to buyer - 25%

      c)        Payment to estate to be applied to the purchase price – 35%

      d)        Payment to Commerce Bank secured claim – 35%

11.  Pursuant to the formula set forth in the agreement based on the estimated revenues the proceeds are to be distributed as follows:

| | |
|---|---|
| Gross revenue – from sale of scrubber sludge, mixed fines and furnace clean up | $3,500,000.00 |
| Buyer fixed fee for operating expenses 30% - per Motion to Clarify Asset Purchase and Processing Agreement | 1,050,000.00[1] |
| Seller operating expenses – as defined on page 23 of the Asset Purchase and Processing Agreement[2] | 785,217.90[3] |
| Seller reserve for operating expenses – reserved pursuant to Section 6.1(f)[4] of the asset Purchase and Processing Agreement | .00 |
| Processing revenue – gross revenue less operating expenses | 1,664,782.10 |

Allocation of Processing Revenue Pursuant to Sect. 4.4(a) of Asset Purchase and Processing Agreement

| | |
|---|---|
| Escrow funds – 5% | $83,329.10 |
| Buyer – 25% | 416,195.52 |
| Seller – 35% | 582,673.74 |
| Commerce Bank – 35% | 582,673.74[5] |

12.  That pursuant to agreement with Commerce Bank, seller agrees to defer $100,000.00 of the expense reimbursement, said $100,000.00 to be applied to the secured claim of Commerce Bank.  This agreement does not

---

[1] Actual payment to buyer reduced by $100,000.00 pursuant to agreement with Commerce Bank set forth in paragraph 13.

[2] Unreimbursed costs incurred by seller through March 2011, and trustee fees.

[3] Actual payment to seller reduced by $100,000.00 pursuant to agreement with Commerce Bank set forth in paragraph 12.

[4] It is anticipated that with the reimbursement of costs and seller's share of the proceeds no additional reserve will be necessary.  The trustee reserves the right to reserve additional funds from the gross revenue in the event said reserve is necessary to maintain the continued operation of the estate.

[5] Actual payment to secured creditor Commerce Bank based on calculations set forth in paragraphs 12 and 13 will be $782,673.43 pursuant to agreement between Commerce Bank, seller and buyer.

APP.0012

change the terms of the Asset Purchase and Processing Agreement as amended with the deferred expense reimbursement to be paid from future sales.

13.  That pursuant to agreement with Commerce Bank, buyer agrees to defer $100,000.00 of the operating expense payments, said $100,000.00 to be applied to the secured claim of Commerce Bank.  This agreement does not change the terms of the Asset Purchase and Processing Agreement as amended with the deferred expenses to be paid from further sales.

14.  The trustee requests authority to distribute funds from the aforementioned sales as funds are received by the estate in accordance with the formula for distribution of funds set forth herein.

15.  The trustee will file periodic reports of sale including a report of the distribution of funds.

WHEREFORE, Donald M. Samson, trustee, prays that this motion be granted, that he be authorized to allocate and distribute funds from the herein described sales as set forth herein and for such further relief as this Court deems just and equitable.

/s/ Donald M. Samson
DONALD M. SAMSON, Trustee
226 W. Main St., Ste. 102
Belleville, IL  62220
618-235-2226
Fax: 618-235-0037

APP.0013

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN RE:                              )         In Proceedings Under
                                    )         Chapter 7
CHEMETCO, INC.,                     )
                                    )         BK 01-34066
        DEBTOR.                     )

OBJECTION TO MOTION TO PAY
SECURED CREDITOR AND ALLOCATE FUNDS

The Illinois Environmental Protection Agency, by Lisa Madigan, Attorney General of the Sate of Illinois, objects to the Motion to Pay Secured Creditor and Allocate Funds ("Motion") as follows:

1.      Through the Motion, the Trustee seeks to distribute revenues "pursuant to the terms of the Asset and Purchasing Agreement entered in to between the Estate of Chemetco and Industrial Asset Disposition, LLC, dated July 29, 2009 as amended by Order Approving and Clarifying the Asset Purchase and Processing Agreement entered May 4, 2010", from the sale of:

> Approximately 3,500 metric tons of mixed fines pursuant to notice dated 12/11/1 0
> Approximately 4,000 metric tons of scrubber sludge pursuant to notice dated 12/11/10
> Approximately 120 tons of furnace clean up pursuant to notice dated 4/15/10

2.      The docket in this cause does not list a notice dated 4/15/10. There is one dated July 28, 2010 (Document 1542) that includes 155 metric tons of furnace cleanup (of unspecified make-up) and a second dated April 15, 2011 (Document 1608) that includes 120 tons of furnace cleanup "containing metallic, slippage, fines, scrap metal, and slag in three grades." Accordingly, the motion is deficient because it does not accurately identify which notice is actually involved. This is particularly relevant because the 7/28/10 notice does not mention any disbursements pursuant to any agreement with Industrial Assets Disposition LLC (hereafter "IAD") and the 4/15/11 notice contends the distribution is only subject to the Asset and Purchasing Agreement entered in to between the Estate of Chemetco and Industrial Asset Disposition, LLC, dated July 29, 2009 and approved by this Court on September 21, 2009.

1

APP.0014

3.      The Asset Purchase and Processing Agreement executed on July 29, 2009 and approved by the Court on September 21, 2009 (hereafter the "Purchase Agreement") provided the Trustee would sell to Buyer certain real property owned by the Estate and defined in the Agreement as the Smelter Site and other real property adjacent to the Smelter Site and certain other assets defined as Scrap Assets. Scrap Assets were defined by the Purchase Agreement to be "miscellaneous stainless steel, iron and other metal bearing material located on the Smelter Site, including the metal contained in or comprising part of the buildings on the Smelter Site" (Section1, par. 1.1(a)(i) of the Purchase Agreement). The Purchase Agreement established a specific reimbursement formula distributing the proceeds of the sale of Scrap Assets. The furnace cleanup described in the 4/15/11 notice would fall under this definition of Scrap Assets and be subject to that distribution formula.

4.      The reimbursement formula for Scrap Assets set forth in Section 3.1 of the Purchase Agreement, allocates the "Scrap Revenue" (gross revenue from the sale net of the Operating Expenses") as 20% to IAD and 80% to the Trustee with no payment directed to Commerce Bank. Yet the 4/15/11 Notice states the net proceeds "less the costs and expenses of the sale" and other fees to the Estate and Trustee will be paid to Commerce Bank because of its "first lien" on such assets.

5.      As a further complexity, the 7/28/10 Notice does not reference the Purchase Agreement and also parrots the language regarding distribution of the proceeds to Commerce Bank utilized in the 4/15/11 Notice.

6.      To clear up the confusion generated by the contradictory Notices of Intent to Sell and the Motion as to the Furnace Cleanup we need:

2

APP.0015

a.    to see the documents supporting Commerce Bank's asserted first lien to determine if they apply to these materials;

b.    to ascertain which Notice of Intent is actually involved; and

c.    confirm that it is either the Scrap Assets formula of the original Purchase Agreement that applies or the distribution required by Commerce Bank's asserted first lien.

7.    Similarly, the definition of Scrap Assets seem to cover the mixed fines since they are "other metal bearing materials located on the Smelter Site" and were not included in the Purchase Agreement's definition of scrubber sludge, slag, or Excluded Assets. The 12/1/10 Notice (Document 1583) did explicitly state this sale was subject to only the original Purchase Agreement approved by the Court on September 21, 2009.

8.    Yet the 12/1/10 Notice interjected further confusion by also utilizing what appears to be the boilerplate language regarding payments to Commerce Bank set out in the 7/28/10 and 4/15/11 Notices

9.    The Purchase Agreement further granted IAD the exclusive right to process and/or sell the Scrubber Sludge and Slag if the Trustee deems it appropriate and provided a second reimbursement formula applicable to such a sale. That formula, set out in Section 4.4(a) of the Purchase Agreement, allocates the Processing Revenue (gross revenue from the sale net of the Trustee's (Seller's) and IAD's (Buyer's) "Operating Expenses" as defined in the Purchasing Agreement) as follows: (1) 5% to the Trustee to be held pursuant to Section 5.2 of the Purchasing Agreement; (2) 25% to IAD; (3) 35% to Trustee to be applied to the Smelter Purchase Price; and (4) 35% to Commerce Bank "to satisfy its lien against the Slag, which shall be applied to the Smelter Purchase Price." The definition of "Processing Revenue" had three components, gross revenue from the sale of Scrubber Sludge, Recovered Materials (hereinafter

3

defined), and Slag (to the extent such Slag has not been processed.  The definition of Recovered materials referred back to the description in Section 4.2 (copper, zinc, lead, tin, nickel, and other materials recovered from the processing of Scrubber Sludge and Slag).

10.    The Trustee filed a motion to clarify the Purchase Agreement which asserted that there would be a third reimbursement formula applicable solely to revenues from the sale of "Recovered Materials" derived from the processing of scrubber sludge and slag "pursuant to a Processing Agreement to be entered into [emphasis added] between Paradigm [Minerals and Environmental Services LLC] and/or its affiliate and the Trustee."  That formula would pay Paradigm "a flat fee of 30% of the gross revenue from the sale of Recovered Materials." The Order, entered May 4, 2010, granting that motion did not make any reference to the Processing Agreement nor did it incorporate the third reimbursement formula into its terms. The Motion seeks to apply this third formula even though it was not incorporated into the Court's order and there has been no processing of Scrubber Sludge to obtain Recovered Materials for sale Since Scrubber Sludge is a separate category from Recovered Materials, a formula applicable to the sale of Recovered Materials does not apply to the sale of Scrubber Sludge.

11.    Furthermore, there has been no accounting of IAD's "Operating Expenses", if any, applicable to this transaction, so Processing Revenues cannot be determined.  Similarly, there has been no accounting of the Trustee's Operating Expenses applicable to this transaction, just a tabulation of all such expenses.

4

APP.0017

Wherefore, the Illinois Environmental Protection Agency objects to the Motion and asks that the Trustee file a new motion which applies the correct reimbursement formulas and provides the necessary detailed accounting of Operating Expenses.

Respectfully submitted,

_____
James L. Morgan
Assistant Attorney General
Environmental Bureau
500 South Second Street
Springfield, Illinois 62706
217-524-7506
217-524-7740

5

**APP.0018**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served electronically upon all parties scheduled upon the Court's ECF Notice List on the 13th day of July, 2011.

/s/ James L. Morgan
James L. Morgan
Assistant Attorney General
Environmental Bureau
Office of the Attorney General
500 South Second Street
Springfield, IL 62706

6

APP.0019

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | In Proceeding Under Chapter 7 |
| | ) | |
| CHEMETCO, INC., | ) | Case No.  01-34066 |
| | ) | |
| Debtor. | ) | **COMMERCE BANK'S RESPONSE** |
| | ) | **TO MOTION TO PAY SECURED** |
| | ) | **CREDITOR AND ALLOCATE FUNDS** |
| | ) | **AND ILLINOIS ENVIRONMENTAL** |
| | ) | **PROTECTION AGENCY'S** |
| | ) | **OBJECTION TO MOTION TO PAY** |
| | ) | **SECURED CREDITORS AND** |
| | ) | **ALLOCATE FUNDS** |

Commerce Bank ("Commerce Bank"), through its undersigned counsel, files its response to the Motion to Pay Secured Creditor and Allocate Funds (the "Motion") filed by Donald Samson, Chapter 7 trustee, and the Objection to Motion to Pay Secured Creditor and Allocate Funds (the "Objection") filed by Illinois Environmental Protection Agency ("IEPA"), and in support thereof, states as follows:

1. By order dated December 19, 2002 entered in Adversary Proceeding No. 02-03103 (the "Adversary Proceeding Order"), this Court ordered as follows:

> Commerce Bank's security interests are valid against Chemetco's inventory, parts inventory, accounts receivable, accounts, copper anodes, black copper, zinc material ("Commerce collateral").  Commerce Bank shall have a valid lien against the Commerce collateral.

A copy of the Adversary Proceeding Order is attached hereto as Exhibit A.

2. During the following nine years, this Court approved numerous distributions to Commerce Bank from sales of its collateral.  IEPA did not object (nor did any other party object) to any of these distributions.

3. The Asset Purchase and Processing Agreement dated July 29, 2009 (the "Purchase Agreement") was drafted to ensure that Commerce Bank would continue to receive distributions

APP.0020

from sales of its collateral.   In particular, the proceeds from all sales of Commerce Bank's collateral under the Purchase Agreement are designated as "Processing Revenue" to ensure that Commerce Bank receives distributions from these sales.   See Section 4.4(a) of the Purchase Agreement.

4.   The materials that are the subject of the Motion (the "Sold Materials") constitute Commerce Bank's collateral because (like each prior sale of Commerce Bank's collateral approved by this Court) they are Chemetco's inventory.   See 810 ILCS 5/9-102(a)(48) ("'Inventory' means goods, other than farm products which: … (D) consist of raw materials, work in progress, or materials used or consumed in a business"); 810 ILCS 5/9-315(a)(2) ("[A] security interest attaches to any identifiable proceeds of collateral").

5.   Because the Sold Materials constitute Commerce Bank's collateral, the Motion correctly identifies the proceeds of the Sold Materials as "Processing Revenue" and proposes to distribute $782,673.43 to Commerce Bank from this "Processing Revenue."

6.   The IEPA is wrong in its assertion that the Sold Materials constitute "Scrap Assets."   The Purchase Agreement contains two distribution formulas depending on whether the sold materials constitute Commerce Bank's collateral or not.   The formula for "Processing Revenue" requires a distribution to Commerce Bank because it involves proceeds from sales of Commerce Bank's collateral.   See Section 4.4(a) of the Purchase Agreement.   Conversely, the formula for "Scrap Revenue" does not require a distribution to Commerce Bank because it does not involve proceeds from sales of Commerce Bank's collateral.   See Section 3.3 of the Purchase Agreement.   Therefore, "Scrap Assets" (the sale of which generate "Scrap Revenue") must only

2

involve materials that do <u>not</u> constitute Commerce Bank's collateral.[1/] To hold otherwise would unfairly deprive Commerce Bank of the proceeds of its collateral.

7.    Currently, approximately $2.2 million remains unpaid on Commerce Bank's $5 million secured claim.   Commerce Bank supports the Motion and the distributions proposed therein.   Commerce Bank reserves it right to object to any modification to the distributions proposed in the Motion.

WHEREFORE, Commerce Bank requests that the Court (i) approve the Motion and the distributions proposed therein, (ii) overrule the Objection, and (iii) grant such additional relief as the Court deems is just.

Dated: July 15, 2011                     Respectfully submitted,

BRYAN CAVE LLP


By:   /s/ David M. Unseth
       David M. Unseth
       211 N. Broadway, Suite 3600
       St. Louis, Missouri 63102-2750
       (314) 259-2000
       (314) 259-2020 (Facsimile)

Attorneys for Commerce Bank

---

[1/]    Commerce Bank believes that "Scrap Assets" are comprised chiefly of Chemetco's equipment (the Adversary Proceeding Order held that Commerce Bank did not have a security interest in Chemetco's equipment) and fixtures located on Chemetco's real property (Commerce Bank does not have a mortgage on Chemetco's real property).

3

APP.0022

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 15th day of July, 2011, the foregoing was served electronically via the Court's ECF/CM system and via first-class mail, postage prepaid, on the following parties:

James L. Morgan
Assistant Attorney General
Environmental Bureau
500 South Second Street
Springfield, Illinois 62706

/s/ David M. Unseth

APP.0023

# EXHIBIT A

APP.0024

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| CHEMETCO, INC., | ) | CASE NO. 01-34066 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LAURA K. GRANDY, | ) | Adv. Pro. No. 02-03103 |
| Trustee in Bankruptcy for Chemetco, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMERCE BANK, N.A., NEWCOURT | ) | |
| FINANCIAL USA, INC., IBM CREDIT CORP., | ) | |
| GENERAL ELECTRIC CAPITAL CORP., | ) | |
| DELPHI AUTOMOTIVE SYSTEMS, | ) | |
| WELLS FARGO EQUIPMENT FINANCE, INC., | ) | |
| IKON OFFICE SOLUTIONS, | ) | |
| K.C. JONES PLATING & ARROW PROFILE, | ) | |
| GOLD'N WEST SURPLUS, DAVIS COOPER, | ) | |
| SNOWMAN RECYCLING, INC., GACHMAN | ) | |
| METALS & RECYCLING, WADDELL'S | ) | |
| METAL RECYCLING, INC., NIBCO INC., THE | ) | |
| YAFFE COMPANIES INCORPORATED, | ) | |
| AMERICAN RECYCLING, EAST TENNESSEE | ) | |
| CONVEYORS, METAL MANAGEMENT, INC., | ) | |
| MUELLER CO., NATIONAL MATERIAL | ) | |
| RECYCLING INC., RIVER RECYCLING | ) | |
| INDUSTRIES, INC., | ) | |
| S & M RECYCLING, INC. and PETAG | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

JUDGMENT ORDER

This matter came before the Court for trial on November 4, 2002. Appearances were

made by Laura K. Grandy, Trustee, and Jennifer A. Merlo, counsel for Commerce Bank, N.A. The

Court having jurisdiction to consider the relief requested in this adversary proceeding; and due and

SL01DOCS\1556408.1

**APP.0025**

proper notice of the trustee's complaint and application to approve settlement having been given; and no objections having been filed thereto; and the Court having determined that the relief sought by the Trustee is in the best interests of the Debtor and all parties in interest; the Court orders as follows:

IT IS ORDERED that the secured claim of Tyco Capital, successor in interest to Newcourt Financial USA, Inc. ("Newcourt"), is resolved in that the equipment Newcourt had an interest in has been returned to Newcourt. Any lien claimed by Newcourt in assets of the estate, other than those assets on which relief from stay was previously granted, is void. Newcourt shall have sixty days from the date of this order to file a proof of claim for any unsecured claim it may have against the estate;

IT IS ORDERED, that any lien claimed by Wells Fargo Equipment Finance, Inc. ("Wells Fargo") against the assets of this estate is void. Wells Fargo shall have sixty days from the date of this order to file a proof of claim for any unsecured claim it may have against the estate;

IT IS ORDERED that Gachman Metals & Recycling ("Gachman") shall have an allowed unsecured claim in the amount of $4,916.00. Gachman shall have sixty days from the date of this order to file a proof of claim for any unsecured claim it may have against the estate. Gachman's claim as to any asset of this estate or lien against any asset of this estate is void.

IT IS ORDERED that Commerce Bank's security interests are valid against Chemetco's inventory, parts inventory, accounts receivable, accounts, copper anodes, black copper, zinc material and the general intangibles ("Commerce collateral"). Commerce Bank shall have a valid lien against the Commerce collateral. Commerce does not have a lien on any equipment described in the complaint. The Trustee's settlement of Commerce Bank's general intangibles security interest in the proceeds of the Debtor's lawsuit against The Hartford Insurance Company, whereby

APP.0026

the Trustee has agreed to pay Commerce one half of the net proceeds of the lawsuit, after payment of the one-third contingency fee and expenses owed to special counsel for the Debtor, is approved. The Trustee is authorized to immediately make the settlement payment to Commerce;

IT IS ORDERED that the Trustee's settlement with Davis Cooper of $8,929.68 is approved. Davis Cooper's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Davis Cooper. Davis Cooper shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

IT IS ORDERED that the Trustee's settlement with The Yaffe Companies, Inc. ("Yaffe") of $3,474.66 is approved. Yaffe's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Yaffe. Yaffe shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

IT IS ORDERED that the Trustee's settlement with Metal Management, Inc. ("Metal Management") of $1,500 is approved. Metal Management's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Metal Management. Metal Management shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

IT IS ORDERED that the Trustee's settlement with Mueller Co. of $7,748.71 is approved. Mueller's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Mueller Co. Mueller Co. shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

1548100.1

3

APP.0027

IT IS ORDERED that River Recycling Industries, Inc. ("River Recycling") has a valid reclamation claim.  River Recycling shall be paid $11,424.33, the full price received by the Trustee for their goods, which were sold post-petition.  River Recycling's claim as to any other asset of this estate or lien against any asset of this estate is void.  River Recycling shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

IT IS ORDERED that the Trustee's settlement with Petag Corporation ("Petag") of $14,927.20 is approved.  Petag's claim as to any asset of this estate or lien against any asset of this estate is void.  The Trustee is authorized to immediately make the settlement payment to Petag. Petag shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

IT IS ORDERED that the Trustee's settlement with S&M Recycling ("S&M") of $3,000 is approved.  S&M's claim as to any asset of this estate or lien against any asset of this estate is void.  The Trustee is authorized to immediately make the settlement payment to S&M.

IT IS ORDERED that the Trustee's settlement with Delphi Automotive Systems ("Delphi") of $5,000 is approved.  The Trustee is authorized to immediately make the settlement payment to Delphi.  Delphi's claim as to any other assets of this bankruptcy estate or lien against any of the assets of this bankruptcy estate is void.  Delphi shall have sixty (60) days from the date of the Order approving this settlement to file an Amended Proof of Claim for any unsecured claim it may have against the estate.

IT IS ORDERED that Gold'N West Surplus ("Gold'N West") does not have a valid reclamation claim against the estate.  Gold'N West's claim as to any asset of this estate or lien

APP.0028

against any asset of this estate is void.  Gold'N West shall have sixty days from the date of this
order to file a proof of claim for any unsecured claim it may have against the estate; and

    IT IS ORDERED that National Material Recycling, Inc. ("National Material") does not
have a valid reclamation claim against the estate.  National Material's claim as to any asset of this
estate or lien against any asset of this estate is void.  National Material shall have sixty days from
the date of this order to file a proof of claim for any unsecured claim it may have against the estate.


ENTERED: December 19, 2002              /s/ Kenneth J. Meyers
                                     UNITED STATES BANKRUPTCY JUDGE

APP.0029

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | In Proceeding Under Chapter 7 |
| | ) | |
| CHEMETCO, INC., | ) | Case No.  01-34066 |
| | ) | |
| Debtor. | ) | **COMMERCE BANK'S RESPONSE** |
| | ) | **TO MOTION TO PAY SECURED** |
| | ) | **CREDITOR AND ALLOCATE FUNDS** |
| | ) | **AND ILLINOIS ENVIRONMENTAL** |
| | ) | **PROTECTION AGENCY'S** |
| | ) | **OBJECTION TO MOTION TO PAY** |
| | ) | **SECURED CREDITORS AND** |
| | ) | **ALLOCATE FUNDS** |

Commerce Bank ("Commerce Bank"), through its undersigned counsel, files its response to the Motion to Pay Secured Creditor and Allocate Funds (the "Motion") filed by Donald Samson, Chapter 7 trustee, and the Objection to Motion to Pay Secured Creditor and Allocate Funds (the "Objection") filed by Illinois Environmental Protection Agency ("IEPA"), and in support thereof, states as follows:

     1.    By order dated December 19, 2002 entered in Adversary Proceeding No. 02-03103 (the "Adversary Proceeding Order"), this Court ordered as follows:

> Commerce Bank's security interests are valid against Chemetco's inventory, parts inventory, accounts receivable, accounts, copper anodes, black copper, zinc material ("Commerce collateral").  Commerce Bank shall have a valid lien against the Commerce collateral.

A copy of the Adversary Proceeding Order is attached hereto as Exhibit A.

     2.    During the following nine years, this Court approved numerous distributions to Commerce Bank from sales of its collateral.  IEPA did not object (nor did any other party object) to any of these distributions.

     3.    The Asset Purchase and Processing Agreement dated July 29, 2009 (the "Purchase Agreement") was drafted to ensure that Commerce Bank would continue to receive distributions

from sales of its collateral. In particular, the proceeds from all sales of Commerce Bank's collateral under the Purchase Agreement are designated as "Processing Revenue" to ensure that Commerce Bank receives distributions from these sales. See Section 4.4(a) of the Purchase Agreement.

4. The materials that are the subject of the Motion (the "Sold Materials") constitute Commerce Bank's collateral because (like each prior sale of Commerce Bank's collateral approved by this Court) they are Chemetco's inventory. See 810 ILCS 5/9-102(a)(48) ("'Inventory' means goods, other than farm products which: ... (D) consist of raw materials, work in progress, or materials used or consumed in a business"); 810 ILCS 5/9-315(a)(2) ("[A] security interest attaches to any identifiable proceeds of collateral").

5. Because the Sold Materials constitute Commerce Bank's collateral, the Motion correctly identifies the proceeds of the Sold Materials as "Processing Revenue" and proposes to distribute $782,673.43 to Commerce Bank from this "Processing Revenue."

6. The IEPA is wrong in its assertion that the Sold Materials constitute "Scrap Assets." The Purchase Agreement contains two distribution formulas depending on whether the sold materials constitute Commerce Bank's collateral or not. The formula for "Processing Revenue" requires a distribution to Commerce Bank because it involves proceeds from sales of Commerce Bank's collateral. See Section 4.4(a) of the Purchase Agreement. Conversely, the formula for "Scrap Revenue" does not require a distribution to Commerce Bank because it does not involve proceeds from sales of Commerce Bank's collateral. See Section 3.3 of the Purchase Agreement. Therefore, "Scrap Assets" (the sale of which generate "Scrap Revenue") must only

2

APP.0031

involve materials that do <u>not</u> constitute Commerce Bank's collateral.[1/] To hold otherwise would unfairly deprive Commerce Bank of the proceeds of its collateral.

       7.     Currently, approximately $2.2 million remains unpaid on Commerce Bank's $5 million secured claim.   Commerce Bank supports the Motion and the distributions proposed therein.   Commerce Bank reserves it right to object to any modification to the distributions proposed in the Motion.

       WHEREFORE, Commerce Bank requests that the Court (i) approve the Motion and the distributions proposed therein, (ii) overrule the Objection, and (iii) grant such additional relief as the Court deems is just.

Dated: July 15, 2011               Respectfully submitted,

                                  BRYAN CAVE LLP

                 By:  /s/ David M. Unseth
                    David M. Unseth
                    211 N. Broadway, Suite 3600
                    St. Louis, Missouri 63102-2750
                    (314) 259-2000
                    (314) 259-2020 (Facsimile)

                    Attorneys for Commerce Bank

---

[1/]    Commerce Bank believes that "Scrap Assets" are comprised chiefly of Chemetco's equipment (the Adversary Proceeding Order held that Commerce Bank did not have a security interest in Chemetco's equipment) and fixtures located on Chemetco's real property (Commerce Bank does not have a mortgage on Chemetco's real property).

3

APP.0032

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 15th day of July, 2011, the foregoing was served electronically via the Court's ECF/CM system and via first-class mail, postage prepaid, on the following parties:

James L. Morgan
Assistant Attorney General
Environmental Bureau
500 South Second Street
Springfield, Illinois 62706

/s/ David M. Unseth

4

APP.0033

# EXHIBIT A

APP.0034

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| CHEMETCO, INC., | ) | CASE NO. 01-34066 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LAURA K. GRANDY, | ) | Adv. Pro. No. 02-03103 |
| Trustee in Bankruptcy for Chemetco, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMERCE BANK, N.A., NEWCOURT | ) | |
| FINANCIAL USA, INC., IBM CREDIT CORP., | ) | |
| GENERAL ELECTRIC CAPITAL CORP., | ) | |
| DELPHI AUTOMOTIVE SYSTEMS, | ) | |
| WELLS FARGO EQUIPMENT FINANCE, INC., | ) | |
| IKON OFFICE SOLUTIONS, | ) | |
| K.C. JONES PLATING & ARROW PROFILE, | ) | |
| GOLD'N WEST SURPLUS, DAVIS COOPER, | ) | |
| SNOWMAN RECYCLING, INC., GACHMAN | ) | |
| METALS & RECYCLING, WADDELL'S | ) | |
| METAL RECYCLING, INC., NIBCO INC., THE | ) | |
| YAFFE COMPANIES INCORPORATED, | ) | |
| AMERICAN RECYCLING, EAST TENNESSEE | ) | |
| CONVEYORS, METAL MANAGEMENT, INC., | ) | |
| MUELLER CO., NATIONAL MATERIAL | ) | |
| RECYCLING INC., RIVER RECYCLING | ) | |
| INDUSTRIES, INC., | ) | |
| S & M RECYCLING, INC. and PETAG | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

JUDGMENT ORDER

This matter came before the Court for trial on November 4, 2002. Appearances were

made by Laura K. Grandy, Trustee, and Jennifer A. Merlo, counsel for Commerce Bank, N.A. The

Court having jurisdiction to consider the relief requested in this adversary proceeding; and due and

SL01DOCS\1556408.1

APP.0035

proper notice of the trustee's complaint and application to approve settlement having been given; and no objections having been filed thereto; and the Court having determined that the relief sought by the Trustee is in the best interests of the Debtor and all parties in interest; the Court orders as follows:

IT IS ORDERED that the secured claim of Tyco Capital, successor in interest to Newcourt Financial USA, Inc. ("Newcourt"), is resolved in that the equipment Newcourt had an interest in has been returned to Newcourt. Any lien claimed by Newcourt in assets of the estate, other than those assets on which relief from stay was previously granted, is void. Newcourt shall have sixty days from the date of this order to file a proof of claim for any unsecured claim it may have against the estate;

IT IS ORDERED, that any lien claimed by Wells Fargo Equipment Finance, Inc. ("Wells Fargo") against the assets of this estate is void. Wells Fargo shall have sixty days from the date of this order to file a proof of claim for any unsecured claim it may have against the estate;

IT IS ORDERED that Gachman Metals & Recycling ("Gachman") shall have an allowed unsecured claim in the amount of $4,916.00. Gachman shall have sixty days from the date of this order to file a proof of claim for any unsecured claim it may have against the estate. Gachman's claim as to any asset of this estate or lien against any asset of this estate is void.

IT IS ORDERED that Commerce Bank's security interests are valid against Chemetco's inventory, parts inventory, accounts receivable, accounts, copper anodes, black copper, zinc material and the general intangibles ("Commerce collateral"). Commerce Bank shall have a valid lien against the Commerce collateral. Commerce does not have a lien on any equipment described in the complaint. The Trustee's settlement of Commerce Bank's general intangibles security interest in the proceeds of the Debtor's lawsuit against The Hartford Insurance Company, whereby

1548100.1                                         2

APP.0036

the Trustee has agreed to pay Commerce one half of the net proceeds of the lawsuit, after payment of the one-third contingency fee and expenses owed to special counsel for the Debtor, is approved. The Trustee is authorized to immediately make the settlement payment to Commerce;

 IT IS ORDERED that the Trustee's settlement with Davis Cooper of $8,929.68 is approved. Davis Cooper's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Davis Cooper. Davis Cooper shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

 IT IS ORDERED that the Trustee's settlement with The Yaffe Companies, Inc. ("Yaffe") of $3,474.66 is approved. Yaffe's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Yaffe. Yaffe shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

 IT IS ORDERED that the Trustee's settlement with Metal Management, Inc. ("Metal Management") of $1,500 is approved. Metal Management's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Metal Management. Metal Management shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

 IT IS ORDERED that the Trustee's settlement with Mueller Co. of $7,748.71 is approved. Mueller's claim as to any asset of this estate or lien against any asset of this estate is void. The Trustee is authorized to immediately make the settlement payment to Mueller Co. Mueller Co. shall have sixty (60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have against the estate;

1548100.1

3

APP.0037

IT IS ORDERED that River Recycling Industries, Inc. ("River Recycling") has a valid

reclamation claim.  River Recycling shall be paid $11,424.33, the full price received by the

Trustee for their goods, which were sold post-petition.  River Recycling's claim as to any other

asset of this estate or lien against any asset of this estate is void.  River Recycling shall have sixty

(60) days from the date of this Order to file a Proof of Claim for any unsecured claim it may have

against the estate;

IT IS ORDERED that the Trustee's settlement with Petag Corporation ("Petag") of

$14,927.20 is approved.  Petag's claim as to any asset of this estate or lien against any asset of this

estate is void.  The Trustee is authorized to immediately make the settlement payment to Petag.

Petag shall have sixty (60) days from the date of this Order to file a Proof of Claim for any

unsecured claim it may have against the estate;

IT IS ORDERED that the Trustee's settlement with S&M Recycling ("S&M") of $3,000 is

approved.  S&M's claim as to any asset of this estate or lien against any asset of this estate is

void.  The Trustee is authorized to immediately make the settlement payment to S&M.

IT IS ORDERED that the Trustee's settlement with Delphi Automotive Systems ("Delphi")

of $5,000 is approved.  The Trustee is authorized to immediately make the settlement payment to

Delphi.  Delphi's claim as to any other assets of this bankruptcy estate or lien against any of the

assets of this bankruptcy estate is void.  Delphi shall have sixty (60) days from the date of the

Order approving this settlement to file an Amended Proof of Claim for any unsecured claim it may

have against the estate.

IT IS ORDERED that Gold'N West Surplus ("Gold'N West") does not have a valid

reclamation claim against the estate.  Gold'N West's claim as to any asset of this estate or lien

1548100.1                                                   4

APP.0038

against any asset of this estate is void.  Gold'N West shall have sixty days from the date of this

order to file a proof of claim for any unsecured claim it may have against the estate; and

       IT IS ORDERED that National Material Recycling, Inc. ("National Material") does not

have a valid reclamation claim against the estate.  National Material's claim as to any asset of this

estate or lien against any asset of this estate is void.  National Material shall have sixty days from

the date of this order to file a proof of claim for any unsecured claim it may have against the estate.

ENTERED: December 19, 2002                   /s/ Kenneth J. Meyers

                                     UNITED STATES BANKRUPTCY JUDGE

APP.0039

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | In Proceeding Under Chapter 7 |
| | ) | |
| CHEMETCO, INC., | ) | Case No.  01-34066 |
| | ) | |
| Debtor. | ) | **PARADIGM MINERALS AND** |
| | ) | **ENVIRONMENTAL SERVICES, LLC'S** |
| | ) | **RESPONSE TO MOTION TO PAY** |
| | ) | **SECURED CREDITOR AND ALLOCATE** |
| | ) | **FUNDS AND ILLINOIS** |
| | ) | **ENVIRONMENTAL PROTECTION** |
| | ) | **AGENCY'S OBJECTION TO MOTION** |
| | ) | **TO PAY SECURED CREDITORS AND** |
| | ) | **ALLOCATE FUNDS** |

Paradigm Minerals and Environmental Services, LLC ("PMES"), through its undersigned counsel, hereby files its response to the Motion to Pay Secured Creditor and Allocate Funds (the "Motion") filed by Donald Samson, Chapter 7 trustee (the "Trustee"), and the Objection to Motion to Pay Secured Creditor and Allocate Funds (the "Objection") filed by Illinois Environmental Protection Agency ("IEPA").

In the Objection, the IEPA objects to the following matters: (a) the identity of the proper party for payments under the Asset Purchase and Processing Agreement dated July 29, 2009 (the "Purchase Agreement"), (b) the characterization of certain materials being sold pursuant to the Purchase Agreement, and (c) the calculation of the payments being made pursuant to the Purchase Agreement.  It is worth noting that (i) IEPA has approved the underlying sales which are generating the Processing Revenues at issue in the Motion so there are no environmental or remediation issues associated with these sales, and (ii) none of the parties that holds a direct interest in the outcome of these matters (namely, the Trustee, Commerce Bank or PMES) has raised similar objections.  PMES will address each of the IEPA's three objections below.

1399901.01

**APP.0040**

## I.     PMES Is the Proper Party for Receipt of Payments under the Purchase Agreement

The Purchase Agreement was originally entered into by the bankruptcy estate of Chemetco, Inc. and Industrial Asset Disposition, LLC ("IAD"). Pursuant to an Assignment, Assumption and Consent Agreement dated April 20, 2011 (the "Assignment"), IAD assigned all of its rights under the Purchase Agreement to PMES. As a result of the Assignment, PMES is now the "Buyer" under the Purchase Agreement.

## II.    "Mixed Fines" and "Furnace Cleanup" are not "Scrap Assets" and should be treated as "Scrubber Sludge" and "Slag"

The Purchase Agreement deals with the two categories of property: "Assets" and "Excluded Assets." The Assets are comprised of the Scrap Assets and certain real property, buildings, facilities and improvements. The Purchase Agreement defines "Scrap Assets" as "miscellaneous stainless steel, iron and other metal bearing materials located on the Smelter Site" (Section 1.1(a)(i) of the Purchase Agreement) and "by-products from the demolition of the buildings, including steel I beams, copper wire, old breakers, transformers and motors" (Section 3.1 of the Purchase Agreement). So, the Scrap Assets are essentially the infrastructure and building components located on the Chemetco site. The Assets (including the Scrap Assets) were sold to the Buyer pursuant to the Purchase Agreement, for which the Buyer agreed to pay the purchase price amounts set forth in Section 2.2 of the Purchase Agreement.

As listed on Schedule 1.2 of the Purchase Agreement, the "Excluded Assets" are comprised of the following:

- Scrubber Sludge and Slag

- Various and sundry feed stocks

- "In-process" materials (i.e., materials contained within or around the existing processing equipment)

2

APP.0041

- ■ Sediments and dusts associated with environmental clean-ups

- ■ Cupro

- ■ Pot slag

- ■ Furnace dust

The Excluded Assets were <u>not</u> sold to the Buyer.  Rather, the Buyer was granted the exclusive right to process and/or sell Scrubber Sludge and Slag.

IEPA contends that the "mixed fines" and "furnace cleanup" should be treated as "Scrap Assets" for purposes of the Purchase Agreement.  This position is not supported by the facts. First, the "mixed fines" and "furnace cleanup" are not Scrap Assets because they are not infrastructure or building components located at the Chemetco site; rather, they are materials used in and generated from Chemetco's prior operations (similar to Scrubber Sludge and Slag).  Second, just like Scrubber Sludge and Slag, the "mixed fines" and "furnace cleanup" can either be sold in their existing (<u>i.e.</u>, unprocessed) form or in a processed form, while Scrap Assets can only be sold in their existing form.  Third, similar to Scrubber Sludge and Slag, the "mixed fines" and "furnace cleanup" can be processed to recover copper, zinc, lead, tin, nickel and other materials.  Fourth, the "mixed fines" and "furnace cleanup" are being sold to buyers that also purchase Scrubber Sludge and Slag.  Finally, because the "mixed fines" and "furnace cleanup" are included within the "Excluded Assets" listed on Schedule 1.2 of the Purchase Agreement, they cannot constitute Scrap Assets (because Scrap Assets, by definition, are <u>not</u> Excluded Assets).

**III.    <u>IEPA's Objection to Payment of 30% Flat Fee to PMES is based on an Incorrect
Reading of the Purchase Agreement</u>**

3

APP.0042

The Purchase Agreement contains two (not three, as argued by IEPA) formulas for calculating distributions of sale revenues.  The first formula calculates distributions of "Scrap Revenue" (which is the gross revenue from the sale of Scrap Assets minus Operating Expenses).  This formula does not apply here because, as discussed above, the Motion does not involve any sales of Scrap Assets.

The second formula calculates distributions of "Processing Revenue" (which is the gross revenue from the sale of Scrubber Sludge, Slag and Recovered Materials minus Operating Expenses).  Regardless of which formula is applicable, both require a calculation of the amount of "Operating Expenses."

The Court (by its approval of the Trustee's Motion to Clarify) clarified that the definition of "Operating Expenses" includes payment of 30% flat fee to PMES in lieu of reimbursement of PMES's actual operating expenses.  IEPA is correct that this 30% flat fee was meant to apply to revenues from the sale of Recovered Materials.  IEPA, however, is incorrect in reading into the term "Recovered Materials" a requirement that these materials actually be recovered or processed at the Chemetco site.  Under the Purchase Agreement, Recovered Materials are defined as "copper, zinc, lead, tin, nickel and other materials."  Section 4.2 of the Purchase Agreement.  The materials that are the subject of the Motion constitute Recovered Materials because they are "other materials" being purchased for the recovery of copper.  See Notices of Intent to Sell Property.

Not only is this position consistent with the Agreement, it also ensures that distributions can be made to the bankruptcy estate (for the benefit of unsecured creditors), to Commerce Bank (on account of its secured claim), and to the Environmental Remediation Fund.  Under the IEPA's reading of the Purchase Agreement, PMES would still be entitled to reimbursement of its "Operating Expenses" from the gross revenues detailed in the Motion before any distributions

4

APP.0043

could be made to the bankruptcy estate, Commerce Bank or the Environmental Remediation Fund. Currently, PMES's has incurred operating expenses in excess of $4 million, which (if required to be reimbursed) would exhaust all anticipated gross revenues. By properly applying the 30% flat fee (rather than reimbursing PMES's incurred operating expenses), distributions to the bankruptcy estate, Commerce Bank and the Environmental Remediation Fund can occur immediately (rather than waiting for all of PMES's actual operating expenses to be reimbursed).

WHEREFORE, PMES requests that the Court (i) approve the Motion and the distributions proposed therein, (ii) overrule the Objection, and (iii) grant such additional relief as the Court deems is just.

Dated: July 15, 2011

Respectfully submitted,

BRYAN CAVE LLP

By:  /s/ David M. Unseth
      Daniel C. Nester
      David M. Unseth
      211 N. Broadway, Suite 3600
      St. Louis, Missouri 63102-2750
      (314) 259-2000
      (314) 259-2020 (Facsimile)

      Attorneys for Paradigm Minerals and Environmental Services, LLC

5

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 15th day of July, 2011, the foregoing was served electronically via the Court's ECF/CM system and via first-class mail, postage prepaid, on the following parties:

James L. Morgan
Assistant Attorney General
Environmental Bureau
500 South Second Street
Springfield, Illinois 62706

/s/ David M. Unseth

6

APP.0045

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

In re:                                  )        IN CHAPTER 7 PROCEEDINGS
                                        )
CHEMETCO, INC.                          )        BK 01-34066
                                        )
        Debtor.                         )

### TRUSTEE'S REPLY TO OBJECTION TO MOTION TO PAY
### SECURED CREDITOR AND ALLOCATE FUNDS

Trustee, Donald M. Samson, by counsel, submits this Reply to the Objection to Motion to Pay Secured Creditor and Allocate Funds ("Objection") submitted by the Illinois Environmental Protection Agency ("IEPA"). The IEPA asserts three basic objections: (1) that the Notice contains a date error (April 15, 2010 vs. April 15, 2011) that created confusion regarding how payment from proceeds should be made; (2) that certain materials being sold pursuant to the Purchase Agreement are not correctly identified, and (3) that uncertainty exists regarding calculation of the payments being made pursuant to the Purchase Agreement. The issues raised in the Objection are without merit and provide no reason to delay the proposed transactions and distributions. No environmental basis for the objection is made and the transactions have been approved by the IEPA. The Objection addresses only how sale proceeds are distributed. These questions have been resolved by other orders and agreements. Thus, no support for objection exists and, as described in the Motion for Expedited Hearing (Document No. 1613), further delay would be detrimental to the operations of the bankruptcy estate.

### I.     NOTICE DATE

The June 23, 2011 Notice appears to contain a typographical error in describing the proposed distribution of revenues from "approximately 120 tons of furnace clean up pursuant to notice dated 4/15/ **2010**". (Document No. 1611). In fact the Notice was dated 4/15/**2011**, as was

1

recognized by the IEPA in its Objection.  No genuine confusion is created by the apparent

typographical error.[1]

## II.     THE MATERIALS TO BE SOLD ARE "EXCLUDED ASSETS"

As described by Paradigm Minerals and Environmental Services, LLC ("PMES") in its

Response to the Motion and Objection ("PMES Response") (Doc. No. 1617), with which the

Trustee concurs, the interpretation urged by the IEPA directly contradicts the plain language of

the controlling documents.  The Asset Purchase and Processing Agreement dated July 29, 2009

("Purchase Agreement") addresses two categories of property: "Assets" and "Excluded Assets."

The Assets are comprised of the Scrap Assets and certain real property, buildings, facilities and

improvements.  The Purchase Agreement further defines "Scrap Assets" as "miscellaneous

stainless steel, iron and other metal bearing materials located on the Smelter Site" (Section

1.1(a)(i) of the Purchase Agreement) and "by-products from the demolition of the buildings,

including steel I beams, copper wire, old breakers, transformers and motors" (Section 3.1 of the

Purchase Agreement).  Scrap Assets, therefore, are the infrastructure and building components

located on the Chemetco site.  The Assets (including the Scrap Assets) were sold to the Buyer

pursuant to the Purchase Agreement, for which the Buyer agreed to pay the purchase price

amounts set forth in Section 2.2 of the Purchase Agreement.[2]

---

[1] The IEPA acknowledged the 4/15/2011 Notice in Paragraph 4 of its Objection and that this Notice referenced that
Commerce would get the net proceeds from the sale less certain specifically identified costs and expenses, referred
to by the IEPA as "boilerplate language."  The IEPA later referenced the 12/1/2010 Notice and that it, too, utilized
this "boilerplate language" claiming that this caused further confusion.  In fact, both the 4/15/2011 Notice and
12/1/2010 Notice correctly acknowledge that Commerce has a first lien on the assets being sold in those Notices and
that Commerce would be paid pursuant to the so-called "boilerplate language" but for the fact that these sales were
"subject to the Purchase Agreement between the Estate of Chemetco and I.A.D."  It is clear in both Notices that
Commerce is to be paid pursuant to the Purchase Agreement, which in these particular instances supersedes the
"boilerplate language."  By contrast, the 7/28/2010 Notice, which the IEPA notes does not reference the Purchase
Agreement but only the "boilerplate language," concerned the sale of Excluded Assets which were not subject to the
Purchase Agreement, hence the "boilerplate language" was properly applied in that case.
[2] PMES entered into an assignment of interest from Industrial Asset Disposition, LLC ("IAD") on April 20, 2011
and is the "Buyer."

2

APP.0047