**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | IN PROCEEDINGS UNDER |
| | ) | CHAPTER 7 |
| CHEMETCO, INC., | ) | |
| | ) | BK 01-34066 |
| Debtor(s). | ) | |

## MOTION TO CLARIFY THE ASSET PURCHASE AND PROCESSING AGREEMENT

COMES NOW Laura K. Grandy, the Trustee in the above-referenced bankruptcy proceeding, and for her Motion to Clarify the Asset Purchase and Processing Agreement states as follows:

1.      On July 29, 2009, the Trustee entered into the Asset Purchase and Processing Agreement ("Purchase Agreement") with Industrial Asset Disposition, LLC ("IAD") to sell certain real property owned by the Debtor and defined in the Purchase Agreement as the Smelter Site and the NPR Property, and certain other assets defined as Scrap Assets, subject to this Court's approval of the Purchase Agreement (the "Court Approval"). The Purchase Agreement further grants IAD the exclusive right to process and/or sell the Scrubber Sludge and Slag pursuant to the terms of the Purchase Agreement. Defined terms used herein and not otherwise defined shall have the meaning given to such terms in the Purchase Agreement.

2.      The Purchase Agreement assumes that the Trustee would consult regularly with IAD on many aspects related to the processing and/or sale of the Scrubber Sludge and Slag. The Purchasing Agreement provides for the distribution of the Processing Revenue according to a certain formula. The Processing Revenue was defined as the gross revenues from the sale of the Scrubber Sludge, Recovered Materials and Slag, net of the Operating Expenses. The Operating Expenses included all costs of operation as well as the costs associated with the location, construction and installation of the Processing Facility. While IAD is obligated to fund the Processing Facility, IAD is at all times entitled to recover the costs associated with the location, construction and installation of the Processing Facility.

3.      The Trustee and IAD reviewed and investigated numerous processes to recover the copper, zinc, lead, tin, nickel and other materials and valuable metals from the Slag, Scrubber Sludge and other by-products from the copper smelter process (referred to in the Purchase Agreement as "Recovered Materials"). Ultimately, it was decided that the process developed by the employees of Paradigm Minerals and Environmental Services, LLC ("Paradigm") would result in significantly all of the Slag and Scrubber Sludge and other by-products being processed, thereby leaving significantly smaller amounts of waste to be disposed of from the Smelter Site. This

combination, the Trustee believes, will result in the highest and best distribution to the creditors of this case. Paradigm has agreed to charge the bankruptcy estate a flat fee of 30% of the gross revenue from the sale of Recovered Materials (ie revenue before Operating Expenses) pursuant to a Processing Agreement to be entered into between Paradigm and/or its affiliate and the Trustee (the "Processing Agreement"). In exchange for said payment, Paradigm will absorb all capital costs associated with the location, construction and installation of the Processing Facility as well as all operating expenses associated with the Processing Facility (except for personnel and administrative costs, specifically related to the bankruptcy estate including Trustee fees and applicable taxes). Elliott Stegin is the majority owner of Paradigm. Elliott Stegin is also the majority owner of IAD. The purpose of this Motion is to clarify the allocation of expenses and payment of same related to the Processing Facility. Therefore, for purposes of the Purchase Agreement, the definition of Operating Expenses shall include the foregoing payments to Paradigm. The purpose of this motion is also to authorize the Trustee to enter into the Processing Agreement with Paradigm and/or its affiliates on such terms as the Trustee deems appropriate.

4.      The Purchase Agreement also sets forth numerous instances in which the Trustee and IAD would discuss issues and make decisions related to the Processing Facility. It was and remains the intention of the parties that the Trustee would have authority to make said decisions without coming back to the Court to approve each decision related to the operations of the Processing Facility. The purpose of this Motion also is to clarify that the Trustee has the authority to make said decisions so as to allow the process to operate smoothly and efficiently. In order for this process to succeed, the liquidation of the assets through the Processing Facility needs to proceed in a responsive, business-like atmosphere. It will be impossible to come back and ask the Court to approve each decision necessary to maintain the day-to-day operations of the bankruptcy estate under the Purchase Agreement and Processing Agreement.

WHEREFORE, the Trustee prays that this Court approve the clarification set forth above, to establish and allow the Trustee to pay the processing fee of 30% of the gross revenue from the sale of Recovered Materials to Paradigm or its affiliate pursuant to the Processing Agreement entered into between Paradigm and/or its affiliates and the Trustee on such terms as the Trustee deems appropriate, and to make all decisions necessary to facilitate the operations of the Processing Facility as they relate to the Purchase Agreement and the Processing Agreement.

Dated this 9th day of March, 2010.

/s/ Laura K. Grandy, Trustee

Mathis, Marifian, Richter & Grandy, Ltd.
23 Public Square, Ste. 300

Belleville, IL  62232
(618) 234-9800
(618) 234-9786

## CERTIFICATE OF SERVICE

I, LAURA K. GRANDY, hereby certify that on this 9th day of March, 2010, I forwarded a copy of the foregoing instrument by U.S. Mail or electronic Mail to Tim Ruppel, Assistant U.S. Trustee, Becker Building, Room 1100, 401 Main Street, Peoria, IL 61602; all parties requesting notification via ECF; and to all creditors set forth on the matrix.

/s/ Laura K. Grandy

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | IN PROCEEDINGS UNDER |
| | ) | CHAPTER 7 |
| CHEMETCO, INC., | ) | |
| | ) | BK 01-34066 |
| Debtor(s). | ) | |

## MOTION TO ALLOCATE FUTURE TRUSTEE FEES

COMES NOW Laura K. Grandy, the Trustee in the above-referenced bankruptcy proceeding and for her Motion to Allocate Future Trustee Fees states as follows:

1.      On November 13, 2001, Chemetco, Inc. ("Debtor") filed a voluntary Petition for Relief pursuant to Chapter 7 of the United States Bankruptcy Code. The Debtor was a secondary copper smelter which used low grade materials to produce high quality copper. The Debtor's facility was located in Hartford, Illinois and consisted of a 40 acre plant facility ("Plant Site"), adjacent farm ground and real estate located in South Roxana, Illinois. At the time of filing, the main plant contained several buildings which housed furnaces, inventory and supplies. Heavy equipment was located throughout the property. Over 1 million tons of slag, scrubber sludge and process by-products were piled in various locations on the Plant Site.

2.      The Debtor had been under investigation by the Illinois Environmental Protection Agency and the United States Environmental Protection Agency for quite some time. Prior to the filing of the bankruptcy, a criminal judgment was entered against the Debtor and in favor of the Department of Justice for environmental violations. Subsequent to filing bankruptcy, the Illinois Environmental Protection Agency ("IEPA") issued a Seal Order closing the site. The Seal Order limited access to the facility to the Trustee and agents of the Trustee. Access for additional individuals was allowed upon special requests to the Illinois Environmental Protection Agency. The IEPA and United States Environmental Protection Agency ("USEPA") have filed claims in the Estate in excess of $177,000,000.00 related to the cost to clean up the Plant Site.

3.      The Debtor closed its plant operations on October 31, 2001. Between the time of closing and the filing of the bankruptcy on November 13, 2001, little was done to organize the documents of the Debtor, the equipment, inventory or the plant itself. The Trustee inherited a plant and an office that were in utter disarray.

4.      The USEPA recently listed the site as a National Priority Superfund Site. At the time the Plant Site was closed, Chemetco left behind approximately 1 million tons of slag and 50,000 tons of scrubber sludge.

These materials contain lead and cadmium in addition to valuable metals. The challenge of the Estate has been to maintain these materials while trying to market and sell the Estate site. In the past, real estate developers had shown interest in the site but the slag and scrubber sludge materials were deterrents to the purchase.

5.      On September 21, 2009, the United States Bankruptcy Court approved the sale of substantially all of the assets of the Estate to Industrial Asset Disposition ("Asset Sale"). The Asset Sale encompasses the ultimate transfer of the real estate, demolition of buildings coated in hazardous wastes and the processing of over 1 million tons of slag, scrubber sludge and/or metal by-products. The Asset Sale is expected to result in the Plant Site being substantially remediated while producing income to pay claims. The claims of the Illinois EPA and United States EPA total $177 million dollars ("EPA Claims"). A portion of the EPA Claims is based on the estimated costs to clean the Plant Site, which amount substantially dilutes the distribution to unsecured creditors. The process being developed by IAD is expected to result in the sale and removal of over 1 million tons of slag, scrubber sludge and metal bearing by-products from the copper smelter operation (collectively "Metal By-Products"). The removal of the Metal By-Products will substantially reduce the claims of the IEPA and USEPA resulting in a more significant distribution to the unsecured creditors.

The Trustee has been responsible for the day-to-day maintenance and liquidation of the assets of Chemetco, Inc. The following functions were performed by the Trustee in the course of maintaining the Estate assets:

I.      ASSETS:

A.      Real Estate:

(1)     Plant Location - As a result of the Seal Order, the Trustee has continued to routinely deal with water and air issues related to the property. The Trustee retained three (3) former employees of Chemetco, Inc. to assist the Bankruptcy Estate in addressing the water issues so as to maintain compliance with all environmental requirements. Issues created by excessive rain or dust problems created by dry conditions have been routinely handled on behalf of the Bankruptcy Estate. Additional issues related to deterioration of plant buildings have also been monitored for safety reasons. The Trustee also retained a full time environmental expert to handle numerous compliance issues with the Illinois EPA related to the Plant Site.

(2)     Seal Order - The Trustee has continued to maintain compliance with the Seal Order so that areas which were considered high risk by the Environmental Protection Agency are contained. Continued environmental compliance is necessary to protect the numerous assets located on the Plant Site such as slag, zinc and other materials as well as protect the environment.

(3)     Farm Property - Adjacent to the Plant Site are approximately 140 acres of farm ground, a house and outbuildings which Chemetco, Inc. owned. The real estate had been acquired by Chemetco, Inc. to control the surrounding area and lessen

the likelihood of neighborhood complaints.  The Trustee has leased the farm ground out and the Estate has earned $103,235.02 in farm income since the filing of the bankruptcy.  The Trustee listed all of the farm ground for sale and has been working with County and State officials to obtain incentives for potential buyers.  Due to the proximity of this ground to the Plant location, real estate developers were not interested in acquiring the ground.  The Farm Property was sold to IAD pursuant to the Asset Sale approved by the Court.

(4)   <u>Real Estate Taxes</u> - The Trustee protested the real estate taxes on the Plant Site. The Trustee appealed the taxes which were ultimately reduced from an assessed value of $1,234,980.00 to $385,020.00.  The Trustee further appealed that decision and proposed a settlement to various taxing districts which was approved by this Court.  As a result of the settlement, the Trustee has continued to pay the real estate taxes on the Farm Ground located adjacent to the site.  The Trustee has not paid the real estate taxes on the Plant Site as a result of said settlement but will be required to pay the reduced real estate taxes upon consummation of the Asset Sale.

(5)   <u>Security</u> - At the time the bankruptcy was filed, Chemetco, Inc. had retained on-site security guards to monitor the facility.  The cost of the security guards was approximately $1,700.00 per week.  The Trustee's staff secured the facility with a configuration of gates and installed a security/alarm system with high resolution cameras to substantially reduce the cost of security.  This has resulted in a savings of approximately $7,000.00 per month while at the same time keeping the facility safe.  The facility has been the target of several copper thieves.  The security/alarm system has been responsible for catching several of those thieves as well as keeping those who would otherwise enter the premises out.  Employees continue to improve security by installing additional cameras.

(6)   <u>Utilities</u> - At the time the Bankruptcy Petition was filed, the utilities had been turned off at the Plant Site.  Power was needed to operate pumps necessary for environmental protection measures as well as to provide light to the office facility.  Chemetco, Inc. had an office facility consisting of approximately 15,000 square feet.  The Trustee negotiated with both Union Electric and Illinois Power Company to obtain power to the facility while at the same time reducing the power usage.

(7)   <u>L.C. Metals</u>

Prior to the filing of the bankruptcy, Chemetco, Inc. had entered into a sale of certain real estate located in Granite City, Illinois, to L.C. Metals.  L.C. Metals paid off the contract.  Since the inception of this bankruptcy proceeding, the Trustee has collected a total of $319,850.38 from the L.C. Metals sale.

B.   <u>Equipment</u>

At the time the bankruptcy was filed, the Plant Site was filled with numerous pieces of heavy equipment used in the operation of the plant as well as tools and other equipment to process the metal.  The Trustee arranged an auction of some of the equipment located on the site.  The auction was held on July 18, 2002.  The auction grossed $495,439.00. The plant still contains equipment that was not sold at the auction.  The Trustee has negotiated a sale of three (3) of the furnaces used to smelt the metals that produced copper, zinc and other metals at the site.  The sale price of the furnaces is $1,525,000.00. The Trustee has been coordinating with various subcontractors and the buyer for the removal of the furnaces.  A work plan will need to be approved by the Illinois EPA prior to the removal of the furnaces.  Additional parts and equipment related to the smelter

process were also sold to the buyer totaling $230,523.40. The Trustee is working with her staff and the subcontractors to propose the work plan to remove the furnaces.

The Trustee sold the Cress Loaders located on site for the amount of $200,000.00. The Trustee's plant staff had refurbished the equipment and the equipment was advertised for sale.

The Plant Site also contains additional equipment including two (2) bag houses, rolling equipment, cranes, and miscellaneous tools. The equipment was sold to Industrial Assets along with all other assets. The Estate will receive 80% of net revenues from further equipment sales.

C.    Inventory

The Trustee has continued to sell scrap inventory from the plant. The Trustee sold scrap inventory in February of 2002 for the amount of $1,006,000.00. The inventory was sold by means of an auction conducted in the Bankruptcy Court. Numerous buyers participated in the sale. Commerce Bank had a lien on the inventory along with several inventory suppliers who asserted reclamation claims. The Trustee filed a Complaint with the Bankruptcy Court to determine the priority of the reclamation claims. The Trustee negotiated the sale of cupro, pot slag and furnace cleanup dust. In order to complete the sales, the Trustee needed approval from the Illinois EPA. An Interim Order was negotiated with the Illinois EPA in a proceeding filed in the United States District Court by the Illinois EPA prior to the filing of the bankruptcy. An Application to Approve Settlement of the Interim Order was filed in August of 2008 and approved by the United States Bankruptcy Court. As a result of said Order, the Trustee sold approximately $1,938,454.78 of cupro, pot slag and clean up dust.

The Trustee also sold copper anodes and black copper by auction in February 2002, for a net sales price of $788,465.95. The Trustee has continued to sell inventory from time to time. To date, the total inventory sold amounts to $4,105,269.83.

D.    Slag/Zinc

By far the most significant asset on the Plant Site consists of slag, which totals approximately 1 million tons. The slag was a by-product of the copper smelter process. The slag contains copper, zinc, lead, cadmium, and other metals. Prior to filing bankruptcy, Chemetco, Inc. had recovered copper from a portion of the slag and ground the remaining slag material from the recovery process. The ground slag material was sold by Chemetco to be used in roofing shingles as well as pigment for ceramic tiles. Due to the value of copper and zinc in the metals markets over the past two years, the Trustee has had renewed interest in the possible sale of the slag. The Trustee negotiated in the past with the Illinois Environmental Protection Agency and the Unites States Environmental Protection Agency to sell the unprocessed slag material. The slag material was sold to IAD pursuant to the Asset Sale. It will be necessary for the Estate to negotiate a work plan and have that work plan approved as a final Order in the District Court action prior to processing. Industrial Asset Disposition will design, construct, and assist in the operation of a processing plant to recover the saleable material by-products located on the Chemetco site. The Trustee previously negotiated a contract with Metals Finance Corporation to process the material. Metals Finance Corporation terminated that contract due to the potential cost of operating the facility and issues related to the Illinois Environmental Protection Agency and United States Environmental Protection Agency. One goal of the IAD project is to clear the Plant Site of the by-products which would otherwise need to go to a hazardous landfill. The project will reduce the EPA Claims while generating net revenue for the Bankruptcy Estate.

Commerce Bank has a lien on the Metal By-Products.   As a part of the Asset Sale, Commerce Bank agreed to reduce its secured claim to $5,000,000.00.

E.      Office Facility

The Chemetco, Inc. office facility located at the plant contains a significant amount of office equipment and furnishings.  The equipment and furnishing are currently being used by the Trustee to house the documents needed for this Bankruptcy Estate.  The sale to Industrial Asset Disposition included the office equipment and furnishings.  The Estate negotiated the continual use of the office equipment and furnishings during the project with IAD as well as continued document storage.

F.      Miscellaneous Scrap Metal

At the time the bankruptcy was filed, the Chemetco, Inc. site was littered with discarded equipment and inventory.  The Trustee retained the services of a scrap metal processor to cut and sell the material.  This netted the Bankruptcy Estate $27,656.40.  The buildings located on the site still contain a significant amount of scrap material.  Many of the buildings have environmental problems which need to be addressed prior to the removal of the material.  The scrap metal will be sold in conjunction with the demolition of the buildings by IAD.

G.      Hartford Casualty Insurance Litigation

At the time the bankruptcy was filed, Chemetco, Inc. had filed a lawsuit against Hartford Casualty Insurance for improper processing of worker's compensation claims.  The Trustee retained the law firm of Morris Chapman to pursue the litigation.  The litigation was settled for $2 million which was paid to the Bankruptcy Estate.  Commerce Bank claimed to have a lien on the insurance settlement proceeds based upon a claim that it had all contract rights and general intangibles.  The Trustee disputed the claim of Commerce Bank and the claim was ultimately settled by Commerce Bank receiving one-half (½) of the net proceeds after payment of all attorney's fees and costs of the Bankruptcy Estate.  The Bankruptcy Estate netted $634,364.84 from settlement.

H.      Preference Litigation

The Trustee investigated various preferences and fraudulent conveyances ("Avoidance Actions") and retained counsel to pursue preference litigation.  As of this date, the Bankruptcy Estate recovered $3,024,353.79 from Avoidance Actions.  The Trustee directed the filing of over two hundred (200) Avoidance Actions.

I.      Miscellaneous Assets

The Trustee has also recovered numerous refunds, deposits, dividends, and structured payments totaling approximately $363,890.35.

J.      Equisearch Recovery

The Trustee recovered various funds held by Equisearch for the benefit of the Bankruptcy Estate in the amount of $333,915.87.

II.    CASE MANAGEMENT ISSUES

A.      Environmental Issues

The Illinois Environmental Protection Agency issued a Seal Order on the Chemetco, Inc. site shortly after the bankruptcy was filed. As a result of the Seal Order, it was necessary for the Trustee to secure the property and limit access to the facility. This requires the Trustee to obtain permission for various creditors to enter the site to recover assets as well as other professionals retained by the Trustee to obtain samples and testing, etc.

B.   Professionals

The Trustee retained Penni Livingston to advise the Trustee on environmental matters. The Trustee has also retained the services of ENSR and Hurst-Roche to assist the Trustee in providing technical advice needed for the Interim Order with the Illinois EPA.

C.   Records

The Trustee has maintained the records of the Debtor which are required by the Illinois Environmental Protection Agency and the United States Environmental Protection Agency. The majority of the records were kept on a Wang computer system. Due to the fact that the power had been turned off prior to the bankruptcy being filed, it was necessary for the Trustee to retain the services of Wang computer experts to repair the system. The Wang system requires a consistently cool temperature; thus, the Estate must keep the utilities turned on at all times. The Wang system has required on-going upkeep and maintenance.

Chemetco, Inc. had two (2) computer systems that operated its facility. The Wang computer system was used for the commercial side of the business and an IBM computer system was used for the plant side of the facility. This computer system was leased through IBM. The Trustee negotiated a discounted payoff of the computer system from IBM. The prior lease required payments of $2,322.17 per month. The Trustee had previously negotiated a discount payment of $500.00 per month to keep the computer system. Both computer systems were necessary for the Avoidance Actions and will be necessary for the claims review process.

D.   Personnel

In order to maintain the plant and office facility, it was necessary for the Trustee to hire personnel on behalf of the Bankruptcy Estate. The employees hired have been essential to the Bankruptcy Estate in order to maintain compliance with the Seal Order as well as recover documents needed to address environmental issues, recover assets of the Bankruptcy Estate, and review claims. Initially, the Trustee employed the employees through a service known as Labor Ready; this was because the Trustee did not have worker's compensation insurance for the employees. Ultimately, the Trustee was able to obtain worker's compensation insurance and health insurance to keep the employees. Due to the long history that the employees have had with the Chemetco, Inc. facility, their knowledge of the plant operation, equipment operation, and material composition is invaluable. At the time the bankruptcy was filed, all of the employees had been terminated and the Trustee had absolutely no employees to assist the Trustee in recovering documents and/or plant and office maintenance. The Trustee's office has calculated and paid payroll since the filing of the bankruptcy. The Trustee conducts weekly staff meetings to ensure the progress of the plant and stay apprised of current issues related to the facility.

E.   Tax Returns

The Trustee retained accountants and accumulated information to assist in the preparation of the tax returns of the Bankruptcy Estate. Once again, the information was difficult to gather due to the fact that there were no employees at Chemetco, Inc. at the time the

facility was closed.   The personnel retained by the Trustee assisted the Trustee in gathering the tax information.   The Trustee has filed all tax returns necessary for the Estate to date.

F.    Miscellaneous Operating

(1)    Expenses - Each month the Trustee reviews and pays utility bills, uniform bills, security bills, trash collection bills, repair bills, testing and sampling bills, etc. incurred to maintain the plant.

(2)    Claims  - The Trustee has organized over 628 claims filed in this case.  The Trustee also assisted the Illinois Department of Employment Pension and Welfare Benefits to review records of the Debtor to determine whether a claim would need to be filed.  Claim objections are in progress.

(3)    Monthly Reports - The Trustee has provided income and expense reports to the U.S. Trustee's office and reviewed those reports on a regular basis with the U.S. Trustee's office.

(4)    Allocation of Sales Proceeds - the Trustee reviewed numerous records relating to the alleged secured claims of various creditors in this case.  The Trustee has negotiated payment of the claims from various assets sold with those secured creditors and has offset against those payments costs of the Bankruptcy Estate so as not to penalize the Bankruptcy Estate for the expenses incurred in those sales.

(5)    Seal Order - The Trustee has continued to provide information to the Illinois Environmental Protection Agency with regard to the Seal Order.  The Trustee has also provided additional information to the Illinois EPA related to other matters in which the Illinois EPA is investigating.

6.    The Trustee has spent countless hours performing the above-referenced duties.  The amount of time the Trustee has spent has increased since the sale to IAD to facilitate the approval of the Consent Decree with the Illinois EPA and U.S. EPA necessary to move forward on the Processing Plant and assorted work plans.  The Trustee has also spent many hours trying to coordinate the working relationship between the bankruptcy estate and IAD.  The Trustee believes that the process being developed by IAD will provide a substantial benefit to this estate by not only improving the Plant Site but providing a distribution to the creditors.  At the time the Trustee took this case, the possibilities for Chemetco, Inc. looked bleak.  The Trustee was willing to withstand carefully calculated risks to continually maintain the plant and create the opportunities to process the material.  The Trustee was recently appointed to be the next United States Bankruptcy Judge for the Southern District of Illinois.  Laura K. Grandy will resign as Trustee prior to assuming the position of United States Bankruptcy Judge.  The U.S. Trustee's Office has selected Donald M. Samson to replace Laura K. Grandy as Trustee.  Donald M. Samson has spent several days since being notified of his selection to become acquainted with the facilities, liquidation process and administration of the estate.  The Trustee was employed by the law firm of Mathis, Marifian, Richter & Grandy, Ltd. the entire time she

acted as Trustee in this bankruptcy estate.  As such, the fees earned by Laura K. Grandy are assets of Mathis, Marifian, Richter & Grandy, Ltd.  The Trustee and Donald M. Samson have agreed to allocate future trustee applications for fees so that one-third (1/3) of all future fees approved by the Court will be paid to Donald Samson and two-thirds (2/3) will be paid to Mathis, Marifian, Richter & Grandy, Ltd.  for the fees earned by Laura K. Grandy but not yet realized due to the fact that the proceeds for said distributions have not yet come to fruition.  The Trustee has spent a significant amount of time laying the groundwork in hopes of improving the Plant Site, increasing distribution to creditors, and realizing the future trustee fees.  The division of these trustee's fees will in no way cause the Trustees to collectively be paid more than allowed by the Bankruptcy Code or approved by the Bankruptcy Court in the future.  The purpose of this Motion is simply to allocate future trustee fees that may be approved by this Court between the current Trustee, Laura K. Grandy, and the future Trustee, Donald M. Samson.

       7.      Donald M. Samson has agreed to this Motion.  The Trustee and Donald M. Samson believe the allocation of the Trustee fees are reasonable considering the substantial amount of time the Trustee has devoted to this case, the risk that certain assets would not sell, the environmental risk, the immediacy of the issues presented to the Trustee, the cost savings methods employed by the Trustee and the potential positive results the Trustee has brought to the Estate by the association with IAD.  The IAD process is expected to substantially reduce the claims of the Illinois EPA and the U.S. EPA resulting in the distributions to the remaining creditors being substantially increased.  Laura K. Grandy has served as Trustee for approximately eight and one half (8½) years.

       WHEREFORE, the Trustee prays that the Court approve this Motion to Allocate Future Trustee Fees as set forth above.

       Dated this 9th day of March, 2010.

Mathis, Marifian, Richter & Grandy, Ltd.    /s/ Laura K. Grandy, Trustee
23 Public Square, Ste. 300
Belleville, IL  62232
(618) 234-9800
(618) 234-9786

Approved as to form and content:

_____
Laura K. Grandy, Trustee


_____
Donald M. Samson

### CERTIFICATE OF SERVICE

I, LAURA K. GRANDY, hereby certify that on this 9th day of March, 2010, I forwarded a copy of the foregoing instrument by U.S. Mail or electronic Mail to Tim Ruppel, Assistant U.S. Trustee, Becker Building, Room 1100, 401 Main Street, Peoria, IL 61602; all parties requesting notification via ECF; and to all creditors set forth on the matrix.

/s/ Laura K. Grandy

F:\WP51\LKG\TRUSTEE\Chemetco, Inc\Motions\Mot to Allocate Future Ttee Dist.doc

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement") is made and entered into effective as of July 30, 2012 or the date of the order approving such Settlement Agreement (whichever is sooner), by and among Donald Samson, in his capacity as Trustee for the Bankruptcy Estate of Chemetco, Inc. ("Trustee" or "Seller"), Paradigm Minerals and Environmental Services, LLC ("Paradigm" or "Buyer"), Commerce Bank f/k/a Commerce Bank, N.A. ("Commerce Bank"), Illinois Environmental Protection Agency ("IEPA"), and the United States of America on behalf of the United States Environmental Protection Agency ("USEPA"). Trustee, Paradigm, Commerce Bank, IEPA, and the United States are collectively referred to as the "Parties" or individually, a "Party."

## RECITALS

A.      On November 13, 2001, Chemetco Inc. ("Chemetco") filed a voluntary petition under Chapter 7 of the Bankruptcy Code, Case No. 01-34066-KJM (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Southern District of Illinois ("Bankruptcy Court"). The Bankruptcy Court appointed Laura Grandy as initial Trustee for the Chemetco bankruptcy estate and, upon Ms. Grandy's appointment to bankruptcy judge, appointed Donald Samson as successor Trustee. For purposes of these Recitals, the defined term "Trustee" shall refer to Ms. Grandy or Mr. Samson, as appropriate.

B.      Trustee entered into an Asset Purchase and Processing Agreement dated July 29, 2009, and, pursuant to a joint motion filed by Trustee, Paradigm and IEPA, the Bankruptcy Court approved and clarified the Agreement by Order dated September 21, 2009 (the "Agreement") with Paradigm's predecessor, Industrial Asset Disposition, LLC ("IAD"). Capitalized terms not otherwise defined herein shall have their respective meanings set forth in the Agreement.

C.      Pursuant to the Assignment, Assumption and Consent Agreement dated April 20, 2011 (the "Assignment"), IAD assigned all of its rights and obligations under the Agreement to Paradigm.

D.      The Agreement was further clarified and amended by a Motion and Order, dated March 9, 2010 and May 4, 2010, respectively.

E.      On June 23, 2011, Trustee filed a Motion to Pay Secured Creditor and Allocate Funds (the "Payment Motion"), seeking approval to allocate and pay the expected proceeds from sales of certain materials to various parties. On July 13, 2011, IEPA filed an objection to the Motion (the "Payment Objection"). On August 8, 2011, following a hearing on the Motion and the Objection, the Bankruptcy Court entered an order granting the Payment Motion (the "Payment Order").

F.      On August 22, 2011, IEPA filed an appeal of the Payment Order, Case No. 3:11-CV-836-DRH (the "Appeal"), with the United States District Court for the Southern District of Illinois. The Appeal is currently pending.

G.     On December 14, 2011, IEPA and USEPA filed a Joint Objection to Second Interim Application to Pay Commission to Broker (the "Broker Objection").

H.     On December 14, 2011, IEPA filed an Objection to Sixth Interim Application for Compensation of Trustee Fees and Expenses (the "Trustee Objection" and, together with the Payment Objection and the Broker Objection, the "Objections").

I.     The Parties now wish to compromise, settle and fully resolve the Appeal and various claims and disputes related to and/or arising from the Agreement, the Assignment, the Objections, and the Payment Order without any admission of law or fact by any of the Parties in any respect whatsoever.

AGREEMENT

NOW, THEREFORE, in consideration of the terms, conditions and mutual promises contained herein, it is acknowledged by all Parties that the Parties hereto do agree and contract with each other as follows:

1.     The foregoing recitals are true and correct and are hereby incorporated into and made are a material part of this Settlement Agreement.

2.     On the Effective Date, the Agreement shall be amended as follows:

a.     The following defined terms contained in Exhibit A to the Agreement are amended to read as follows:

i.     "'Buyer' shall mean Paradigm Minerals and Environmental Services, LLC."

ii.     "'NPR Transfer Date' shall mean the date upon which Seller transfers title to the NPR Property to Buyer or to a third party purchaser in accordance with Section 11.1(b) which shall be after the date that the NPR Purchase Price has been paid in full; provided that Buyer is not obligated to take title to the NPR Property."

iii.     "'Operating Expenses shall mean: (i) the costs, real estate taxes, insurance coverage, maintenance and upkeep for the Smelter Site not related to the Processing Facility; (ii) Seller's personnel and administration costs and Seller's taxes; (iii) health and safety costs applicable to the Smelter Site and Seller's personnel; (iv) any and all legal and accounting fees incurred in connection with a particular sale; (v) the Broker Fee of 2% on non-real estate gross sales revenue and the Broker Fee of 6% on real estate gross sales revenue; (vi) Trustee's fee on all gross sales revenue; (vii) all costs of Seller's compliance with Regulatory Agency requirements (except as provided in Section 5.2 (b) hereof); and (viii) any

recording and filing fees except as directly related to a particular sale hereunder."

iv.    "'Scrap Assets' shall mean the miscellaneous steel, iron, and other metal bearing material comprising part of the buildings on the Smelter Site or constituting scrap metal  previously acquired as feed stock for smelting; provided, however that "Scrap Assets" shall not include any Recovered Materials or Unprocessed Materials or furnaces."

v.    "'Smelter Transfer Date' shall mean the date upon which Seller transfers title to the Smelter Site to Buyer or a third party purchaser in accordance with Section 11.1(a) which shall be after the date that the NPR Purchase Price has been paid in full; provided that Buyer is not obligated to take title to the Smelter Site."

vi.    "'Trustee' shall mean Donald Samson, in his capacity as Trustee of the Chemetco bankruptcy estate and any successor trustee."

b.    The following new defined terms are added to Exhibit A to the Agreement:

i.    "'Broker Fee' shall have the meaning ascribed to such term in Section 11.5."

ii.    "'Buyer Fee' shall have the meaning ascribed to such term in Section 4.5."

iii.    "'Mixed Fines' shall mean, in general, material of the type identified as "Mixed Fines" in Trustee's December 1, 2010 Notice of Intent to Sell (Doc. 1583)."

iv.    "'Sale Revenue' shall mean the gross revenue from the sale of all Recovered Materials and Unprocessed Materials on or after March 31, 2012, net of the Buyer Fee and the Operating Expenses."

v.    "'Total Purchase Price' shall have the meaning ascribed to such term in the new Section 4.4(c)."

vi.    "'Unprocessed Materials' shall mean Slag, Scrubber Sludge, Mixed Fines, furnace cleanup, furnace dust, cupro, pot slag, and any other unprocessed materials containing copper, zinc, lead, tin, nickel, or other metals."

c.    The defined term "Processing Revenue" is deleted from Exhibit A of the Agreement, and all references to "Processing Revenue" in the Agreement shall be deemed to refer to "Sale Revenue."

     d.    Section 2.1(a) of the Agreement is deleted in its entirety and replaced with the following:

    "(a)    As of the date hereof, Buyer has paid to Seller the sum of $100,000 (the "Deposit"), which amount shall be applied to the Smelter Purchase Price."

     e.    Section 3.4 of the Agreement is revised to read as follows: "All demolition and sale of Scrap Assets were substantially completed as of the date of this Settlement Agreement."

     f.    The first sentence of Section 4.2 of the Agreement is deleted in its entirety and replaced with the following:

    "4.2    If Buyer elects to do so, Buyer shall construct and operate a facility to process Unprocessed Materials on the Smelter Site (the "Processing Facility") for purposes of recovering copper, zinc, lead, tin, nickel, iron, and other materials, including compounds containing one or more of the aforementioned metals, from the Unprocessed Materials (the "Recovered Materials")."

     g.    Section 4.4(a) of the Agreement is revised by adding "(i) For sales made prior to March 31, 2012," at the start of the current subparagraph, deleting the last sentence of that subparagraph, and by adding the following subparagraph:

    "(ii)    For sales on or after March 31, 2012, so long as a balance remains on the Smelter Purchase Price, and after the Buyer Fee is paid to Buyer and the Operating Expenses are reimbursed, the Sale Revenue shall be distributed by Seller as follows: (i) 5% to Trustee to be transferred by Trustee pursuant to Section 5.2 of the Agreement with no cap or limit on the aggregate amount of such Escrowed Funds; (ii) 15% to Buyer; (iii) 40% to Seller to be applied to the Smelter Purchase Price; and (iv) 40% to Commerce Bank to satisfy Commerce Bank's valid and first priority lien against Mixed Fines, Slag, Scrubber Sludge and Recovered Materials, which amount shall be applied to the Smelter Purchase Price."

     h.    Section 4.4(b) of the Agreement is deleted in its entirety and replaced with the following:

    "(b)    Following payment in full of the Smelter Purchase Price, so long as there remains a balance due on the NPR Purchase Price, and after the Buyer Fee is paid to Buyer and the Operating Expenses are reimbursed, the Sale Revenue shall be distributed by Seller as follows: (i) 5% to Trustee to be transferred by Trustee pursuant to Section 5.2 of the Agreement with no cap or limit on the aggregate amount of such Escrowed Funds; (ii) 15% to Buyer; (iii) 30% to Seller to be applied to the

NPR Purchase Price; and (iv) 50% to Seller, which shall not be applied to the NPR Purchase Price."

    i.    Section 4.4(c) of the Agreement is deleted in its entirety and replaced with the following:

"(c)    At such time as the Smelter Purchase Price and NPR Purchase Price (collectively, the "Total Purchase Price") have been paid in full, and after the Buyer Fee is paid to Buyer and the Operating Expenses are reimbursed, the Sale Revenue shall be distributed by Seller as follows: (i) 5% to Trustee to be transferred by Trustee pursuant to Section 5.2 with no cap or limit on the aggregate amount of such Escrowed Funds; (ii) 47.5% to Buyer; and (iii) 47.5 % to Seller."

    j.    Section 4.5 of the Agreement is deleted in its entirety and replaced by the following:

"(a)    Notwithstanding anything herein to the contrary, all processing shall be completed by the seventh anniversary of: (i) Bankruptcy Court approval of this Settlement Agreement, or (ii) the District Court's approval of the Consent Decree currently being negotiated between the Parties, whichever is later, unless measures approved by USEPA in consultation with the IEPA are in place and maintained which will prevent the release of hazardous substances onto or into areas addressed by remedial or removal actions (as those terms are defined in CERCLA Section 101, 42 U.S.C. ' 9601) that are outside of the 41.1 acre portion of the Smelter Site encompassing the Foundry area, Slag Pile and Zinc Oxide Bunker.

(b)    Buyer shall absorb all costs that are related to:  (i) demolition, removal, and sale of Scrap Assets (Buyer has applied revenue from scrap sales to pay such costs and shall not be liable to the Trustee or otherwise for reimbursement of such costs paid by such revenue); (ii) all costs of construction, labor, equipment, marketing, development, and logistics of the construction and operation of the Processing Facility to produce Recovered Materials; (iii) all costs of the sale of Recovered Materials and Unprocessed Materials;  (iv) all costs for the development and implementation of the Work Plans; and (v) all costs of Buyer's compliance with Regulatory Agency requirements (except as provided in Section 5.2 (b) hereof).  In return for absorbing all of these costs, Buyer shall receive the following percentage payments from the gross sales revenue from the sale of Recovered Materials and Unprocessed Materials: 30% for sales prior to March 31, 2012 and 40% for sales on or after March 31, 2012. This fee shall be defined as the "Buyer Fee." Direct costs (not including Seller's Operating Expenses) incurred by Seller to effectuate such sales shall be credited against the Buyer Fee and reimbursed at Trustee's discretion but in any event no later than the date of termination

Case 3:00-cv-00670-NJR-RCW Document 498-3 Filed 08/23/13 Page 18 of 36   Page ID
Case 01-34066-kjm   Doc 1094   Filed 08/24/12   Page 6 of 24
#1043

of the Agreement. The Buyer Fee shall remain at 40% of the gross sales
revenue until the Total Purchase Price has been paid in full, after which
the Buyer Fee shall change to 30% of gross sales revenue for the
remainder of the Agreement."

k.      A new Section 4.7 of the Agreement is added as follows:

"4.7    In the event that Buyer elects, in its sole discretion, to proceed with
the construction and operation of the Processing Facility, Buyer will pay
for the Processing Facility from the Buyer Fee and from the Buyer's share
of Sale Revenue (or other funds available to Buyer).  However, in its sole
discretion, Seller may advance to Buyer funds for the costs of construction
of the Processing Facility (to the extent Seller has available funds).  Funds
so advanced by Seller may be recouped from Buyer's distribution share of
the Sale Revenue (but not from the Buyer Fee paid to Buyer).    In
addition, with respect to the requirements under Section 4.6(c) hereof,
Seller and Buyer shall work together to determine an appropriate
contractor or contractors for such work and the corresponding level of
insurance, bonds or lien waivers required, if any, in Seller's reasonable
discretion."

l.      Section 5.2 of the Agreement is hereby deleted in its entirety and replaced
with the following:

"5.2    (a)     Any amounts directed to be transferred by Trustee pursuant
to Section 4.4(a)(i), 4.4(b)(i), and 4.4(c)(i) hereof shall be transferred by
Trustee into an interest bearing account for the benefit of USEPA and
IEPA as described in subparagraph (d) of this Section ("Escrowed
Funds").
(b)    The purpose of the Escrowed Funds is to fund, upon approval of
USEPA after consultation with the State, performance of any
environmental response actions that may be required as a result of
performance by Seller's, Paradigm's or its contractor's work. After
Escrowed Funds have been used by Paradigm, for environmental response
actions, Seller or Paradigm may access such funds to fund, upon approval
of EPA after consultation with the State, for the:  (i) closure and post-
closure of all units used  to store, manage, and process the Recovered
Materials and/or Unprocessed Materials; (ii) disposal of all Recovered
Materials and/or Unprocessed Materials that are in process but are not yet
sold and any accumulated process wastes; (iii) decontamination of all
equipment and buildings used in such processes; and (iv) any professional
fees, related to the  activities described in subsections (i) – (iii) of this
subparagraph.
(c)    The unutilized Escrowed Funds shall remain in escrow until all
appropriate "no further remediation" letters have been received by Seller.
As used in this Section 5.2(c), the phrase "all appropriate 'no further
remediation' letters" is not a specific reference to a "No Further

Remediation Letter" pursuant to Section 58.10 of the Environmental Protection Act but rather a generic reference to any appropriate closure or termination letter issued by an agency with jurisdiction over the remediation in question.

(d)     Any Escrowed Funds remaining after termination of the Agreement for whatever reason and after such Escrowed Funds have been used to remediate any new environmental non-compliance conditions caused by Buyer or Seller after September 21, 2009, may be used to remediate any environmental problem or condition existing on the site prior to the filing of Chemetco's bankruptcy proceeding."

m.     Section 6.1(f) of the Agreement is deleted in its entirety and replaced with the following:

"(f)     Notwithstanding anything else in this Agreement to the contrary, to the extent funds are available, make monthly distributions of Scrap Revenue and Sale Revenue, provided, that Seller may retain a portion of the Scrap Revenue and/or the Sale Revenue otherwise distributable to Buyer or Commerce Bank to meet the ongoing Operating Expenses as determined from time to time by Seller (and pay such retained amounts to Buyer or Commerce Bank, as applicable, as soon as funds are available). Seller may advance funds to Buyer for the costs of operation of the Processing Facility, the costs of implementation of Work Plans, the costs of compliance with Regulatory Agency requirements, and payment of the Buyer Fee if necessary to maintain continued operations. Such advanced funds shall be recovered at a time determined by Seller from future distributions of the Buyer Fee, the Scrap Revenue and/or the Sales Revenue payable to Buyer."

n.     A new Section 6.3 of the Agreement is added, as follows:

"6.3     Notwithstanding any provision contained in this Agreement to the contrary, Buyer shall have no duty or obligation to (a) request or accept ownership to or possession of the Smelter Site or the NPR Property from Trustee or any other party, (b) sell the Smelter Site or the NPR Property, or (c) construct or operate the Processing Facility. If no Processing Facility is constructed or Paradigm ceases operation of the Processing Facility, all sales of Unprocessed Material must be completed by the seventh anniversary of: (i) the Bankruptcy Court's approval of this Settlement Agreement, or (ii) the District Court's approval of the Consent Decree currently being negotiated between the Parties, whichever is later, unless measures approved by the United States Environmental Protection Agency in consultation with the Illinois Environmental Protection Agency are in place and maintained which will prevent the release of hazardous substances onto or into areas addressed by remedial or removal actions (as those terms are defined in CERCLA Section 101, 42 U.S.C. ' 9601) that

are outside of the 41,1 acre portion of the Smelter Site encompassing the Foundry area, Slag Pile and Zinc Oxide Bunker."

o.    Section 11.1 of the Agreement is deleted in its entirety and replaced with the following:

"11.1   Time and Place of Transfer

(a)    Title to the Smelter Site shall remain with Seller until the occurrence (if ever) of the Smelter Transfer Date.  Upon payment in full of the Total Purchase Price, Buyer shall have the right (but not the obligation) to (i) request that Trustee transfer to Buyer all of Trustee's right, title and interest in and to the Smelter Site pursuant to a trustee's deed executed by Trustee (and in form and substance acceptable to Buyer), or (ii) sell, as Trustee's agent, all of Trustee's right, title and interest in and to the Smelter Site (exclusive of and subject to Trustee's and/or Buyer's rights in and to the Scrap Assets and/or Recovered Materials) to a third party purchaser on terms and conditions acceptable to Buyer, subject to applicable approvals, with all net proceeds of such sale to be paid to Buyer.

(b)    Title to the NPR Property shall remain with Seller until the occurrence (if ever) of the NPR Transfer Date.  Upon payment in full of the Total Purchase Price, Buyer shall have the right (but not the obligation) to (i) request that Trustee transfer to Buyer all of Trustee's right, title and interest in and to the NPR Property pursuant to a trustee's deed executed by Trustee (and in form and substance acceptable to Buyer), or (ii) sell, as Trustee's agent, all of Trustee's right, title and interest in and to the NPR Property to a third party purchaser on terms and conditions acceptable to Buyer, subject to applicable approvals, with all net proceeds of such sale to be paid to Buyer."

p.    A new Section 11.5 of the Agreement is added, as follows:

"11.5   The fee due to the Barber Murphy Group (the "Broker Fee") of 2% on non real estate gross sales revenue, the Broker Fee of 6% on all real estate gross sales revenue, and Trustee's fee of 3% on all gross sales revenue shall be paid by Seller.  The Broker Fee of 6% on all real estate gross sales revenue applicable to the Smelter Site or the NPR Property shall be due and payable upon  payment of the applicable purchase price."

q.    Section 13.5 of the Agreement is amended to provide the following new notice addresses for the parties:

"To Buyer:

Paradigm Minerals and Environmental Services, LLC
3574 Chemetco Lane

Hartford, IL 62048
Attn: Elliott Stegin and Steve Zuber

With a copy to:

Daniel Nester
Bryan Cave LLP
211 N. Broadway, Suite 3600
St., Louis, MO 63102

-and-

Steve Poplawski
Bryan Cave LLP
211 N. Broadway, Suite 3600
St., Louis, MO 63102

To Seller:

The Bankruptcy Estate of Chemetco, Inc.
c/o Donald Samson
226 W. Main Street, Suite 102
Belleville, IL 62220

With a copy to:

William Niehoff
Mathis, Marifian & Richter, Ltd.
23 Public Square, Suite 300
Belleville, IL 62220"

3.      The Parties acknowledge distributions made in connection with the sales
described below must be recalculated using the revised formulae
established pursuant to this Settlement Agreement. The Parties agree that
the recalculated distributions for these sales are as follows:

| Sale | Gross Revenue $$ | Direct Cost of Sales $$ | Allocated Estate Operating Costs | Allocated Paradigm Operating Costs (3) | Net for Distribution | Distribution to be Paid |
|------|------|------|------|------|------|------|
| Mixed Fines/Scrubber Sludge Notice 12/1/10 | 1,475,807.75 | 526,100.25 | 250,000 | 250,000 | 475,807.75 | P: $118,951.93<br>C: $166,532.56<br>E: $166,532.56<br>RAE:23,790.39 |

Case 3:00-cv-00670-NJR-RCW   Document 694-8   Filed 08/23/13   Page 22 of 36   Page ID
Case 01-34066-kjm   Doc 694-8   Filed 08/23/12   Page 10 of 21
#1047

| Furnace Cleanup Notice 4/15/11 | 447,091.19 | 36,170.55 | 100,000 | 100,000 | 210,920.64 | P:   $52,730.16<br>C:   $73,822.22<br>E:   $73,822.22<br>RAE:10,546.03 |
|---|---|---|---|---|---|---|

| | Gross Revenue | Buyer Fee 30% | Direct Costs of Sales | Allocated Estate Costs | Net      for Distribution |
|---|---|---|---|---|---|
| Scrap      Sale Demolition | 1,730,199.69 | NA | 1,652,517.49 | 77,628.20 | 0 |
| Scrap      Sale Non-Demolition | 38,863.40 | 5083.30 | 0 | 31,781.10 | 0 |

The Parties agree that any Party that previously received a distribution in excess of the amount recalculated above shall not be required to disgorge any such excess distribution amounts; rather, future distributions to such Party shall be adjusted to recover such excess distribution amounts, and such recovered amounts shall be used to reimburse any Party who previously received a distribution less than the amount recalculated above.

The Parties further agree that the Sales occurring before March 31, 2012 shall be reconciled as described in the table above.

The Parties further agree that the Sales occurring after March 31, 2012 (excluding the 900,000 MT slag sale contract described in the next section) shall be distributed according to the following:

> Gross Revenue
> Less Operating Expenses;
> Less Buyer Fee.

The resulting sum shall be distributed according to the formulas set forth in paragraph 4.4 as appropriate.

The Parties further agree that with respect to sale of any portion under the 900,000 MT slag sale contract priced at $22.50 per MT, proceeds shall be distributed according to the following:

> Gross Revenue
> Less Direct Costs of Sale, including loading, screening, containers,
>         materials, equipment, and labor;
> Less Buyer Fee;
> Less Operating Expenses;

The resulting sum will be distributed according to the formulas set forth in paragraph 4.4 as appropriate.

4.      The Parties expressly acknowledge and agree that Commerce Bank has a first priority lien on Mixed Fines, Slag, Scrubber Sludge, Cupro, Pot Slag, copper fines, Furnace Cleanup, and Recovered Materials and any other Unprocessed Materials, but not on Scrap Assets, real estate or on the furnaces.

5.      It remains the intention of the Parties that Trustee is vested with the authority to make decisions to allow the Processing, sales of metal bearing material and all related operations authorized by the Agreement to be undertaken by Paradigm to proceed in a smooth and efficient manner.  Such authority includes, but is not limited to, the decision to extend the timeframes for performance by Buyer as set forth in the Agreement, provided that the Trustee shall advise the other Parties in writing, in advance, of any changes to such time frames.

6.      Trustee has itemized, by category, $680,217.90 in costs sought by Trustee in the Payment Motion and all costs incurred by Trustee prior to March 31, 2012 (the "Itemized Costs"), which itemization is attached hereto as Exhibit A.  After payment in full of the Total Purchase Price, $446,392.65 of the Itemized Costs (as set forth in Exhibits A and B) and $91,248.04 shall be paid by Paradigm (such amounts will be paid from Seller's deductions of this amount from future distributions of the Buyer Fee or Sale Revenue payable to Paradigm, unless paid earlier by Paradigm on a mutually agreeable basis).  If the Agreement is terminated without full payment of the Total Purchase Price, the portion of Itemized Costs payable by Paradigm will be deducted from any payment then owed to Paradigm or paid back by Paradigm as mutually agreed to or as ordered by the Bankruptcy Court if no further payment is owed.

7.      Within seven (7) days after the execution of this Settlement Agreement by the Parties, Trustee shall (a) file a motion with the Bankruptcy Court, seeking approval of this Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "Settlement Motion"), (b) file a notice of hearing on the Settlement Motion with the Bankruptcy Court (the "Settlement Notice"), scheduling the hearing on the Settlement Motion for a date no more than 30 days after the filing of the Settlement Motion, and (c) serve a copy of the Settlement Notice on all parties listed on the creditor matrix filed in the Bankruptcy Case.

8.      Unless otherwise agreed to by the Parties in writing, if the Court does not enter an order approving each of the terms and conditions contained in this Settlement Agreement (the "Settlement Order") within 45 days after the filing of the Settlement Motion, this Settlement Agreement shall be null and void.

9.      The "Effective Date" shall be the date on which the Settlement Order becomes a final, non-appealable order, provided that no stay of the Settlement Order has been granted by any court and is then pending.

10.      As soon as reasonably practicable after the Effective Date, the Parties shall take all actions necessary to dismiss the Objections and the Appeal.

Case 3:00-cv-00670-NJR-RGW  Document 198-8 Filed 08/23/13 Page 24 of 36  Page ID
Case 01-34000-kjm   Document 694-1 Filed 08/23/12 Page 24 of 21
#1049

11.     Except as otherwise provided herein, as of the Effective Date, each Party (and anyone claiming by, through or under such Party) releases, acquits and forever discharges each other Party from any and all claims, demands, losses, costs, expenses, actions, causes of action, suits, disputes, objections, and defenses that were brought in the Objections or the Appeal .

12.     This Settlement Agreement shall bind and inure to the benefit of all successors and assigns of the Parties, including, without limitation, any trustee, estate representative, responsible officer or examiner appointed or elected in the Bankruptcy Case. In the event of any conflict between the terms of this Settlement Agreement and the terms of the Agreement or the Payment Order, the terms of this Settlement Agreement shall govern. In the event of a conflict between the terms of this Settlement Agreement and the terms of the Consent Decree currently being negotiated between the parties, the Consent Decree shall govern.

13.     All notices, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given: (a) when personally delivered; (b) upon receipt during normal business hours, or otherwise on the first business day thereafter, if transmitted by facsimile with confirmation of receipt; (c) when received, if mailed by certified mail, return receipt requested, postage prepaid; or (d) when received, if sent by overnight courier; in each case, to the following addresses, or to such other addresses as a Party may from time to time specify by notice to the other Party given pursuant hereto.

If to Trustee, to:

Donald Samson
226 W. Main Street, Suite 102
Belleville, IL 62220

With a copy to:

William Niehoff
Mathis, Marifian & Richter, Ltd.
23 Public Square, Suite 300
Belleville, IL 62220

If to Paradigm, to:

Paradigm Minerals and Environmental Services, LLC
3574 Chemetco Lane
Hartford, IL 62048
Attn: Elliott Stegin and Steve Zuber

With a copy to:

Daniel Nester
Bryan Cave LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102

-and-

Steve Poplawski
Bryan Cave LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102

If to Commerce Bank, to:

Commerce Bank
8000 Forsyth Blvd.
St. Louis, MO 63105
Attn: David Orf

With a copy to:

David Unseth and Dan Nester
Bryan Cave LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102

If to IEPA, to:
James Kropid
Division of Legal Counsel
Illinois Environmental Protection Agency
1021 North Grand Avenue East
P.O. Box 19276
Springfield, IL 62794-9276


With a copy to:
James Morgan
Assistant Attorney General
Environmental Bureau
Office of the Attorney General
500 South Second Street
Springfield, IL 62706

Case 3:00-cv-00670-NJR-GCW  Document 198-8  Filed 08/23/13  Page 26 of 36  Page ID
Case 01-34066-kjm  Doc 1694  Filed 03/18/13  Page 4 of 21
#1051

If to the United States, to

As to U.S. Department of Justice

[By U.S. Mail]                              [By Courier]

Chief                                       Chief
Environmental Enforcement Section           Environmental Enforcement Section
U.S. Department of Justice                  U.S. Department of Justice
P.O. Box 7611                               ENRD Mailroom, Room 2121
Ben Franklin Station                        601 D. Street NW
Washington, D.C. 20044                      Washington, D.C. 20004
Re:  No. 90-5-1-1-4516                      Re:  No. 90-5-1-1-4516


As to U.S. EPA:

Thomas Martin
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Chicago, Illinois 60604-3590

Michelle Kerr
Remedial Project Manager
Superfund Division
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Chicago, IL 60604-3590


    14.    The Parties shall cooperate fully and shall execute and deliver any and all supplementary papers, documents, instruments and other assurances, and shall do any and all acts that may be reasonably necessary or appropriate to give full force and effect to the terms and intent of this Settlement Agreement.

    15.    The Bankruptcy Court shall have exclusive jurisdiction to determine as a core proceeding any dispute or controversy with respect to the interpretation or enforcement of this Settlement Agreement.

    16.    This Settlement Agreement contains the entire agreement between the Parties with respect to the matters covered by this Settlement Agreement, and no promise or understanding or representation made by any Party or agent, director, officer, employee or attorney of any Party that is not expressly contained in this Settlement Agreement shall be binding or valid.  The clarifications/amendments sought by the Motion and Order, dated March

9, 2010 and May 4, 2010, respectively, have been supplanted by this Settlement Agreement and are merged into and controlled by this Settlement Agreement.

17.     This Settlement Agreement may not be modified, amended, or supplemented by the Parties except in accordance with further order of the Bankruptcy Court or by a written agreement that all of the Parties have signed.

18.     A waiver of any provision of this Settlement Agreement shall not constitute a waiver of any other provision of this Settlement Agreement.

19.     In case any provision of this Settlement Agreement shall be determined to be invalid, illegal or unenforceable for any reason, the remaining provisions and portions of this Settlement Agreement shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law.

20.     This Settlement Agreement is intended to settle and dispose of claims which are contested and denied.  Nothing herein shall be construed as an admission by the Parties of any liability of any kind.

21.     Each Party warrants and represents that the person executing this Settlement Agreement on its behalf is authorized to do so.

22.     The Parties may execute this Settlement Agreement in one or more counterparts, each of which constitutes an original, and all of which constitute one and the same agreement.  A facsimile or any other copy of this Settlement Agreement executed by the Parties, whether complete or in counterparts, shall constitute sufficient evidence of the executed original of this Settlement Agreement for all purposes.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement effective on the date set forth above.

_____
DONALD SAMSON
Trustee for the Bankruptcy Estate of Chemetco, Inc.

PARADIGM MINERALS AND
ENVIRONMENTAL SERVICES, LLC

By: _____

Name: _Elliott G. Stegin_____

Title: _CEO_____

Case 3:00-cv-00670-NJR-RGW   Document 198-8   Filed 03/18/13   Page 29 of 36   Page ID
#1054
Case 01-34060-kjm   Doc 1694-8   Filed 08/23/12   Page 7 of 21

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement effective on the
date set forth above.

COMMERCE BANK

By: _____

Name: David L. Bof

Title: Senior Vice President

Case 3:00-cv-00670-NJR-DGW Document 198-8 Filed 03/18/13 Page 30 of 36 Page ID
#1055
Case 01-34000-kjm Doc 1694-1 Filed 08/23/12 Page 8 of 21

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement effective on the date set forth above.

ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

By: _____

Name: _____

Title: _____

Case 3:00-cv-00670-MJR-PGW   Document 198-8   Filed 03/18/13   Page 31 of 36   Page ID
#1056
Case 01-34068-kjm   Doc 1694-1   Filed 08/23/12   Page 19 of 21

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement effective on the
date set forth above.

UNITED STATES OF AMERICA

IGNACIO S. MORENO
Assistant Attorney General
Environment and Natural Resources
Division

_____   7/24/12

GREGORY L. SUKYS
Senior Attorney
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044
Tel: 202-514-2068
Fax: 202-616-6584
greg.sukys@usdoj.gov

Case 3:00-cv-00670-NJR-PGW Document 198-6 Filed 02/18/13 Page 32 of 36 Page ID
Case 01-34000 kjm Doc 1694-1 Filed 08/23/12 Page 20 of 21
#1057

Operating Expenses September 2009 thru March 2011

$680,217.90

Estate expenses 9/09 thru 3/11

$378,454.66 payroll
$2,700.00 office cleaning
$2,269.86 computer & copier maintenance
$2,368.22 office supplies
$3,961.62 wisper internet
$421.57 fedex and postage
$11,776.96 uniforms
$43,621.92 health & life insurance
$2,277.54 dental insurance
$7,396.14 work comp premium
$3,114.36 reimburse medical deductible
$1,400.05 medical surveillance employees
$956.10 hazwoper training
$9,000.00 forktruck purchase

Paradigm expenses 9/09 thru 3/11

$34,998.33 Security
$1,024.56 Waste Hauling
$258.57 Absopure water
$2,341.07 camera maintenance
$9,241.73 USEPA Compliance
$753.63 safety supplies
$128,260.47 utilities
$5,116.00 NPDES testing
$4,150.00 NPN environmentals
$2,442.00 Odesco
$1,176.52 Heritage
$201.50 Midwest Sanitary
$1,000.00 IEPA
$356.17 Environmentals Supplies
$249.59 Shipping
$576.61 Oxygen/Acteleyene
$2,124.17 Norweco Septic
$285.00 State Fire Marshall
$1,085.75 Parts-maintenance
$2,192.60 Office maintenance
$2,110.98 Mobile equipment
$966.62 propane
$479.20 scale repair
$5,716.20 diesel fuel
$2,926.88 equipment rental
$464.75 miscellaneous

Estate $469,719.00

Paradigm $210,498.90

Exhibit A

Operating Expenses April 1, 2011 thru March 31, 2012

$647,713.73

Estate expense 4/11 thru 3/12

| | |
|---|---|
| $300,482.06 | payroll |
| $1,800.00 | office cleaning |
| $460.00 | computer & copier maintenance |
| $1,768.08 | office supplies |
| $923.01 | fedex and postage |
| $12,535.82 | uniforms |
| $28,638.03 | health & life insurance |
| $1,643.09 | dental insurance |
| $16,988.14 | work comp premium |
| $2,724.27 | reimburse medical deductible |
| $1,614.20 | medical surveillance employees |
| $985.00 | hazwoper training |
| $9,000.00 | truck purchase |
| $10,000.00 | forktruck purchase |
| $9,000.00 | generator purchase |
| $9,500.00 | manlift purchase |
| $2,437.41 | mig welder purchase |
| $1,320.87 | internet |

Paradigm expenses 4/11 thru 3/12

| | |
|---|---|
| $92,945.84 | Security |
| $711.36 | waste hauling |
| $318.31 | water |
| $30,236.86 | Utilities |
| $1,030.10 | NPDES permit |
| $27,671.68 | Midwest Sanitary |
| $1,466.75 | environmental supplies |
| $182.00 | EMA |
| $250.00 | St. Louis Testing |
| $1,360.00 | SGS NA |
| $1,083.01 | oxygen/acteleyne |
| $519.78 | parts |
| $1,295.65 | office maintenance |
| $467.85 | propane |
| $1,432.92 | mobile equip.maintenace |
| $1,018.40 | scale repair |
| $8,992.66 | repair parts |
| $27,263.75 | diesel fuel |
| $1,506.86 | equipment rental |
| $3,800.00 | Aerotek |
| $4,457.00 | NPDES testing |
| $4,480.00 | Baker frac tanks |
| $16,570.78 | Heritage RCRA bins |
| $5,425.92 | Illini Env. - take water out of frac tanks & haul away |
| $702.37 | safety supplies |
| $703.90 | freight |

Estate   $411,819.98

Paradigm (   $235,893.75

Exhibit 8

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | IN CHAPTER 7 PROCEEDINGS |
| CHEMETCO, INC., | ) | BK 01-34066 |
| | ) | |
| Debtor. | ) | |

## ORDER APPROVING SETTLEMENT

Pending before the Court is the Application to Approve Settlement (Doc. 1694), Objection of Interco Trading Company ("Interco")(Doc. 1701) and Objection of Olin Corporation ("Olin")(Doc. 1702).  The Court conducted a hearing at which the Trustee and Counsel for Trustee, the U.S. Department of Justice (on behalf of the USEPA), the Illinois Attorney General's office, Paradigm Minerals and Environmental Services, LLC ("PMES"), Commerce Bank, Olin and Interco all appeared.  Subject to certain clarifications to the Settlement Agreement dated July 30, 2012, set forth below, Olin and Interco withdraw their Objections and recommend that the Settlement be approved.

1.     New Section 5.2(d) is amended to state that Escrowed Funds "shall" be used to remediate any environmental problem or condition existing on the site prior to the filing of Chemetco's bankruptcy proceeding.

2.     New Section 4.4(a) is amended to clarify that Commerce Bank will not receive any more than its secured claim under that paragraph and that any amounts otherwise payable to Commerce Bank under this paragraph in excess of its secured claims shall be paid to the Estate of Chemetco.

3.     New Section 11.1(a) and (b) are amended to state that Buyer shall have the option to exercise its rights to take title to the Smelter Site and the NPR property for three years from

1

Case 3:00-cv-00670-NJR-DGW Document 198-8 Filed 07/12/13 Page 35 of 36 Page ID
#1060
Case 04-34066-kjn Doc 1716 Filed 10/11/12 Page 2 of 3

the date the Total Purchase Price is paid or two years from the date that the Escrowed Funds are
depleted, whichever occurs later.

    4.    To correct a mathematical error, the chart specifying the distributions of revenues
from past sales is revised as follows:

| Sale | Gross Revenue $$ | Direct Cost of Sales $$ | Allocated Estate Operating Costs | Allocated Paradigm Operating Costs (3) | Net for Distribution | Distribution to be Paid |
|---|---|---|---|---|---|---|
| Mixed Fines/Scrubber Sludge Notice 12/1/10 | 1,475,807.75 | 526,100.25 | 250,000 | 250,000 | 449,707.25 | P: 112,426.87 C: 157,397.63 E: 157,397.63 EF:22,485.37 |
| Furnace Cleanup Notice 4/15/11 | 447,091.19 | 36,170.55 | 100,000 | 100,000 | 210,920.64 | P: $52,730.16 C: $73,822.22 E: $73,822.22 EF:10,546.03 |

    IT IS THEREFORE ORDERED that the Settlement Agreement filed August 23, 2012
(Doc. 1694-1), as clarified by this Order, is hereby approved.

    Counsel for the moving party shall serve a copy of this Order by mail to all interested
parties who were not served electronically.

ENTERED: October 11, 2012

                /s/ William V. Altenberger
                UNITED STATES BANKRUPTCY JUDGE-2

Agreed to:

DONALD M. SAMSON, TRUSTEE

/s/ William Niehoff_____
By: William Niehoff, Attorney for Trustee

PARADIGM MINERAL and ENVIRONMENTAL SERVICES


/s/ Dan Nester_____
By: Bryan Cave LLP, its attorney



COMMERCE BANK


/s/ Dan Nester_____
By: Bryan Cave LLP, its attorney


ILLINOIS ENVIRONMENTAL PROTECTION AGENCY


/s/ James Morgan_____
By: James Morgan


U.S. DEPT. OF JUSTICE (On behalf of the USEPA)


/s/ Gregory Sukys_____
By: Gregory Sukys


INTERCO TRADING CO.


/s/ Robert Brownlee_____
By: Robert Brownlee, Thompson Coburn LLP


OLIN CORPORATION


/s/ Gary Vincent_____
By: Gary Vincent, Husch Blackwell LLP