## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Nos. 00-670-DRH |
| v. | ) | CJRA Track C |
| | ) | |
| CHEMETCO, INC., | ) | 00-677-DRH (consolidated) |
| | ) | |
| Defendant. | ) | |
| ———————————— | ) | |
| | ) | |
| PEOPLE OF THE STATE OF | ) | Hon. David R. Herndon |
| ILLINOIS, ex rel. LISA MADIGAN, | ) | U.S. District Judge |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Mag. Judge Donald G. Wilkerson |
| | ) | |
| v. | ) | |
| | ) | |
| CHEMETCO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————— | ) | |

## **CONSENT DECREE**

## TABLE OF CONTENTS

**Page**

I        BACKGROUND ................................................................................................1

II       JURISDICTION AND GENERAL PROVISIONS ........................................7

III      PARTIES BOUND.............................................................................................8

IV       DEFINITIONS ..................................................................................................9

V        GENERAL PROVISIONS................................................................................24

VI       EFFECT OF NPL LISTING ............................................................................25

VII      OBLIGATIONS OF TRUSTEE AND PARADIGM, ASSET MANAGEMENT,
         AND DUE CARE ..............................................................................................27

VIII     RESOLUTION OF POTENTIAL LIABLITY OF PARADIGM ...........................33

IX       RESOLUTION OF THE UNITED STATES' CLAIMS AGAINST THE
         ESTATE ............................................................................................................35

X        RESOLUTION OF THE STATE'S CLAIMS AGAINST THE ESTATE...............36

XI       PAYMENT FOR FUTURE OVERSIGHT COSTS ........................................37

XII      COVENANTS NOT TO SUE BY THE UNITED STATES AND THE STATE.....41

XIII     RESERVATIONS OF RIGHTS BY THE UNITED STATES AND THE
         STATE...............................................................................................................45

XIV      TRUSTEE'S COVENANTS NOT TO SUE AND RESERVATION OF
         RIGHTS.............................................................................................................49

XV       PARADIGM'S COVENANT NOT TO SUE AND RESERVATION OF
         RIGHTS.............................................................................................................50

XVI      PERFORMANCE OF THE WORK ................................................................52

XVII     PROJECT COORDINATORS & SUPERVISING CONTRACTOR.......................60

XVIII    FINANCIAL ASSURANCE.............................................................................62

XIX      QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS ....................67

XX       ACCESS.............................................................................................................70

XXI        RECORDKEEPING AND REPORTING REQUIRMENTS ....................................71

XXII       EPA APPROVAL OF PLANS, REPORTS, AND OTHER DELIVERABLES .......74

XXIII      CERTIFICATION OF COMPLETION ..................................................................75

XXIV       EMERGENCY RESPONSE ..................................................................................80

XXV        INDEMNIFICATION AND INSURANCE ...........................................................82

XXVI       STIPULATED PENALTIES .................................................................................83

XXVII      FORCE MAJEURE................................................................................................88

XXVIII     DISPUTE RESOLUTION .....................................................................................90

XXIX       ACCESS TO INFORMATION..............................................................................92

XXX        RETENTION OF RECORDS ................................................................................94

XXXI       EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION..........................95

XXXII      NOTICES AND SUBMISSIONS .........................................................................96

XXXIII     EFFECTIVE DATE ..............................................................................................99

XXXIV      CONTINUING JURISDICTION...........................................................................99

XXXV       TERMINATION OF TRUSTEESHIP/ESTATE/CONSENT DECREE..................99

XXXVI      APPENDICES .....................................................................................................101

XXXVII     MODIFICATION.................................................................................................102

XXXVIII    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT...........................103

XXXIX      SIGNATORIES...................................................................................................104

Appendix A:      Asset Purchase and Processing Agreement & Related Documents
Appendix B:      Map of the Chemetco Hartford Property
Appendix C:      Interim Order, Sept. 16, 2008
Appendix D:      Operation and Maintenance Plan
Appendix E       Process Work Plan
Appendix F:      Map of Paradigm Processing Facility and Source Areas within the
                 Chemetco Site
Appendix G:      Map of Long Lake
Appendix H:      Map of Wetlands and Unpermitted Fill Area
Appendix I:      Furnace Removal Work Plan
Appendix J:      Unprocessed Metal Bearing Materials Work Plan

Appendix K:        Copper Furnace Clean Up Solids Work Plan
Appendix L:        North Polishing Pond and Sump Work Plan
Appendix M:        Circuit Board and Shredded Circuitry Board Material Work Plan
Appendix N:        Scrap Metal Work Plan
Appendix O:        1986 Trust Agreement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | Civil Nos. 00-670-DRH |
| | ) | CJRA Track C |
| v. | ) | |
| | ) | |
| CHEMETCO, INC., | ) | 00-677-DRH (consolidated) |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| PEOPLE OF THE STATE OF | ) | Hon. David R. Herndon |
| ILLINOIS, ex rel. LISA | ) | U.S. District Judge |
| MADIGAN, ATTORNEY | ) | |
| GENERAL OF THE STATE | ) | |
| OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff | ) | Mag. Judge Donald G. Wilkerson |
| v. | ) | |
| | ) | |
| CHEMETCO, INC., | ) | |
| | ) | |
| Defendant | ) | |

## CONSENT DECREE

### I        BACKGROUND

**WHEREAS,** Plaintiff United States of America ("United States"), on behalf of the

Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint

in this Court against Chemetco, Inc. ("Chemetco"), seeking injunctive relief and civil penalties

for alleged civil violations of the Clean Water Act ("CWA") 33 U.S.C. §§ 1251-1387, and the

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, that occurred at

1

Chemetco's secondary copper smelting Facility, and surrounding properties, in Hartford, Illinois ("Chemetco Hartford Property").

**WHEREAS,** Plaintiff, People of the State of Illinois, *ex rel.* Lisa Madigan, Attorney General of the State of Illinois ("State of Illinois" or "State"), contemporaneous with the filing of the United States' complaint, filed a complaint in this Court against Chemetco, Inc. pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, seeking, among other things: (1) reimbursement of costs incurred and to be incurred by the State of Illinois in responding to the release and/or threatened release of Hazardous Substances at the Chemetco Facility and surrounding property belonging to Chemetco; and (2) a declaratory judgment, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), on Chemetco's liability for future response costs associated with the Chemetco Facility and surrounding property. The State's Complaint also seeks injunctive relief and civil penalties for alleged violations of the Illinois Environmental Protection Act, 415 ILCS 5/1, *et seq.*, (2002) ("State Act"), at the Chemetco Facility and surrounding property. On October 16, 2001, the United States' Complaint and the State's Complaint were consolidated for purposes of discovery and trial (the United States' and the State's complaints are referred to herein individually as the "Complaint" or collectively as the "Complaints").

**WHEREAS,** on November 13, 2001, Chemetco filed a voluntary petition under Chapter 7 of the Bankruptcy Code. *See In re Chemetco*, No. 01-34066 (Bankr. S.D. Ill.) (the "Bankruptcy Case"). Laura K. Grandy was appointed Trustee to take control of the bankruptcy estate ("Estate") and has proceeded with the liquidation of Chemetco, Inc. Effective March 9, 2010, Donald Samson replaced Laura K. Grandy as Trustee.

**WHEREAS,** on or about May 1, 2002, the United States, on behalf of EPA, filed a Proof of Claim (Claim No. 690) in the Bankruptcy Case which asserted entitlement to a general unsecured claim for civil penalties for RCRA and CWA violations, and the injunctive requirements of an Administrative Order.  The total amount of Chemetco's potential liability to the United States as alleged in the United States' Proof of Claim is One Hundred Forty Million Dollars ($140,000,000.00).

**WHEREAS,** neither the Trustee nor Paradigm admits any issue of fact or law or any liability to the Plaintiffs arising out of the transactions or occurrences alleged in the Complaints or this Consent Decree.

**WHEREAS,** the Parties recognize that mismanagement of the Facility by the previous owners and operators of the Chemetco Hartford Property resulted in conditions that may pose a threat or threats to the public health or welfare or the environment.

**WHEREAS,** the Trustee contends that the Estate has a limited ability to pay for the injunctive relief sought in the Complaints and wishes to rely in significant part on the proceeds from the sale of certain Facility Assets to pay for the Estate's contribution toward the cleanup of the Chemetco Site.

**WHEREAS,** on April 28, 2008, the Bankruptcy Court authorized the Trustee to employ the BarberMurphy Group as a Broker to market and sell property of the Estate including scrap, slag materials, Metal Bearing Materials, furnaces and furnace related parts, and casting wheels and rings for a commission of 2% of the purchase price.  The Trustee subsequently entered into a Brokerage Agreement with the BarberMurphy Group that conformed to the terms of the arrangement approved by the Bankruptcy Court.

**WHEREAS,** on September 16, 2008, this Court signed and approved an Interim Order entered into by the Trustee and the State of Illinois, which authorized the Trustee to undertake certain work at the Facility, subject to Work Plans and within the framework of relevant State statutes, regulations and applicable or relevant and appropriate requirements ("ARARs"), in an effort to continue liquidation of the Facility Assets as specifically set forth in the Interim Order. The expiration date of this Interim Order has been extended multiple times in order to allow for the sale of materials and performance of work.  Under the Interim Order, the Trustee with Paradigm as performing contractor demolished and scrapped the main foundry building and the interior of the tank house (involving the salvage of over 3,700 tons of metals associated with the former structures and disposal of over 26,000 gallons of oils and liquids in addition to over 1,100 tons of waste); executed asset sales that significantly reduced the presence of over 11,000 tons and 4,000 gallons of potentially contaminated source material; sold three of the facility's four furnaces; and clean closed two RCRA solid waste management units at the facility (the American Air Filter System and Brick Shop).

**WHEREAS,** on April 1, 2009, the Trustee entered into an Asset Purchase and Processing Agreement ("APPA") with Industrial Asset Disposition, LLC ("IAD") (Appendix A).  The Bankruptcy Court modified and clarified the APPA several times, most recently by Order entered October 10, 2012, including making modifications on April 20, 2011 to assign to Paradigm Minerals and Environmental Services LLC ("Paradigm") IAD's rights under the APPA.  Among other things, the APPA authorizes the acquisition, by Paradigm, of certain parcels of land at the Chemetco Hartford Property, and allows for the recovery of value via either sale "as is," or via processing prior to sale, of certain Metal Bearing Materials that had been accumulated at the Chemetco Facility, some of which recovered value may be applied as further

4

contribution toward cleanup of the Chemetco Site consistent with the terms of the APPA or subsequent order of the Bankruptcy Court.  Any conflict between the requirements set forth in this Consent Decree and the APPA shall be construed in favor of this Consent Decree.  Nothing in this Consent Decree shall make the United States or the State, or any other governmental entity, a third party beneficiary or allow them enforcement rights under the APPA.

**WHEREAS,** on March 4, 2010, the EPA added to the National Priority List ("NPL") the Chemetco Superfund Site ("Site").  *See* 75 Fed. Reg. 9782 (Mar. 4, 2010).  The Chemetco Facility, *i.e.*, the primary location of Chemetco's smelting operations, comprises a portion of the Chemetco Site.

**WHEREAS,**  on April 10, 2012, EPA issued a General Notice of Potential Liability (the "General Notice Letter") for the Site to the Trustee for the Estate of Chemetco under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).  Previously, on November 30, 2011, EPA issued General Notice Letters to 115 other potentially responsible parties ("PRPs") who owned or operated or arranged for materials to be treated or disposed of or transported to be treated or disposed of at the former Chemetco secondary copper smelting facility.

**WHEREAS,** the State and/or EPA may undertake additional Response Actions at the Chemetco Site pursuant to various environmental statutes, including but not limited to CERCLA Sections 106 and 107, 42 U.S.C. §§ 9606 and 9607, and Section 22.2(f)-(k) of State Act, 415 ILCS 5/22.2(f)-(k).

**WHEREAS,** while Paradigm's Work under this Consent Decree and under the Interim Order has and will continue to substantially benefit the public interest by reducing the Existing Contamination at the Chemetco Facility, Paradigm's entry into this Consent Decree does not

constitute acceptance by Paradigm of any obligation to perform any CERCLA remediation investigations, feasibility studies, or remedial actions at the Chemetco Hartford Property.

**WHEREAS,** the Parties agree that Paradigm's entry into this Consent Decree and the actions to be undertaken by Paradigm in accordance with the Consent Decree do not constitute an admission of liability by Paradigm with respect to the Facility or the Site. Further, the Parties agree that the public will benefit by resolving Paradigm's potential liabilities that may arise as a result of Paradigm's becoming the owner of, or operator at, the Chemetco Facility, as set forth in this Consent Decree. The resolution of Paradigm's potential liabilities in exchange for Paradigm's undertaking work that will provide the United States and the State of Illinois with substantial environmental benefits is in the public interest.

**WHEREAS,** on March 25, 1986, Chemetco, Inc. (as "Grantor"), under regulations established by EPA and applicable to Chemetco, entered into a Trust Agreement with the First National Bank and Trust Company (as the "Trustee"), for the purpose of establishing a trust fund ("Fund") to provide for the payment of costs related to closure and post closure care at the Chemetco facility ("1986 Trust Agreement" attached hereto as Appendix O). The Trustee for the Estate of Chemetco and EPA agree that this Fund should be applied to, and be available for EPA's use in undertaking Response Actions at, the Chemetco Site under EPA's Superfund authorities, or used otherwise as described herein.

**WHEREAS,** EPA determined in a 2013 "Enforcement Action Memorandum— Determination of Threat to Public Health and/or the Environment at the Chemetco Site, Madison County, Hartford, Illinois (Site ID #B5HB)" ("Action Memorandum"), that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a Hazardous Substance at the Site resulting from

6

Chemetco's activities.  In the Action Memorandum, EPA proposed implementation or continued implementation of Stormwater Management and Site Security Work Plan measures to address the actual or threatened release, as well as other source reduction efforts at the Site. EPA also determined in the Action Memorandum that the Trustee's and Paradigm's activities in support of EPA's removal action will not completely remove all Hazardous Waste from the Site, necessitating the need for post-removal Site controls and Response Actions.

**WHEREAS,** the Work to be implemented by the Trustee and Paradigm under this Consent Decree provides measures to stabilize and prevent additional releases for the Site, as well as move the Chemetco Facility toward compliance with the applicable environmental laws. Accordingly, the Work to be performed under this Consent Decree will be undertaken within the framework of EPA's and the State's authorities under CERCLA, Section 22.2(F-K) of the State Act and ARARs arising thereunder, including but not limited to those found in RCRA, CWA, and the State Act.

**WHEREAS,** the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and that implementation of this Consent Decree will expedite the cleanup of the Chemetco Site, avoid unnecessary depletion of the Estate's assets, and avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE,** it is hereby Ordered, Adjudged, and Decreed:

## II       JURISDICTION AND GENERAL PROVISIONS

1.       This Court has jurisdiction over the subject matter of this action pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b); RCRA Section 3008(a) and (h), 42 U.S.C. § 6928(a) and (h); CERCLA Sections 106, 107, and 113(b), 42 U.S.C. §§ 9606, 9607, and 9613(b), and 28

U.S.C. §§ 1331, 1345, and 1355. This Court also has been vested with personal jurisdiction over Chemetco and the Estate, and that jurisdiction now extends to the Trustee. As representative of Chemetco, Inc. and the Estate, the Trustee has the authority to compromise claims against Chemetco, subject to approval of the Bankruptcy Court. Pursuant to that authority, the Trustee acknowledges that Chemetco, Inc. and the Estate have no objections or defenses to the jurisdiction of this Court or to venue in this District or to this Court's jurisdiction to enter and enforce this Consent Decree.

2.      Solely for purposes of this Consent Decree, including without limitation, its entry and enforcement, Paradigm hereby voluntarily submits itself to the jurisdiction of this Court. In addition, and solely for the purposes of this Consent Decree and the underlying Complaint, the Parties shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. The Parties agree that Paradigm's entry into this Consent Decree, and the actions undertaken by Paradigm in accordance with the Consent Decree, do not constitute an admission of any liability by Paradigm.

3.      This Consent Decree and its appendices constitute the final and exclusive agreement and understanding among the parties with respect to the settlement embodied in this Consent Decree, as of the date of its execution. The Parties further acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree and its appendices.

### III      **PARTIES BOUND**

4.      This Consent Decree applies to and is binding upon the United States and the State, the Trustee, and the Trustee's successors and assigns, the Estate and the Estate's successors and assigns, Paradigm, and its successors and assigns, and Chemetco, Inc. The

8

Trustee shall provide a copy of this Consent Decree and relevant appendices and Work Plans to each contractor hired to perform the Work and to each person representing either the Trustee or Paradigm with respect to the Chemetco Facility, the Site, or the Work. The Trustee or Paradigm, as appropriate, shall condition all contracts entered into hereunder for performance of the Work to conform to the terms of this Consent Decree. The Trustee and Paradigm shall provide written or electronic notice of the Consent Decree to all subcontractors hired to perform any portion of the Work. The Trustee and Paradigm shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the Work Plans attached to this Consent Decree.

5.    a.    To the extent that the Facility or any other property to which access is required for the implementation of this Consent Decree is sold or leased by the Trustee to persons other than the Estate, the Trustee shall require all such grantees and lessees to provide access to the Estate, the Agencies, and their representatives including, but not limited to, their contractors, as necessary to effectuate this Consent Decree.

b.    In no event shall any conveyance, release, or otherwise affect the requirement of the Trustee to comply with all provisions of this Consent Decree, absent the prior written consent of EPA.

## IV    **DEFINITIONS**

6.    Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in the State Act, RCRA, CERCLA, or in regulations promulgated under those statutes shall have the meaning assigned to them in those statutes or in such regulations. Whenever the terms listed below are used in this Consent Decree or in the appendices attached hereto, the following definitions shall apply:

9

**Agencies** shall mean EPA and Illinois EPA.

**Asset Agreement** or **"APPA"** shall mean the Asset Purchase and Processing Agreement, together with the September 21, 2009 Bankruptcy Court order approving the Asset Agreement as further clarified and amended by the Bankruptcy Court. Any amendments to the APPA shall be subject to the approval of the Bankruptcy Court for the duration of the Estate's bankruptcy proceeding. A copy of the APPA and the October 10, 2012 Bankruptcy Court Order amending, modifying and clarifying the APPA are provided in Appendix A.

**ARAR** or **ARARs** shall mean:

a.     Applicable Requirements consisting of those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or State environmental laws or regulations that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site; or

b.     Relevant and Appropriate Requirements consisting of those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or State environmental or facility siting laws that, while not applicable to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstances at a CERCLA site, address problems or situations sufficiently similar to those encountered at the Chemetco Facility such that their use is well suited to this particular site.

c.     All Work Plans shall require compliance with all ARARs pertinent to the tasks covered by those Work Plans.

**Bankruptcy Case** shall mean the proceeding initiated by the voluntary petition for Chapter 7 liquidation filed by Chemetco Inc, and captioned *In re Chemetco, Inc.*, No. 01-34066 (Bankr. S.D. Ill.).

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the Southern District of Illinois sitting in East St. Louis, Illinois.

**Brokerage Agreement** shall mean the contract entered into by the Trustee and BarberMurphy Group on or about April 28, 2008, pursuant to which the BarberMurphy Group agreed to sell the real property and scrap assets belonging to the Estate.

**CBI** shall mean confidential business information which is protected from public disclosure pursuant to 40 CFR Part 2; 5 U.S.C. § 552(b)(4); 5 ILCS 140/7(1)(g).

**CERCLA** shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

**Chemetco** or **Chemetco, Inc.** shall mean the company or corporation that previously owned and operated the copper smelting equipment and associated facilities at the Chemetco Facility in Hartford, Illinois.

**Chemetco Facility** *See* definition of **Chemetco Hartford Property**.

**Chemetco Hartford Property** shall mean the real property that is subject to the terms of this Consent Decree, as depicted on the map provided at Appendix B, and including the following areas:

**Facility** or **Chemetco Facility** shall mean the former Chemetco Smelter site, Parcel No. 011 (41.1 acres), and adjacent real property consisting of Subparcel Nos. 004(a) (5.0 acres) and 026(a) and (b) (53.43 acres) and Parcel Nos. 008 (9.98 acres), 009 (0.5 acres), 010 (11.9 acres), 013.001 (10.25 acres), 016.001 (4.33 acres), 017.001 (45.97 acres), and

11

018 (21.43 acres) as shown on the property map attached as Appendix B, referred to in the APPA as "Smelter Site," and, except for Subparcel 004(a) and Parcel Nos. 008, 009, and 013, previously subject to Illinois EPA's December 4, 2001, Seal Order (Appendix C to Interim Order (attached hereto as Appendix C)) and shall be subject to all terms of this Consent Decree.

**Site** or **Chemetco Site** shall mean the Chemetco Superfund Site that EPA added to the NPL on March 4, 2010. *See* 75 Fed. Reg. 9782 (Mar. 4, 2010). The entirety of the Site is comprised of the Facility, the NPR Property, Long Lake and the Filled Waters of the United States, the areal extent of contamination, and all suitable areas in very close proximity to the contamination necessary for implementation of EPA's Response Action. *See* 40 C.F.R. § 300.5. EPA will determine the appropriateness of any further actions, if any, regarding the entirety of the Site, following a thorough investigation of the Chemetco Hartford Property and surrounding areas.

**NPR Property** shall mean Subparcels 004(b)-(d), and Parcels 007, 020, 021, 022, located north of New Poag Road, and Subparcels 026(c) and (d) and Parcel 027 located east of the current location of Old Alton Road, which are also part of the Estate, but off the Chemetco Smelter Site grounds. One or more of these particular parcels are not subject to this Consent Decree until the Trustee proposes to do Work on one or more of those parcels or the Consent Decree is modified to subject any of these parcels to this Consent Decree. In any event, these parcels remain subject to evaluation by the State and EPA to determine whether separate response actions on such areas, not required by this Consent Decree, may be necessary.

**Chemetco Site Superfund Special Account** shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to CERCLA Section 122(b)(3), 42 U.S.C. § 9622(b)(3).

**Closure Activities** shall mean those activities necessary to properly close, dispose of, remove, decommission, and/or decontaminate all units, equipment, and materials at the Chemetco Facility utilized or generated by Paradigm in the Process Work or through the sale of Unprocessed Metal Bearing Materials.

**Consent Decree** shall mean this Consent Decree and all appendices attached hereto. (Listed in Section XXXVI). In the event of conflict between this Consent Decree and any appendix, this Consent Decree shall control. However, in the event of a conflict between the Consent Decree and an attached Work Plan, this Consent Decree shall control, except that Work Plans shall govern as to the specific ARARs applicable to certain activities set forth therein.

**CWA** shall mean the Clean Water Act, 33 U.S.C. §§ 1251-1387.

**Day** shall mean a calendar day unless expressly stated to be a Working Day.

**Effective Date** shall be the date defined in Section XXXIII of this Consent Decree.

**Emergency Response or Emergency Response Action** shall refer to a response action taken by Paradigm to address an accidental or inadvertent discharge, release or spill of contaminants, or other emergency condition resulting from performance of the Work, which discharge, spill or release of contaminants causes or may cause a potential threat to human health or the environment.

**Escrowed Funds** shall have the meaning set forth in Paragraph 71 of this Consent Decree.

**Estate** shall mean the bankruptcy estate of Chemetco, Inc., a debtor.

**Existing Contamination** shall mean:

      a.    As applicable to the Trustee, any hazardous substances, pollutants or contaminants present or existing on or under the Facility as of November 13, 2001 (or as of the date of last inspection prior to that date);

      b.    As applicable to Paradigm, any hazardous substances, pollutants or contaminants present or existing on or under the Facility as of the Effective Date.

**Facility Assets** shall mean all potentially saleable material and equipment present on the Chemetco Facility grounds, including, but not limited to, four smelting furnaces, office buildings, storage buildings, a slag pile and other accumulations of slag (a by-product of the smelting process), scrubber sludge and other metal-bearing materials, two parking lots, a storm water management system, a bunker containing "zinc oxide" and other materials, a rotary dryer, screening equipment, and air pollution control equipment, and the 41.1 acres of real property lying there under; provided that, for purposes of the Consent Decree, the following shall not be considered Facility Assets: books and records (and filing cabinets containing same) of the Estate located throughout the Site, computer systems, including the WANG computer system and Application System/400 (AS/400) computer system and associated data storage media, and related office equipment.

**Former Officers, Directors, and Employees** shall mean any and all individuals who served as officers or directors of Chemetco, Inc., or who were employed by Chemetco, Inc., prior to and up to the date of filing of the Bankruptcy Case.

**Future Oversight Costs** shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs after the Date of Lodging in reviewing or developing plans, reports, and other deliverables submitted pursuant to this Consent Decree, in overseeing

implementation of the Work, or otherwise implementing, overseeing, or enforcing this Consent Decree, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, and the costs incurred pursuant to paragraph 18.a (Notice to Interested Persons/Prospective Sales of Real Property), Sections XX (Access) and XXIV (Emergency Response).   Moreover, Future Oversight Costs shall not include any costs incurred by EPA or the United States with respect to activities at the Chemetco Site relating to EPA's issuance of general notice of potential liability under CERCLA Section 107(a) to PRPs, or any other costs unrelated to requirements of this Consent Decree.

**Hazardous Substances** shall mean the substances identified in CERCLA Section 101(14), 42 U.S.C. § 9601(14).

**Hazardous Waste** shall mean the substances identified in RCRA Section 1004(5), 42 U.S.C. § 6903(5).

**Hazardous Waste Fund** shall mean the special fund created within the Illinois State Treasury pursuant to Section 22.2(a) of the State Act, 415 ILCS 5/22.2(a), and Section 5.84 of the State Finance Act, 30 ILCS 105/5.84.

**IAD** shall mean Industrial Asset Disposition, LLC, a company organized under the laws of California, and the entity that originally entered into the APPA with the Trustee.

**Illinois EPA** or **IEPA** shall mean the Illinois Environmental Protection Agency and any successor agencies of the State of Illinois.

**Interest** shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1st of each year, in accordance with 42 U.S.C. § 9607(a).   The applicable rate of interest

15

shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1st of each year.

**Initial Financial Assurance Costs** shall have the meaning provided in Paragraph 69 herein.

**Interim Order** shall mean the Order that was entered into by the State of Illinois and the Trustee, which was approved and signed by this Court on September 16, 2008 (Appendix C), as extended and amended by multiple Court Orders.

**Long Lake Special Account** shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to CERCLA Section 122(b)(3), 42 U.S.C. § 9622(b)(3), and the Pretrial Diversion Agreement dated January 20, 2010, Criminal No. 99-300048-002-WDS.

**Metal Bearing Materials** or **MBM** shall mean the approximately 46,000 tons of scrubber sludge (including approximately 35,000 tons in the Zinc Oxide Bunker), approximately 900,000 tons of slag, various and sundry former smelter feed stocks, "in-process" materials (including materials contained within or around former processing equipment), and sediments, sludges, metal spills and splatters, and dusts associated with former operations and past and future environmental cleanups at the Facility that contain economically viable and reclaimable concentrations of metals (including, but not limited to, copper, zinc, lead, tin, and nickel).

**National Contingency Plan** or **NCP** shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300.

**National Priority List** or **NPL** shall mean the list created by EPA, pursuant to CERCLA Section 105(a)(8)(B), 42 U.S.C. § 9605(a)(8)(B), of those sites throughout the United States

most in need of long-term remedial evaluation and response, as a result of known or threatened releases of hazardous substances, pollutants, or contaminants. The NPL is set forth at 40 C.F.R. § 300.425(b).

**NPR Property** *See* definition of **Chemetco Hartford Property**.

**Operation and Maintenance** or **O&M** shall mean all activities required to manage Facility Assets and to provide storm water management, fugitive emissions control and security, and any other activities required under the Operation and Maintenance Plan ("O&M Plan"), including any work plans constituting part of the O&M plan.

**On-Scene Coordinator** or **OSC** shall mean the government official designated by the EPA to coordinate and direct responses at the Chemetco facility or the Site under subpart E of the NCP. *See* 40 C.F.R. §§ 300.5 and 300.400.

**Operation and Maintenance Plan** or **O&M Plan** shall mean the document attached as Appendix D hereto.

**Paradigm** shall mean Paradigm Minerals and Environmental Services LLC, a company organized under the laws of the State of Illinois, together with any of its affiliates, contractors, assignees, or successors including, but not limited to, affiliates or contractors who are retained by Paradigm to process Scrubber Sludge or Slag. Paradigm was assigned IAD's rights under the APPA pursuant to an Assignment, Assumption and Consent Agreement executed by IAD, the Trustee and Paradigm, and dated April 20, 2011.

**Paradigm Process** or **Process Work** shall mean Paradigm's proprietary activities designed to recycle the Metal Bearing Materials present on the Facility to recover metals and other materials suitable for use or reuse as raw materials in an industrial process to make a product, or as effective substitutes for commercial products, in accordance with the Process

Work Plan.  Paradigm's process activities shall take place in the Process Areas, as defined herein.

**Paragraph** shall mean a portion of this Consent Decree identified by an Arabic numeral or an uppercase letter.

**Parties** shall mean the United States, the Illinois Environmental Protection Agency, the Illinois Attorney General, the Trustee, Paradigm, and the Estate.

**Past Response Costs** shall mean all response costs incurred at the Facility by the State prior to the Effective Date of this Consent Decree.

**Process Area** shall mean all areas at the Facility that Paradigm will use in the Process Work.  The Process Area is comprised of:  the Process Material Staging Area, Process Buildings, Process Waste Staging Area and RMBM Staging Area.  These areas are defined herein, depicted on the map at Appendix F, and are more specifically described in the approved Work Plan.

**Process Buildings** shall mean the buildings on the Facility in which Paradigm's proprietary activities designed to recycle and/or reclaim valuable metals from the Metal Bearing Materials will take place, as further defined in the Process Work Plan appended to this Consent Decree.  Currently, Paradigm plans to undertake its process activities in the Tank House and the Brick Shop, identified and labeled as the Process Buildings Nos. 7 and 8 on the map at Appendix F.

**Process Material** shall mean materials removed from Source Areas, and staged for use in or used in the Paradigm Process, as defined herein, and as specified in the Process Work Plan (Appendix E), until such material becomes either a Process Waste or a RMBM.

**Process Material Staging Area** shall mean the area on the Facility, the location of which is shown on the map at Appendix F, on which Paradigm shall stage the Unprocessed Metal

18

Bearing Materials that have been removed from the Source Areas to be prepared for processing or for sale as RMBM.

**Process Waste** shall mean the material that is generated by Paradigm in managing Metal Bearing Materials pursuant to the approved Process Work Plan, which is discarded and not excluded from the definition of Solid Waste under 40 CFR § 261.2. Process Waste may include Solid Waste, Hazardous Waste, Hazardous Substances, and process waters.

**Process Waste Staging Area** shall mean the area on the Facility, the location of which is shown on the map at Appendix F, on which Paradigm shall stage the Process Waste as defined herein.

**Process Work Plan** shall mean the Work Plan attached to this Consent Decree as Appendix E.

**Project Coordinator** shall mean each person designated as a project coordinator by a Party pursuant to Section XVII of this Consent Decree.

**RCRA** shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. § 6901-6992k (also known as the Resource Conservation and Recovery Act).

**Remedial Project Manager** or **RPM** shall mean the official designated by EPA to coordinate, monitor, or direct remedial or other Response Action at the Chemetco Facility or the Site under subpart E of the NCP. *See* 40 C.F.R. §§ 300.5 and 300.400.

**Removal Action** shall mean the actions described in Section V of the Action Memorandum, and more specifically in the O&M Work Plan provisions for site security and stormwater management.

**Response Action** shall mean past or future actions undertaken or approved by the State and/or EPA, pursuant to CERCLA.

19

**Response Costs** shall mean all unreimbursed costs not inconsistent with the NCP, including, but not limited to, direct and indirect costs, that the United States pays or incurs in the performance of response actions at or in connection with the Site (other than Future Oversight Costs, as defined herein), plus Interest on all such costs which accrues pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

**Recyclable Metal Bearing Material** or **RMBM** shall mean any of the following, as approved for sale by Bankruptcy Court, and by EPA, pursuant to this Consent Decree:

a.       **Processed Metal Bearing Materials** or **PMBM** shall mean those Metal Bearing Products taken from Source Areas and marketed for sale after having undergone the Paradigm Process in accordance with the Process Work Plan or other approved Work Plans and this Consent Decree; or

b.       **Unprocessed Metal Bearing Materials** or **UMBM** shall mean those Metal Bearing Materials taken from Source Areas and marketed for sale, in accordance with the Bulk Unprocessed Bearing Materials Work Plan or other approved Work Plans and this Consent Decree, without having undergone the Paradigm Process.

**RMBM Staging Areas** shall mean the areas at the Facility, shown on the map at Appendix F, on which Paradigm shall store RMBM prior to sale/shipment in accordance with an approved Work Plan.  Separate RMBMs shall not be commingled within the RMBM Staging Area.  Unprocessed Metal Bearing Materials approved for sale under this Consent Decree as RMBMs may be staged within a portion of the Process Material Staging Area.

**Scrubber Sludge** shall mean, in general, a granular solid material that was recovered from the dust collection systems that were operated by Chemetco in conjunction with the former Chemetco secondary copper smelting process.  From the startup of the Facility in 1970 until the

mid-1980's, Chemetco collected Scrubber Sludge as wet slurry in earthen pits and later transferred the Scrubber Sludge to a bunker. After the mid-1980s, Chemetco collected the Scrubber Sludge as a wet filter cake and a dry solid and stockpiled it under cover in process buildings for recycling and commercial sales due to the presence of metal oxides, such as copper, zinc, lead, tin, and nickel. The Scrubber Sludge is found in the source areas depicted on Appendix F.

**Section** shall mean a portion of this Consent Decree identified by a Roman numeral.

**Site** or **Chemetco Site** *See* definition of **Chemetco Hartford Property**.

**Slag** shall mean, in general, an iron-silicate solid material that was a by-product of the former Chemetco secondary copper smelting process, that was produced as a liquid, transported outside the smelter process building and placed in stockpiles where it was cooled, by air or water, and solidified. The Slag at the Facility contains metal oxides, such as copper, zinc, lead, tin, and nickel. Slag is found in the source areas depicted on the Map of Paradigm Processing Facility and Source Areas within the Chemetco Site (Appendix F).

**Solid Waste** shall mean the materials defined at 40 CFR § 261.2.

**Source Areas** shall mean the unprocessed material storage locations at the Facility, as depicted on the map at Appendix F.

**State** shall mean the State of Illinois and all of its departments and agencies, including, but not limited to, the IEPA and the Illinois Attorney General.

**State Act** shall mean the Illinois Environmental Protection Act, 415 ILCS 5/1-58.12 (2002).

**Superfund** or **EPA Hazardous Substance Superfund** shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

**Successor-in-Title** shall mean any person who acquires any possessory interest in any property included in the Facility, other than a person who acquires such interest solely to protect a security interest in the property and who has not exercised any right to enter or possess the property.

**Trustee** shall mean the Trustee approved by the Court to act as representative of the Estate in *In re Chemetco*, No. 01-34066 (Bankr. S.D. Ill). Trustee shall mean the Trustee acting in his representational capacity and not individually and/or personally.  Nothing herein is intended to create personal liability for the Trustee as to the actions herein described.

**United States** shall mean the United States of America and all of its departments, agencies and instrumentalities, including but not limited to EPA.

**Unprocessed Metal Bearing Materials (UMBM) Sales** shall mean Paradigm's and/or the Trustee's sale of Unprocessed Metal Bearing Materials present at the Chemetco Facility to purchasers who intend to recover metals and other materials suitable for use or reuse as raw materials in an industrial process to make a product, or as effective substitutes for commercial products, in accordance with the Work Plans required by this Consent Decree.

**USACE** shall mean the U.S. Army Corps of Engineers and any successor agencies of the United States.

**U.S. EPA** or **EPA** shall mean the United States Environmental Protection Agency and any successor agencies of the United States.

**U.S. DOJ** or **DOJ** shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

**Work** shall mean all actions taken or to be undertaken by the Trustee and/or Paradigm under this Consent Decree, including, but not limited to implementation of the Storm Water

22

Management, Fugitive Emission Control, and Site Security Work Plans, which are included in the Site's Operation and Maintenance Plan. Work shall also include but not be limited to implementation of approved work plans to: (1) manage, sell and/or reuse the Facility Assets; and (2) reclaim, recycle, and/or sell Metal Bearing Materials and Unprocessed Metal Bearing Materials. The management and/or sale of Facility Assets and MBM and UMBM is intended, among other things, to provide further funding of clean-up actions by the Agencies. To the extent that Work stabilizes and/or reduces the pollutant source materials on the Site and prevents releases from the Site, the Work to be undertaken by the Trustee and Paradigm shall be considered to be actions taken consistent with, and in support of, EPA's Removal Action. The Parties recognize that, pursuant to the APPA, the Trustee has granted Paradigm the exclusive right to process and/or sell the Scrubber Sludge and Slag, and certain other materials such as mixed fines.

**Working Day** shall mean a day other than a Saturday, Sunday or a federal or State holiday. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or United States holiday, the period shall run until the close of business of the next working day.

**Work Plans** shall mean the Process Work Plan, the O&M Plan, Unprocessed Metal Bearing Materials Work Plan, Scrap Metal Work Plan, Copper Furnace Clean Up Solids Work Plan, North Polishing Pond and Sump Work Plan, Circuit Board and Shredded Circuitry Board Material Work Plan, Furnace Removal Work Plan, and any other Work Plans approved by the Agencies pursuant to Section XXII of this Consent Decree.

## V     <u>**GENERAL PROVISIONS**</u>

7.     <u>**Objectives of the Parties.**</u>   The objectives of the Parties in entering into this Consent Decree are to:

a.     Resolve in their entirety the United States' claims for civil penalties and injunctive relief set out in its Complaint filed in this matter and the potential claims under CERCLA for which the United States is providing covenants not to sue in Paragraphs 37 and 38 of this Consent Decree, subject to the United States' Reservation of Rights set forth in Section XIII;

b.     Resolve the Proof of Claim that the United States filed on behalf of EPA in the Bankruptcy Case;

c.     Resolve the Proof of Claim (Claim No. 465) filed on behalf of the Illinois EPA relating to Past Response Costs and Stipulated Penalties accrued for violations of the Supplemental Consent Order in the case of *People of the State of Illinois v. Chemetco, Inc.*, 88-CH-200 (Madison County);

d.     Resolve in its entirety the State's claim for civil penalties under the Illinois Environmental Protection Act in the complaint in the pending case, and resolve the State's claim under the Illinois Environmental Protection Act for injunctive relief against the Estate;

e.     Provide a mechanism through which the Trustee can complete the liquidation of the Facility Assets;

f.     Reduce the extent of future cleanup work required under CERCLA to address the past mismanagement of Facility Assets by Former Officers, Directors, and employees;

24

g.      Ensure that Paradigm's on-site processing of MBM is accomplished consistent with environmental law and in a way that helps sustain or fund stabilization and cleanup efforts at the Site, and prevents additional releases, or threatened releases, of Hazardous Substances at or from the Chemetco Facility into the environment as a result of the Process Work;

h.      Provide for the coordination of the CERCLA Response Action to be undertaken at the Chemetco Facility with the actions to be undertaken by the Trustee and/or Paradigm;

i.      Protect public health, welfare, and the environment at the Facility by the design and implementation of appropriate management standards for the Facility Assets which will assure compliance with applicable statutes and regulations.

8.      In exercising its approval authorities under this Consent Decree, EPA shall consult with the State.

## VI      EFFECT OF NPL LISTING

9.      The Chemetco Superfund Site, which includes the Chemetco Facility, was added to the NPL on March 4, 2010.  75 Fed. Reg. 9782 (Mar. 4, 2010).  As a result of the addition of the Chemetco Site to the NPL, EPA will undertake, or arrange for the undertaking of, an investigation into the nature and extent of the threat posed by the release and an evaluation of proposed Response Action(s).  Following selection of one or more Response Action(s), EPA may undertake, or arrange for the undertaking of the selected Response Action(s).  Solely for the purposes of CERCLA Section 113(j), 42 U.S.C. § 9613(j), the removal action set forth in the Action Memorandum and the Work to be performed by the Settling Defendants shall constitute a

25

response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

10. **Implementation of Response Actions.**

a. EPA, acting through its OSC, shall manage the Chemetco Site, including the performance of any Response Action selected by EPA, in accordance with the NCP and all applicable ARARs. The Trustee and Paradigm shall coordinate their Chemetco activities with the OSC.

b. As provided in CERCLA Section 121(e), 42 U.S.C. § 9621(e), and NCP Section 300.400(e), 40 C.F.R. § 300.400(e), no permit shall be required for any portion of the Work conducted entirely on-site (*i.e.*, within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, the Trustee and Paradigm, as appropriate, shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

c. The Trustee and Paradigm, as appropriate, may seek relief under the provisions of Section XXVII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in Paragraph 10.b and required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

11. This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

# VII   OBLIGATIONS OF TRUSTEE AND PARADIGM, ASSET MANAGEMENT, AND DUE CARE

12.   **Obligations of the Trustee/Estate.**

a.   The Trustee is primarily responsible for the management of the Estate and the Chemetco Hartford Property. The Trustee shall be primarily responsible for implementing the approved work plans required under the O&M Plan.

b.   Other than the work under UMBM, and Process Work Plans, the Trustee shall be responsible for managing the assets of the Estate, including the Chemetco Hartford Property, and implementing all plans, standards, specifications, and schedules set forth in or developed in the Work Plans, including but not limited to the Stormwater Management Response Action.

13.   **Obligations of Paradigm.**

a.   Notwithstanding the provisions of Paragraph 12, EPA acknowledges that Paradigm will be the party primarily responsible for the performance of the Process Work and the sale of UMBM at the Chemetco Facility on the terms and conditions set forth herein and pursuant to the Process Work Plan and the UMBM Work Plan. EPA, in its enforcement discretion, will initially seek, from Paradigm alone, compliance and corrective measures with the terms of this Consent Decree relating to the Process Work, and the sale of UMBM, as well as any Stipulated Penalties for the violations identified in Section XXVI of this Consent Decree, unless and until any obligations imposed on Paradigm by this Consent Decree become unenforceable against Paradigm including, without limitation, by reason of Paradigm's decision to end its Work under the Consent Decree, or Paradigm's bankruptcy, insolvency, winding up, or other dissolution.

27

b.     Paradigm's obligations under this Consent Decree, subject to Paradigm's right to stop performing the Process Work pursuant to Paragraph 93.d(2), include:

(1) performing the Process Work without exacerbating harm to the public health or the environment, consistent with plans, standards, specifications, and schedules set forth in or developed in the Work Plans;

(2) providing Initial Financial Assurance as provided in Section XVIII of this Consent Decree;

(3) funding the Environmental Escrow Account consistent with the terms of the APPA and Section XVIII of this Consent Decree;

(4) paying, if required pursuant to Section XI, any Future Oversight Costs incurred by EPA;

(5) paying, as provided in Paragraph 13.a, if required pursuant to Section XXVI, any Stipulated Penalties;

(6) once processing is initiated, operating its processing operation on site with the exception of defined periods due to maintenance or periods of inclement weather; and

(7) ceasing or completing its processing operation on site within seven years of the Effective Date of this Consent Decree.

c.     The injunctive relief claims set forth in the United States' and the State's Complaint need not be satisfied as regards Metal Bearing Materials that are sold as RMBM or UMBM, and removed from the Chemetco Facility.

d.     Subject to Paradigm's right to stop performing the Process Work pursuant to Paragraph 93.d(2), Paradigm's financial inability to perform shall not be a defense to any action to enforce the requirements of this Consent Decree applicable to Paradigm.

28

14.    **Due Care.**  In undertaking Work at the Chemetco Facility, Paradigm and the Trustee, and their contractors, subcontractors, agents or affiliates shall: (a) exercise due care at the Chemetco Facility with respect to all Metal Bearing Materials, Process Materials, RMBMs and Process Waste, and the Existing Contamination at the Chemetco Facility; and (b) comply with all Work Plans and the ARARs contained therein.

15.    **Non-Emergency Stop Orders.**  Paradigm and the Trustee recognize that EPA's implementation of its selected Response Actions to address environmental contamination at the Chemetco Hartford Property may interfere with the Work, and may require the temporary stoppage or cessation of Work, which authority shall be in addition to the emergency response authorities set forth in Section XXIV (Emergency Response).   The Trustee and Paradigm agree to cooperate fully with EPA in the implementation of any stoppage or cessation of Work and further agree not to interfere with such Response Action.   EPA agrees, consistent with its responsibilities under applicable law and subject to EPA's emergency response authorities set forth in Section XXIV (Emergency Response), to use reasonable efforts to minimize any interference with the Trustee's and Paradigm's use of the Chemetco Hartford Property and, to the extent practicable, to avoid any such stoppage and minimize the duration of any cessation of the Work.

16.    **Application of ARARs.**

a.    All Work Plans shall include the obligation to comply with ARARs pertinent to the tasks covered by the Work Plans.

b.    EPA has determined that the Trustee's Work and Paradigm's Work under this Consent Decree, together, constitutes a removal action which is part of, and consistent with, EPA's Response Action for the Chemetco Site.

29

      c.     The Work conducted by the Trustee or Paradigm pursuant to this Consent Decree, if completed consistent with, and in compliance with, ARARs in approved Work Plans shall be considered to be consistent with the NCP, as provided in Section 300.700(c)(3)(ii) of the NCP, 40 C.F.R. § 300.700(c)(3)(ii).

      d.     Nothing in this Consent Decree or any of the Work Plans constitutes a warranty or representation of any kind by EPA that compliance with the requirements set forth in the Work Plans will achieve ARARs or permits the reuse of the Site for all purposes.  Subject to the covenants not to sue by the United States and the State in Section XII of this Consent Decree, compliance with the Work Plans shall not foreclose the Agencies from seeking compliance with all terms and conditions of this Consent Decree, including, but not limited to, ARARs that are identified in approved Work Plans.

17.    **Applicability of Bankruptcy Code Section 363.**  All future sales of Facility Assets not already approved by the Bankruptcy Court on the Effective Date shall be subject to requirements of Section 363 of the Bankruptcy Code.  11 U.S.C. § 363.  Sales of Metal Bearing Materials and the allocation of the revenues resulting there from shall be made in accordance with the provisions of the Brokerage Agreement and the APPA, subject to the approval of the Bankruptcy Court.  Provided that, except as to Chemetco Facility property that is purchased by Paradigm in accordance with the provisions of the APPA,  nothing in this Consent Decree, or the Asset Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any other transferee of Facility Assets would be subject to as the owner or operator of property covered by this Consent Decree after its Effective Date.  Nothing in this Consent Decree or the APPA authorizes a transfer to a prospective purchaser (as discussed in Paragraph 18.a below) of any

license, permit, registration, or other governmental authorization or approval without the prospective purchaser's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

18.    **Sales of Real Property.**

a.    Notice to Interested Persons/Prospective Sales of Real Property.  Should Paradigm decline to take title to all or any portion of the Chemetco Hartford Property pursuant to Section 6.3 of the APPA, the Trustee shall undertake the following actions to alert prospective purchasers of the status of the Estate's property:

(1)    Within sixty (60) days after the Effective Date, the Trustee shall place on the land records of Madison County, Illinois, a notice which:

(A)    states that the real property comprising the Chemetco Facility and the Chemetco Hartford Property are subject to this Consent Decree;

(B)    references the recorded location of this Consent Decree and any restrictions applicable to the real property that is subject to this Consent Decree;

(C)    requires all future deeds, titles, or other instruments conveying an interest in the real property comprising the Chemetco Facility and the Chemetco Site to replicate such notice; and

(D)    states that persons proposing to acquire an interest in the real property that is covered by Paragraph 17 will be subject to the provisions of CERCLA Sections 101(40) and 107(r), 42 U.S.C. §§ 9601(40) and 9607(r), and that any requirements set forth therein must be satisfied before a sale is executed.

(2)    The Trustee and any Successor-In-Title shall, at least sixty (60) days prior to the conveyance of an interest in the real property comprising the Chemetco Facility

31

or Chemetco Site to any party other than Paradigm or a successor to Paradigm, provide a non-electronic copy of this Consent Decree to each person and provide written notice of the proposed sale or lease to the Agencies, including the name and address of the prospective grantee/lessee, and the date on which a copy of this Consent Decree was given to the prospective grantee/lessee.

19.    **Modification of Consent Decree to Delete Real Property.**   Should any real property that is subject to this Consent Decree be sold or otherwise conveyed by the Trustee in accordance with the preceding Paragraph, and should the Parties agree that such parcel should no longer be subject to the provisions of this Consent Decree, the Parties shall file with the Court, pursuant to the material modification procedures of Section XXXVII (Modification), a joint motion seeking to modify this Consent Decree to remove the sold parcel.

20.    **Provisions Pertaining to Filled Waters of the United States.**

a.     In the event the Trustee elects to sell that portion of the Chemetco Hartford Property that is the location of the unpermitted wetlands fill depicted on the map attached as Appendix H, the sale shall be conditioned on a commitment by the grantee to undertake the following actions, which shall not relieve any purchaser of any obligations under federal environmental law or the State Act:

(1)     apply to the St. Louis District Office of USACE for an After-The-Fact Permit, pursuant to CWA Section 404, 33 U.S.C. § 1344, within ninety (90) days after the closing date of the sale; and

(2)     comply with the After-The-Fact-Permit issued by USACE within one year of the issuance of the Permit or such other time as the Corps allows.

b.     This Consent Decree is not and shall not be interpreted to be a permit or modification of any existing permit issued pursuant to CWA Sections 402 or 404, 33 U.S.C. §§

1342 or 1344, or any other law.  Nothing in this Consent Decree shall limit the ability of USACE to issue, modify, suspend, revoke or deny any individual permit or any nationwide or regional general permit, nor shall this Consent Decree limit EPA's ability to exercise its authority pursuant to CWA Section 404(c), 33 U.S.C. § 1344(c) except that EPA shall not contend that Work undertaken in accordance with approved Work Plans violates 33 U.S.C. § 1344.

## VIII     RESOLUTION OF POTENTIAL LIABLITY OF PARADIGM

21.     Pursuant to the APPA, Paradigm may acquire portions of the Chemetco Hartford Property.  In view of the complex nature and significant extent of the Work to be performed by Paradigm, and the risk that entities that are not parties to this Consent Decree may assert CERCLA claims against Paradigm as a consequence of the Work, regardless of whether Paradigm can successfully assert any legal defenses under Sections 107 or 119 of CERCLA, this Consent Decree resolves any potential liability of Paradigm under CERCLA for the Existing Contamination, subject only to: (a) the provisions of Paragraph 4 of this Consent Decree; and (b) the reservations and limitations contained in Section XII (Covenants Not to Sue by the United States and the State) and Section XIII (Reservations of Rights by the United States and the State).  The resolution of this potential liability in exchange for Paradigm's performance of the Work and reimbursement of Future Oversight Costs is in the public interest.

22.     By entering into this Consent Decree, Paradigm certifies that to the best of its knowledge and belief, it has fully and accurately disclosed to the United States and the State all information known to Paradigm and all information in the possession or control of its officers, directors, employees, contractors and agents which relates in any way to any Existing Contamination.  Paradigm also certifies that to the best of its knowledge and belief it has not

caused or contributed to a release or threatened release of hazardous substances or pollutants or contaminants at the Site.

23. The United States and the State agree that the disposal of hazardous substances at the Chemetco Hartford Property occurred throughout Chemetco's ownership and operation of the Chemetco Hartford Property and well before any date in the future on which Paradigm may acquire any portions of the Chemetco Hartford Property. Moreover, Sections VII (Obligations of Trustee and Paradigm, Asset Management, and Due Care), XVI (Performance of the Work), and XXI (Recordkeeping and Reporting Requirements) of this Consent Decree require Paradigm to exercise due care and submit appropriate notices to the EPA. As long as Paradigm satisfies Sections VII (Obligations of Trustee and Paradigm, Asset Management, and Due Care), XVI (Performance of the Work), XXI (Recordkeeping and Reporting Requirements) of this Consent Decree, and operates in accordance with all Work Plans under this Consent Decree and all provisions in this Consent Decree, the United States and the State agree that, in the event Paradigm acquires any portions of the Chemetco Hartford Property, Paradigm shall have resolved its liability to the United States and the State for any Existing Contamination as provided by the covenants in Section XII of this Consent Decree.

24. Subject to the Reservation of Rights in Section XIII of this Consent Decree, upon satisfactory completion of the Work, EPA agrees to release and waive any lien it may have now and in the future for costs incurred or to be incurred by EPA in responding to the release or threatened of release of Existing Contamination, through operation of CERCLA Section 107(l) and (r), 42 U.S.C. § 9607(l) & (r), on any portion of the Chemetco Hartford Property that Paradigm acquires pursuant to the APPA.

## IX    RESOLUTION OF THE UNITED STATES' CLAIMS AGAINST THE ESTATE

25.    The United States' Proof of Claim for penalties in the Bankruptcy Case shall be allowed as an unsecured claim in the amount of $500,000 and paid according to the priority established in 11 U.S.C. § 726(a)(4).  This unsecured claim of $500,000 shall resolve all civil penalty claims set forth in the United States' Complaint in this action as well as the civil penalty claims set forth in the United States' proof of claim that was filed in the Bankruptcy Case, specifically excluding all claims made by the United States related to criminal penalties that were imposed against Chemetco, Inc. prior to November 13, 2001.  One fifth of said penalty shall be attributable to the United States' claim for civil penalties under the CWA, 33 U.S.C. § 1251 *et seq.*, and four fifths of said penalty shall be attributable to the United States' claim for civil penalties under RCRA, 42 U.S.C. § 6901 *et seq.*

26.    As of the Effective Date, the United States will be deemed to have withdrawn with prejudice the United States' Proof of Claim on behalf of EPA for any penalty amount in excess of $500,000.  The United States on behalf of EPA further agrees that it shall not assert in the Bankruptcy Case any other claims and causes of action that the United States may have against Chemetco, Inc., the Trustee, or the Estate arising prior to the date of the United States' execution of this Consent Decree, including but not limited to any claims or causes of action relating to the Chemetco Hartford Property.

27.    a.    Payments to the United States under this VIII (Resolution of the United States' Claims) and Section XXVI (Stipulated Penalties) shall be made by Trustee's check or cashier's check to the United States Department of Justice lock box bank, referencing DOJ No. 90-5-1-1-4516/2 and USAO File No. 2000v00285.  Payments shall be made in accordance with

the instructions to be provided by the United States Trustee's Office. A copy of the check shall be mailed to each Party at the addresses identified in Section XXXII (Notices and Submissions).

       b.     The performance of Work, to the extent that it results in a reduction of the amount of hazardous wastes on the Chemetco Hartford Property, shall satisfy, in part, the United States' claims for injunctive relief.

## X    RESOLUTION OF THE STATE'S CLAIMS AGAINST THE ESTATE

28.    The State's Proof of Claim (Claim No. 465) in the Bankruptcy Case for Past Response Costs shall be allowed as a general unsecured claim in the amount of $150,000 and shall be paid according to the priority established in 11 U.S.C. § 726 in the same manner and to the same extent as other general unsecured claims without discrimination. All payments made under this Paragraph shall be deposited in the Hazardous Waste Fund and shall be made in the manner described in Paragraph 32.

29.    The State's claim in its Complaint in this case for penalties under the State Act shall be allowed as an unsecured claim in the amount of $350,000 and shall be paid according to the priority established in 11 U.S.C. § 726(a)(4). All payments made under this Paragraph shall be deposited in the Hazardous Waste Fund and shall be made in the manner described in Paragraph 32.

30.    The State's claim in the Illinois Pollution Control Board case *People of the State of Illinois v. Chemetco, Inc.*, PCB 96-76 (RCRA Enforcement) for penalties shall be allowed as an unsecured claim in the amount of $2,000,000 and paid according to the priority established in 11 U.S.C. § 726(a)(4). All payments made under this Paragraph shall be deposited into the Illinois Environmental Protection Trust Fund and shall be made in the manner described in Paragraph 32.

31.     The State's Proof of Claim (Claim No. 465) in the Bankruptcy Case for Stipulated Penalties accrued for violations of the Supplemental Consent Order in the case of *People of the State of Illinois v. Chemetco, Inc.*, 88-CH-200 (Madison County), shall be allowed as an unsecured claim in the amount of $38,781,791.00 and paid according to the priority established in 11 U.S.C. § 726(a)(4).  All payments made under this Paragraph shall be deposited into the Illinois Environmental Protection Trust Fund and shall be made in the manner described in Paragraph 32.

32.     Each payment to the State under this Section X (Resolution of the State's Claims) and Section XXVI (Stipulated Penalties) shall be made by certified Trustee's check or cashier's check, payable to the Illinois EPA and designated for deposit into the specified Fund and shall be sent by first class mail and delivered to:

Illinois Environmental Protection Agency
Fiscal Services
1021 North Grand Avenue East
Post Office Box 19276
Springfield, Illinois 62794-9276

A copy of the transmittal notice shall be mailed to each party at the addresses identified in Section XXXII (Notices and Submissions).

## XI       PAYMENT FOR FUTURE OVERSIGHT COSTS

33.     **Payments by the Trustee and Paradigm for Future Oversight Costs.** Paradigm and the Trustee shall be liable for all Future Oversight Costs not inconsistent with the NCP.

a.     On a periodic basis, EPA will send to the Trustee or Paradigm, as appropriate, a bill requiring payment that includes an itemized cost summary of all EPA costs.

b.      In accordance with Paragraph 34, the Trustee and/or Paradigm, as appropriate, shall make all payments within sixty (60) Days after receipt of each bill requiring payment, except as otherwise provided in Paragraph 35.

c.      The total amount to be paid to EPA by the Trustee or Paradigm shall be deposited by EPA in the Chemetco Site Superfund Special Account established for the Site within the EPA Hazardous Substance Superfund, pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), to be retained and used to conduct or finance Response Actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

34.    **Payment Instructions.**  All payments of Future Oversight Costs shall be made by Trustee's check or cashier's check(s) made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party making the payment, the "Chemetco Superfund Site," and EPA Site ID# B5HB.  Payors shall send the check(s) to:

> U.S. Environmental Protection Agency
> Superfund Payments
> Cincinnati Finance Center
> P.O. Box 979076
> St. Louis, MO 63197-9000

35.    **Cost Disputes.**

a.      The Trustee or Paradigm may contest any Future Oversight Costs billed under Paragraph 33.a if either determines that:

(1)      EPA has made a mathematical error;

(2)      EPA included a cost item that is not within the definition of Future Oversight Costs;

(3)      EPA included a cost item that is not related to Work under this Consent Decree; or

38

(4)     The Trustee or Paradigm believes that EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP or this Consent Decree.

b.     Such objection shall be made in writing within thirty (30) days after receipt of the bill by the Trustee or Paradigm and must be sent to the United States pursuant to Section XXXII (Notices and Submissions).  Any such objection shall specifically identify the contested Future Oversight Costs and the basis for objection.

c.     In the event of an objection under Paragraph 35.a, the objecting party shall pay all uncontested Future Oversight Costs to the United States within 30 days after such party's receipt of the bill requiring payment. Simultaneously, the objecting party shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation ("FDIC"), and remit to that escrow account funds equivalent to the amount of the contested Future Oversight Costs. The objecting party shall send to the United States, as provided in Section XXXII (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Oversight Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account.

d.     Simultaneous with the establishment of the escrow account, the objecting party shall initiate the Dispute Resolution procedures in Section XXVIII (Dispute Resolution). If the United States prevails in the dispute, the objecting party shall pay the sums due (with accrued interest) to the United States within thirty (30) days after the resolution of the dispute.

If the objecting party prevails concerning any aspect of the contested costs, such party shall pay to the United States, within thirty (30) days after the resolution of the dispute, that portion of the costs (plus associated accrued interest) for which it did not prevail.  The objecting party shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with Paragraph 34 (Payment Instructions).  The dispute resolution procedures set forth in this Paragraph, in conjunction with the procedures set forth in Section XXVIII (Dispute Resolution), shall be the exclusive mechanisms for resolving disputes regarding the objecting party's obligation to reimburse the United States for its Future Oversight Costs.

36.    **Interest**.  In the event that the either the Trustee or Paradigm, as appropriate, fails to make any payment for Future Oversight Costs required under this Section by the date required, Paradigm or the Trustee, as appropriate, shall pay Interest on the unpaid balance.  The Interest to be paid on Future Oversight Costs shall begin to accrue on the date immediately following the date on which payment is due (for clarity's sake, the 31st day after the Trustee receives a bill, unless such bill is contested).  The Interest shall accrue through the date of the payment.

## XII      COVENANTS NOT TO SUE BY THE UNITED STATES AND THE STATE

37.      **Covenant by the United States under CERCLA Pertaining to Existing Contamination and Work.**

a.      With regard to the Work to be performed under this Consent Decree, the Trustee and Paradigm are "operators" of the Facility within the meaning of CERCLA Sections 101(20)(a) and 107, 42 U.S.C. §§ 9601(2)(a) and 9607.

b.      Subject to Paragraph 38 below and except as specifically set forth in the United States' Reservation of Rights set forth in Section XIII of this Consent Decree, the United States, on behalf of EPA, and in consideration of the obligations of the Trustee, the Estate, and Paradigm under the terms of this Consent Decree, covenants not to sue or take any other civil or administrative action under CERCLA Sections 106 and 107, 42 U.S.C. §§ 9606 and 9607, and Section 7003 of RCRA, 42 U.S.C. § 6973, against the Trustee,  the Estate, and Paradigm for any civil liability for reimbursement of Response Costs, or injunctive relief resulting from Existing Contamination, where:

(1)      The Trustee and Paradigm have managed the Facility in accordance with ARARs, through their compliance with approved Work Plans in undertaking the Work pursuant to this Consent Decree and the Interim Order; and

(2)      The Trustee and Paradigm, and their contractors, sub-contractors, agents or affiliates, have exercised due care with respect to any Existing Contamination such that they have not exacerbated, dispersed or otherwise affected the Existing Contamination in a manner that increases environmental harm or Response Costs.

41

c.    For purposes of this Paragraph, "affiliates" of the Trustee or Paradigm include any persons or entities that control, are controlled by, or are under common control with the Trustee or Paradigm.

d.    This covenant extends only to claims arising out of the Work to be conducted by the Trustee and/or Paradigm, or by persons acting under the direction of the Trustee and/or Paradigm under this Consent Decree, or to claims relating to Existing Contamination.

38.    **Covenant by the United States under the CWA and RCRA.**  Except as provided in the United States' Reservation of Rights set out in Section XIII of the Consent Decree, and in consideration of the obligations of the Trustee under the terms of this Consent Decree, the United States covenants not to file a civil action or take civil administrative action against Paradigm, the Estate, the Trustee (both individually and in the Trustee's representative capacity as Trustee of the Estate), and the employees, contractors, or attorneys of the Trustee, the Estate or Paradigm for claims under the CWA, 33 U.S.C. §§ 1251-1387, and RCRA, 42 U.S.C. §§ 6901-6992k, that were set forth in the United States' complaint and arose before the lodging of the Consent Decree.  As it applies to employees, the above covenant not to sue the employees of the Trustee, the Estate, and Paradigm is limited to any alleged liability arising in their alleged capacity as employees and does not extend to any independent liability that they might have. This covenant not to sue extends only to the Estate, the Trustee (both individually and in his representative capacity as Trustee of the Estate), Paradigm; the Trustee's, the Estate's and Paradigm's employees contractors and attorneys, and/or the Trustee's successor in that person's representative capacity as Trustee of the Estate, and does not extend to any other person.

39.   __Covenant by the State under CERCLA Pertaining to Existing Contamination__ __and Work__.

    a.    With regard to the Work to be performed under this Consent Decree, the Trustee, the Trustee and Paradigm are "operators" of the Facility within the meaning of CERCLA Sections 101(20)(a) and 107, 42 U.S.C. §§ 9601(20)(a) and 9607.

    b.    Subject to Paragraph 40 below and subject to the State's Reservation of Rights set out in Section XIII of this Consent Decree and in consideration of the obligations of the Trustee, the Estate, and Paradigm under the terms of this Consent Decree, the State covenants not to sue or take any other civil or administrative action under CERCLA Sections 106 and 107, 42 U.S.C. §§ 9606 and 9607, and Section 7002 of RCRA, 42 U.S.C. § 6972, against the Trustee, the Estate, and Paradigm for any civil liability for reimbursement of Response Costs, restoration costs, or injunctive relief resulting from Existing Contamination, where:

    (1)    The Trustee and Paradigm have managed the Facility in accordance with ARARs, through their compliance with approved Work Plans in undertaking the Work pursuant to this Consent Decree and the Interim Order; and

    (2)    The Trustee, Paradigm, and their contractors, sub-contractors, agents or affiliates have exercised due care with respect to any Existing Contamination such that they have not exacerbated, dispersed or otherwise affected the Existing Contamination in a manner that increases environmental harm or Response Costs.

    c.    For purposes of this Paragraph, "affiliates" of the Trustee or Paradigm include any persons or entities that control, are controlled by, or are under common control with the Trustee or Paradigm.

43

d.       This covenant extends only to claims arising out of the Work to be conducted by the Trustee, the Estate, Paradigm, or by persons acting under the direction of the Trustee and Paradigm under this Consent Decree or claims relating to Existing Contamination.

40.       **Covenant by the State under Sections 12 and 21 of the Environmental Protection Act.**  Except as provided in the State's Reservation of Rights set out in Section XIII of this Consent Decree, and in consideration of the obligations of the Trustee and Paradigm under the terms of this Consent Decree, the State covenants not to file a civil action against Paradigm, the Estate, the Trustee (both individually and in the Trustee's representative capacity as Trustee of the Estate), or the employees, contractors, or attorneys of the Trustee, the Estate or Paradigm for claims under Sections 12 and 21 of the State Act, 415 ILCS 5/12 and 21, that were set forth in the State's complaint and arose before the lodging of the Consent Decree.  As it applies to employees, the above covenant not to sue the employees of the Trustee, the Estate, and Paradigm is limited to any alleged liability arising in their alleged capacity as employees and does not extend to any independent liability that they might have.  This covenant not to sue extends only to the Estate, the Trustee (both individually and in his representative capacity as Trustee of the Estate), Paradigm, the Trustee's, the Estate's and Paradigm's employees, contractors and attorneys and/or the Trustee's successor in that person's representative capacity as Trustee of the Estate, and does not extend to any other person.

41.       The United States' and the State's covenants shall take effect upon entry of this Consent Decree.  As to the Trustee, United States' and the State's covenants not to sue are conditioned upon the satisfactory performance by the Trustee of the Trustee's obligations under this Consent Decree.  As to Paradigm and its employees, attorney and contractors, the United

States' and the State's covenants not to sue are conditioned upon the satisfactory performance by the Trustee or Paradigm of the requirements of Paragraph 37.b(1) and (2), and 39.b(1) and (2).

## XIII      RESERVATIONS OF RIGHTS BY THE UNITED STATES AND THE STATE

### A.      Reservation of Rights as to Former Officers and Employees of Chemetco, Inc.

42.      The covenants by the United States and the State set forth in Section XII of this Consent Decree do not extend to Chemetco, Inc., including its Former Officers, Directors, and Employees.

43.      Notwithstanding any other provision of this Consent Decree, the United States and the State reserve all rights to bring actions against Chemetco, Inc., including its Former Officers, Directors, and Employees, under CERCLA, including, but not limited to, actions seeking:

a.      liability under CERCLA Section 107, 42 U.S.C. § 9607, for unrecovered costs incurred by the State or EPA in responding to any releases and/or threats of releases of Hazardous Substances, pollutants or contaminants, at or from the Chemetco Hartford Property that were caused, or contributed to, by Chemetco, Inc., its successors, assignees, transferees, lessees or sublessees (but excluding the Trustee and employees and attorneys hired or retained by the Trustee);

b.      liability for injunctive relief or administrative order enforcement under Section 106 of CERCLA, 42 U.S.C. § 9606;

c.      liability arising from the past, present, or future disposal, release, or threat of release of Hazardous Substances outside of the Site;

d.      criminal liability not previously resolved; and

e. liability under CERCLA for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resources assessments.

## B. <u>Reservation of Rights as to the Estate, the Trustee, and Paradigm</u>

44. Notwithstanding any other provision of this Consent Decree, the United States and the State reserve all rights against the Estate, the Trustee in his representative capacity, and Paradigm with respect to:

a. claims based on a failure to comply with the requirements of this Consent Decree;

b. criminal liability not previously resolved;

c. any matters not expressly included in the United States' and the State's covenants not to sue set forth in Section XII of this Consent Decree;

d. claims arising under RCRA, 42 U.S.C. § 6901, *et seq.*, and the CWA, 33 U.S.C. § 1251 *et seq.*, for violations arising after the Effective Date;

e. liability under CERCLA for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resources assessments;

f. any liability resulting from newly created releases or threatened releases at or from the Chemetco Hartford Property, of Hazardous Substances as a result of the processing activities undertaken pursuant to the APPA; and

g. claims arising under the State Act, 415 ILCS 5/1, et seq., for violations arising after the Effective Date.

**C.**     <u>Reservation of Rights as to the Estate, Paradigm and the Trustee Pertaining to Existing Contamination</u>

45.     a.     The United States, and the State, further reserve, and this Consent Decree is without prejudice to all rights under RCRA and CERCLA against the Estate, the Trustee, Paradigm, and their contractors, subcontractors, or affiliates, where environmental harm, Response Costs, Response Actions, restoration costs or natural resource damages result from, or are exacerbated by, the Trustee's, the Estate's or Paradigm's management of Metal Bearing Materials, Process Materials, RMBMs, Process Waste, and Existing Contamination, and the Trustee and Paradigm otherwise are unable to satisfy the requirements of Paragraph 37.b(1) and (2) or 39.b(1) and (2).

b.     In such a case, the Trustee, the Estate, and Paradigm shall be severally liable only for the exacerbation of environmental harm, Response Actions, Response Costs under CERCLA, restoration costs or natural resource damages which have been caused solely by their respective individual failure: (1) to manage the Estate's assets in accordance with ARARs through compliance with approved Work Plans or (2) to exercise due care under Section VII (Obligations of Trustee and Paradigm, Asset Management and Due Care).  However, in any such proceeding, Paradigm and the Trustee retain the right to argue that each is entitled to a reduction in damages claimed or other appropriate relief based on the amount of unreimbursed costs which Paradigm and/or the Estate have incurred which have reduced the amount of environmental harm or Response Costs under CERCLA, restoration costs or natural resource damages incurred, or to be incurred, by the United States, the State or third parties at the Facility.

46.     Nothing in this Consent Decree shall constitute a release or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law

or in equity, which the United States or the State may have against any person, firm, corporation or other entity not a party to or otherwise identified as a beneficiary of this Consent Decree.

47.     Nothing herein is intended to expand nor shall it have the effect of expanding the rights of the United States and the State to assert claims against the Estate beyond those specified in this Consent Decree.

48.     Nothing in this Consent Decree shall be deemed to:

a.     limit the authority of the United States or the State to either undertake Response Actions at the Chemetco Facility themselves, or to order parties other than Paradigm, Chemetco, the Estate or the Trustee to undertake such Response Actions with respect to the Facility under any applicable state or federal law, regulation, or rule;

b.     alter the applicable legal principles governing judicial review of any action covered by Paragraph 45.a taken by the United States or the State pursuant to such authority;

c.     limit the future information-gathering authority of the United States and the State under any applicable state or federal law, regulation, or rule; or

d.     restrict or limit the nature or scope of Response Actions which may be taken or required by the United States and/or the State in exercising their authority under federal or State law other than Response Actions against Paradigm, Chemetco, the Estate or the Trustee and their respective contractors.

49.     The United States and the State also reserve all rights they may have against the Trustee, if any, for *ultra vires* acts, breaches of the Trustee's fiduciary duties or any other actions taken by the Trustee in contravention of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, that materially diminish the value of the Estate.

50.      Nothing in this Consent Decree shall constitute a release from liability for any person or entity other than Paradigm, the Trustee, the United States, and the State.  The United States, the State, the Estate and the Trustee expressly reserve all claims, demands and causes of action either judicial or administrative, past, present or future, in law or equity, which they may have against all other persons, firms, corporations, entities, or predecessors, shareholders, officers, directors, or employees of Chemetco, Inc. for any matter arising at or relating in any manner to the Chemetco Facility, the Complaints, the Proofs of Claim, or claims or causes of action addressed herein.

## XIV     <u>TRUSTEE'S COVENANTS NOT TO SUE AND RESERVATION OF RIGHTS</u>

51.      In consideration of the Covenants Not to Sue by the United States and the State in Section XII of this Consent Decree, the Trustee, on behalf of the Estate and Chemetco, Inc., hereby covenants not to sue and not to assert any claims or causes of action against the United States or the State, their authorized officers, employees, or representatives with respect to the Facility or this Consent Decree, including but not limited to, any direct or indirect claims for reimbursement from the Hazardous Substance Superfund established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507, through CERCLA Sections 106(b)(2), 111, 112, or 113, 42 U.S.C. §§ 9606(b)(2), 9611, 9612, or 9613, or any other provision of law, any claim against the United States or the State, including any department, agency or instrumentality of the United States or the State under CERCLA Sections 107 or 113, 42 U.S.C. §§ 9607 or 9613, related to the Site or any claims arising out of Response Actions at the Site constituting the Work, including claims based on EPA's or IEPA's oversight of such activities or approval of plans for such activities.

49

52.     The Trustee on behalf of the Estate and Chemetco, Inc. reserves, and this Consent Decree is without prejudice to, the right to initiate actions against the United States and/or the State based on negligent actions taken directly by the United States and the State, not including oversight or approval of the Trustee's plans or activities, that are brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA.  Nothing herein shall be deemed to constitute pre-authorization of a claim within the meaning of CERCLA Section 111, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

53.     Notwithstanding the foregoing, the Trustee reserves, and this Consent Decree is without prejudice to, the right to initiate claims against the United States, subject to the provisions of 28 U.S.C. § 171, brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of Response Actions, or the oversight or approval of the Trustee's or Paradigm's plans, reports, other deliverables or activities.

## XV     PARADIGM'S COVENANT NOT TO SUE AND RESERVATION OF RIGHTS

54.     In consideration of the United States' Covenant Not To Sue in Section XII of this Consent Decree, Paradigm hereby covenants not to sue and not to assert any claims or causes of

action against the United States or the State, their authorized officers, employees, or representatives with respect to the Site or this Consent Decree, including but not limited to, any direct or indirect claims for reimbursement from the Hazardous Substance Superfund established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507, through CERCLA Sections 106(b)(2), 111, 112, or 113, 42 U.S.C. §§ 9606(b)(2), 9611, 9612, or 9613, or any other provision of law, any claim against the United States or the State, including any department, agency or instrumentality of the United States or the State under CERCLA Sections 107 or 113, 42 U.S.C. §§ 9607 or 9613, related to the Site, or any claims arising out of response activities at the Site, including claims based on EPA's or IEPA's oversight of such activities or approval of plans for such activities.

55.     Notwithstanding the foregoing, Paradigm reserves, and this Consent Decree is without prejudice to, the right to initiate claims against the United States, subject to the provisions of 28 U.S.C. § 171, brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of Response Actions, or the oversight or approval of the Trustee's or Paradigm's plans, reports, other deliverables or activities.

## XVI    <u>PERFORMANCE OF THE WORK</u>

56.    The State and the Trustee agree that the Work to be performed hereunder shall not be deemed to be in violation of the Seal Order issued December 4, 2001, pursuant to Section 34 of the State Act and filed with the Bankruptcy Court on December 8, 2001, and the State hereby consents to the presence at the Facility of those persons performing Work at the Facility on behalf of the Trustee or Paradigm pursuant to an approved Work Plan.  The Parties agree that, from time to time, the Seal Order may need to be modified, amended, or rescinded by the State as it deems appropriate.

57.    All aspects of the Work to be performed by the Trustee or Paradigm pursuant to this Section XVI (Performance of the Work), Section XIX (Quality Assurance, Sampling, and Data Analysis), Section XX (Access), and Section XXIV (Emergency Response) shall be under the direction and supervision of Paradigm's Project Coordinator and Supervising Contractor or the Estate's Project Coordinator and Supervising Contractor, as appropriate.

58.    **<u>Work Plans/Implementation.</u>**  Paradigm shall undertake the Process Work and manage the Process Materials in accordance with approved Work Plans.  To the extent not already included as attachments to this Consent Decree, all plans submittals, or other deliverables required under the approved Work Plans shall be submitted to the Agencies for approval by EPA. EPA shall not unreasonably deny approval of submitted Work Plans. Each Work Plan shall designate whether the Trustee or Paradigm has primary responsibility for implementation of each Work Plan.

59.    a.    Unless otherwise specified in a Work Plan, all Work Plans shall be implemented by the Trustee or Paradigm, according to the approved schedules.  The Trustee or Paradigm shall not implement any Work Plan until it has been approved.  Upon EPA approval,

the various Work Plans shall be incorporated into and become enforceable under this Consent Decree, and the Trustee or Paradigm, as appropriate, shall be obligated to comply with their terms and requirements.

        b.      Approved Work Plans under this Consent Decree include:

        (1)     Process Work Plan. The Process Work Plan, as approved by the Agencies, is attached hereto as Appendix E. Consistent with the APPA, the parties acknowledge that Paradigm may apply for Agency approval of additional sales of Scrubber Sludge or Slag as a RMBM rather than process it in accordance with the Process Work Plan.

        (2)     Operation and Maintenance Plan (O&M Plan). The O&M Plan, as approved by IEPA, is attached hereto as Appendix D. The attached approved O&M Plan may be modified and upgraded by the Trustee, or at the direction of the EPA, and upon review and approval by EPA, in consultation with the State, shall be implemented as so modified. The O&M Plan includes the Stormwater Management Plan, the Security Plan, the Health and Safety Plan, and the Fugitive Dust Plan.

        (3)     The UMBM Work Plan, as approved by the Agencies, is attached hereto as Appendix J.

        (4)     The Scrap Metal Work Plan, as approved by the Agencies, is attached hereto as Appendix N.

        (5)     The Copper Furnace Clean Up Solids Work Plan, as approved by the Agencies, is attached hereto as Appendix K.

        (6)     The North Polishing Pond and Sump Work Plan, as approved by the Agencies, is attached hereto as Appendix L.

(7)    The Circuit Board and Shredded Circuitry Board Material Work Plan, as approved by the Agencies, is attached hereto as Appendix M.

(8)    The Furnace Removal Work Plan, as approved by the Agencies, is attached hereto as Appendix I.

60.    **Additional Work.**

a.    In the event that EPA determines, or the Trustee proposes and EPA agrees, that additional actions are necessary to carry out any Approved Work Plans, other than the Processing Work Plan, EPA shall provide a written request for such additional actions to the Project Coordinator for the Trustee.

(1)    Within sixty (60) days of receipt of the written request from EPA referred to in subparagraph a. of this Paragraph, the Trustee shall submit to the Agencies for approval by EPA, a work plan for the additional work.  Upon approval of such plan, the Trustee shall implement the plan in accordance with the schedule contained therein.

(2)    Paradigm and the Trustee may invoke the procedures set forth in Section XXVIII (Dispute Resolution) to dispute a determination by EPA that additional work is necessary to satisfy the Work Plans.  Such a dispute shall be resolved pursuant to Section XXVIII of this Consent Decree.

b.    Should Paradigm propose Additional Work, it shall amend, as determined by EPA, the following Work Plans:

(1)    A Waste Analysis Plan as required by the Process Work Plan;

(2)    A Contingency Plan as required under 40 CFR § 264.53, and set forth in the Process Work Plan; and

(3)     A Health and Safety Plan.   Within ninety (90) days after the Effective Date, Paradigm shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of the Work under this Agreement. This plan shall be prepared in accordance with EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration regulations found at 29 C.F.R. Part 1910.  If EPA determines that it is appropriate, the plan shall also include contingency planning. Paradigm shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

61.     **Map of Process and Storage Areas.**

a.     Attached hereto at Appendix F is a map of the Facility that depicts the areas upon which Paradigm will perform the Process Work, the location of the source areas, and the areas on which Paradigm will store RMBM and Process Waste prior to shipment for sale or appropriate off-site disposal, respectively.

b.     Paradigm may utilize other Facility areas for the Process Work only with the written concurrence of the OSC.  To obtain such concurrence, Paradigm shall submit to the OSC a description of the proposed use, and a proposed modification of the map at Appendix F that depicts the additional areas proposed for use in the Process Work.  Should the OSC approve such a request, the modified map, Paradigm's modification request, and the written concurrence shall be filed with the Court in accordance with the minor modification provisions of Section XXXVII (Modification).

62.     **Approval of Process Materials as RMBM.**  Paradigm shall not stage or ship off-site any Processed Materials in the absence of such materials having been approved as a RMBM

55

by EPA and the Bankruptcy Court; provided, however, Paradigm may, without such prior approval, make subsequent shipments of specific types or grades of RMBM(s) of a type that have previously been approved for shipment, except that any such shipments will be subject to random inspections.  In the event that the EPA does not approve the sale of any Processed Materials that Paradigm proposes to be designated as RMBM, Paradigm shall, within five (5) days of EPA's disapproval, either return the Processed Materials as feedstock to the Process Material Staging Area for further processing or place the materials in the Process Waste Staging Area.  EPA's determination under this paragraph shall be subject to Dispute Resolution; however, Paradigm shall segregate the materials in dispute within either the Process Material Staging Area or the Process Waste Staging Area.

63.     **Classification of RMBMs/Management of RMBMs and Process Materials.** Paradigm shall manage Process Materials in accordance with appropriate Work Plans.

a.      **Staging of Process Materials.**  Paradigm shall stage Process Materials removed from Source Areas only in the Process Material Staging Area as defined in the Process Work Plan.  Paradigm shall not stage a quantity of Process Material at the Process Material Staging Area that would exceed the quantity upon which the estimated cost of disposal in the Initial Financial Assurance Fund was based (400 tons, as described in the Process Work Plan), until such time as the Environmental Escrow Account replaces the Initial Financial Assurance, at which time the amount in the Environmental Escrow Account shall be used by EPA as the basis for determining the cap on the amount of Process Material that can be stored in the Process Staging Area.  Primary sorting and sizing activities associated with the Process Materials shall occur within this Process Material Staging Area.

b. <u>**Handling and Staging of RMBM and Process Waste**</u>.

(1)     **Staging and Classification of Products**.   Any Metal Bearing Materials approved as RMBM pursuant to this Consent Decree, including Processed and Unprocessed Metal Bearing Materials, shall be staged for shipment in a designated RMBM Staging Area.  In accordance with the Process Work Plan, Paradigm may designate and use an area within the Process Material Staging Area for the staging of UMBM that has been approved for sale as a RMBM under this Consent Decree.  Paradigm shall handle and stage materials in a contained manner on the Facility, and package the material for transport from the Facility, in ways that prevent dispersal, spillage or release. Like grades and specifications of RMBM shall be staged together in the same area.  Paradigm shall not stage a quantity of RMBM at the RMBM Staging Area that would exceed the quantity upon which the estimated cost of disposal included in the Initial Financial Assurance fund was based until such time as the Environmental Escrow Account replaces the Initial Financial Assurance, at which time the amount in the Environmental Escrow Account shall be used by EPA as the basis for determining the cap on the quantity of RMBM that can be stored in the Finished RMBM Staging Area.

(2)     <u>**Handling and Staging of Waste**</u>.   Paradigm shall transfer all wastes from its Process Work to the Process Waste Staging Area, which shall be operated in accordance with the Process Work Plan.  All operations conducted at the Process Waste Staging area shall comply with the pre-transport requirements set forth in 40 C.F.R. § 262, Subpart C. Paradigm shall not stage a quantity of Waste at the Process Waste Staging Area that would exceed the quantity amount upon which the estimated cost of disposal included in the Initial Financial Assurance fund was based until such time as the Environmental Escrow Account replaces the Initial Financial Assurance, at which time the amount in the Environmental Escrow

Account shall be used as the basis by EPA for determining the cap on the amount of Waste that can be stored in the Process Waste Staging Area.

    64.    **Off-Site Shipment of Waste.**

        a.    **Shipment of Process Waste.**

        (1)    Shipment off-site of any Process Waste will be subject to approval by EPA, provided that Paradigm may make subsequent shipments of Waste previously approved for shipment without prior approval except that any such shipments will be subject to random inspections. Paradigm shall, as soon as practical prior to any off-Site shipment of Process Waste from the Chemetco Facility, but in any event, no fewer than ten days prior to any such shipment, provide written notification of such shipment to the Agencies' Project Coordinators and, if required by law or regulation, to the appropriate federal and/or State officials or entities. The notification shall be in writing and shall include the following information: (A) the name and location of the facility to which the Waste is to be shipped; (B) the type and quantity of the Waste to be shipped; (C) the expected schedule for the shipment of the Waste; (D) the method of transportation and identification of the transporter; and (E) identification of the State and federal law regarding the appropriate waste management and disposal requirements for the specific Waste to be shipped. Respondent shall notify the Agencies and, if required by law or regulation, other appropriate federal and/or State officials or entities of major changes in the shipment plan, such as a decision to ship the Waste to another facility within the same state, to a facility in another state, or through the use of a different shipping company.

        (2)    The Trustee or Paradigm may ship Waste from the Chemetco Facility to an off-Site facility only if the Trustee or Paradigm, as appropriate, either verifies, prior to any shipment, that the off-Site facility is operating in compliance with the requirements

of Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440, by obtaining a determination from EPA that the proposed receiving facility is operating in compliance with 42 U.S.C. § 9621(d)(3) and 40 C.F.R. § 300.440.

(3)    The Trustee or Paradigm may ship Waste from the Chemetco Facility to an out-of-state waste management facility only if, prior to any shipment, the Trustee or Paradigm, as appropriate, provides written notice to the OSC and to the appropriate state environmental official in the receiving facility's state. This notice requirement shall not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten cubic yards. The Trustee and Paradigm, as appropriate, shall include the following information, if available, in the written notice: (A) the name and location of the receiving facility; (B) the type and quantity of Waste to be shipped; (C) the schedule for the shipment; and (D) the method of transportation. The Trustee and Paradigm, as appropriate, also shall notify the OSC and the state environmental official referenced above of any major changes in the shipment plan, such as a decision to ship the Waste to an out-of-state facility not previously used as a disposal facility by the Trustee or Paradigm. Paradigm or the Trustee, as appropriate, shall provide the written notice after the award of a contract for sale of any Waste and before the Waste is shipped.

(4)    The Trustee or Paradigm, as appropriate, shall provide to each Agency's Project Coordinator, with the submission of quarterly reports, a copy of each manifest for any shipment of Waste off-site for that quarter, if a manifest was required for the shipment of the Waste, depending on who shipped the waste.

b.    **Disposal of Process Waste.** The Trustee or Paradigm shall dispose of all Process Waste from the processing of Scrubber Sludge and/or Slag at an off-Site facility authorized to receive materials of the type being disposed of:  Provided, the Parties agree that

59

the Trustee or Paradigm may dispose of the Process Waste at an on-site facility, should EPA approve the construction and operation of an on-site disposal facility on the Chemetco Hartford Property in writing in accordance with applicable regulations and procedures.   Any disputes regarding EPA's decision to approve or disapprove any on-site disposal of Process Waste shall be considered an objection to EPA's selection of a response action posing issues concerning the adequacy of a response action taken or ordered by EPA, so any dispute resolution proceedings under Section XXVIII (Dispute Resolution) concerning such a decision shall be governed by the arbitrary and capricious standard of review and review based on an administrative record as specified by CERCLA Section 113(j), 42 U.S.C. § 9613(j).

## XVII      PROJECT COORDINATORS & SUPERVISING CONTRACTOR

65.    a.      **Project Coordinators.**  Within thirty (30) days following the lodging of this Consent Decree, the Trustee, Paradigm, EPA, and the State will notify each other, in writing, of the name, address and telephone number of their respective designated Project Coordinators and Alternate Project Coordinators, which shall be subject to approval by EPA.  The Trustee's and Paradigm's Project Coordinator or Alternative Project Coordinators shall not be an attorney for either party in this matter.   The Trustee's and Paradigm's Project Coordinator and Alternate Project Coordinator shall be subject to disapproval by EPA, and each such coordinator shall have the technical expertise sufficient to adequately oversee all aspects of compliance. The Trustee's and Paradigm's Project Coordinator may assign other representatives, including other contractors, to serve as a Site representative for oversight of the Trustee's and Paradigm's performance of the daily operations during implementation of Work Plans.

b.      If either Paradigm or the Trustee proposes to change their Project Coordinator, they shall notify EPA and the State, and must obtain an authorization to proceed

60

from EPA, after a reasonable opportunity for review and comment by the State, before the new Project Coordinator performs, directs, or supervises any Work under this Consent Decree. Paradigm's and the Trustee's proposed replacement Project Coordinator shall be subject to disapproval by EPA, and shall have the technical expertise sufficient to adequately oversee all aspects of compliance.

66.     a.     **Supervising Contractor.** All aspects of the Work to be performed by the Trustee or Paradigm pursuant to Sections XVI (Performance of the Work), shall be under the direction and supervision of the Supervising Contractor, the selection of which shall be subject to disapproval by EPA after a reasonable opportunity for review and comment by the State. Within ten (10) days after the lodging of this Consent Decree, Paradigm or the Trustee shall notify EPA and the State in writing of the name, title, and qualifications of any contractor proposed to be the Supervising Contractor. With respect to any contractor proposed to be Supervising Contractor, Paradigm or the Trustee shall demonstrate that the proposed contractor has a quality assurance system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001, reissued May 2006) or equivalent documentation as determined by EPA. EPA will issue a notice of disapproval or an authorization to proceed regarding the hiring of the proposed contractor.  If at any time thereafter, Paradigm or the Trustee proposes to change a Supervising Contractor, Paradigm or the Trustee shall give such notice to EPA and the State and must obtain an authorization to proceed from EPA, after a reasonable opportunity for review and comment

by the State, before the new Supervising Contractor performs, directs, or supervises any Work under this Consent Decree.

b.      If EPA disapproves a proposed Supervising Contractor, EPA will notify Paradigm or the Trustee, as appropriate, in writing.  Paradigm or the Trustee, as appropriate, shall submit to EPA and the State a list of proposed alternative contractors, including the qualifications of each contractor that would be acceptable to Paradigm within thirty (30) days after receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Paradigm or the Trustee, as appropriate, may select any contractor from that list that is not disapproved and shall notify EPA and the State of the name of the contractor selected within twenty-one (21) days after EPA's authorization to proceed.

c.      If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents Paradigm or the Trustee from meeting one or more deadlines in a plan approved by EPA pursuant to this Consent Decree, Paradigm or the Trustee, as appropriate, may seek relief under Section XXVII (Force Majeure).

67.    EPA and the State may designate other representatives, including, but not limited to, EPA and State employees, and EPA and State contractors and consultants, to observe and monitor the progress of any activity undertaken pursuant to this Consent Decree.  The Parties' Project Coordinators will confer periodically as requested by EPA's Project Coordinator.

## XVIII    FINANCIAL ASSURANCE

68.    The Trustee and Paradigm shall be obligated to set aside and maintain, as set forth herein, "financial assurance," *i.e.* sufficient funds to pay the costs, and for the closure and post-

closure of all units, facilities, and/or equipment outside the Source Areas used by Paradigm to store, manage, and process the Process Materials present at the Facility or to execute UMBM sales.

69.     **Initial Financial Assurance.**

a.     Paradigm, on behalf of the Estate, shall provide Initial Financial Assurance in the amount of $200,000 for:  (1) closure and post-closure by Paradigm of units used by Paradigm to store, manage, and process the Process Materials present at the Facility; and (2) disposal by Paradigm of all Process Materials and any accumulated Process Wastes, including, but not limited to, the decontamination and decommissioning of all equipment and buildings used in the Paradigm Process.  Such financial assurance shall be established in accordance with the requirements of 35 Ill. Adm. Code § 724.243 and 40 CFR Part 264.143 through either a trust account solely accessible by EPA or its designee or a letter of credit meeting the requirements of 35 Ill. Adm. Code Part §724.243 and 40 CFR Part 264.143. Paradigm shall not be required to post the Initial Financial Assurance until thirty (30) days after completion of construction of the facility in the Process Building that will be used to perform the Process Work but shall post the Initial Financial Assurance before movement of the Metal Bearing Materials to the Process Material Staging Area.  The costs described in this paragraph shall be an administrative expense of the Estate if the posted Initial Financial Assurance will not fully fund all activities described in this paragraph.

b.     In the event that EPA determines at any time that the Initial Financial Assurance established pursuant to this Section is inadequate, or if it becomes inadequate due to an Emergency Response related to Paradigm's operations, Paradigm or the Trustee shall, within thirty (30) days of receipt of notice of such a determination by EPA, increase the Initial

Financial Assurance to the amount determined by EPA to be necessary for Paradigm to fulfill the tasks identified in Paragraph 68 of this Section and/or undertake Emergency Response Actions as required by Section XXIV (Emergency Response).  EPA's determination under this Paragraph shall be subject to Dispute Resolution; however, Paradigm shall post the additional Initial Financial Assurance during the time period that the matter is under dispute.  If the Trustee provides such additional Initial Financial Assurance, such amount shall be treated as a Direct Cost incurred by the Trustee and such amount shall be recoverable by the Trustee from Paradigm pursuant to Section 4.5 of the APPA.

70.     The Initial Financial Assurance created pursuant to Paragraph 69 of this Section shall be maintained until there are sufficient funds in the Environmental Escrow Account to cover the costs of Initial Financial Assurance, as determined by EPA, at which time the obligation to maintain Initial Financial Assurance shall cease, and the monies in the Environmental Escrow Account shall be used to satisfy the Trustee's and Paradigm's obligation to maintain financial assurance.  After the cessation of the obligation to maintain initial financial assurance, any funds used to establish the Initial Financial Assurance shall revert to the party who posted the funds, *i.e.* either Paradigm or the Trustee, as appropriate.

71.     **Environmental Escrow Account/Financial Assurance.**

a.     Pursuant to Section 5.2 of the APPA, the Trustee has established an interest bearing account in a federally insured financial institution for the purpose of holding certain monies (specified in Section 4 of the APPA) derived from the generation of Processing Revenue under the APPA (the "Escrowed Funds").  *See* Exhibit A, APPA Sections 5.2, 4.4(a)(i) and 4.4(b)(i).  The Escrowed Funds shall be used to satisfy the Trustee's and Paradigm's obligation to maintain financial assurance, as follows:

(1)     One purpose of the Escrowed Funds is to reimburse, upon Approval by EPA, the cost of the Trustee's/Paradigm's performance of any Emergency Response Actions that are undertaken pursuant to Section XXIV (Emergency Response).  *See* APPA Sections 4.1.b, and 5.1.

(2)     Paradigm also may access the Escrowed Funds to fund, upon approval by EPA, the:  (A) closure and post-closure of all units, facilities, and equipment used by Paradigm to store, manage, and process the Process Materials present at the Facility or to execute Unprocessed Metal Bearing Materials Sales; (B) disposal of all Process Materials and any accumulated Process Waste, including but not limited to water used in the Process Work; (C) decontamination and decommissioning of all equipment and buildings used in such processes; and (D) all documented consultant and third party contractor costs required to conduct the activities described in subsections (A) – (C) of this subsection a.(2).

b.     At least thirty (30) days prior to the initiation of Process Work, the Trustee shall execute or otherwise finalize all instruments or other documents required to create the interest bearing account referred to in subparagraph a. of this Paragraph.  Within fifteen (15) days after the creation of said account, the Trustee shall submit copies of all executed and/or otherwise finalized instruments or other documents required to create the account to the EPA Regional Financial Management Officer in accordance with Section XXXII (Notices and Submissions), with a copy to the United States, and EPA.

c.     **Replenishment of Escrowed Funds/Revised Financial Assurance.**  In the event that EPA determines that:

(1)     the amount of Escrowed Funds has been reduced below the Initial Financial Assurance amount due to an Emergency Response Action associated with Paradigm's operations; or

(2)     the Financial Assurance Account needs to be revised to cover a greater quantity of Process Material, RMBM and/or Waste than the quantities that were used to calculate the amount of the Initial Financial Assurance,

Paradigm shall replenish the Escrowed Funds or increase the Financial Assurance, as appropriate, within sixty (60) days of its receipt of EPA's determination.

d.     Notwithstanding the provisions of Section 5.2 of the APPA, the total amount contributed to the Escrowed Funds over time pursuant to Section 4.4(a)(ii), 4.4(c) of the APPA shall not be limited or be less than the amount of the Initial Financial Assurance or the Revised Financial Assurance after the obligation to maintain the Initial Financial Assurance expires in accordance with Paragraph 70.

e.     Twenty-five percent (25%) of the amount in the Escrowed Funds in excess of the Initial Financial Assurance amount or, upon expiration of the Initial Financial Assurance, the financial assurance amount, shall be held in the Escrow Account, and exclusively dedicated for EPA's use in conducting Response Actions associated with Long Lake consistent with Paragraph 72 below, and shall not be accessible or available to Paradigm or the Trustee for any other purpose.

72.     Consistent with the APPA, any Escrowed Funds remaining after termination of the APPA for whatever reason, and after those funds have been used to fund any of the actions set forth in Paragraph 68, or upon certification of completion of all work plan requirements pursuant to Section XXIII, the United States or the State shall deposit such remaining Escrowed

66

Funds in the Chemetco Site Superfund Special Account and the Long Lake Special Account (consistent with Paragraph 71.e above), to be retained and used by EPA to conduct or finance Response Actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

73.      Pursuant to Section 17 of the 1986 Trust Agreement, and with the agreement hereby given by the Trustee for the Estate of Chemetco, within sixty (60) days after the entry of this Consent Decree, EPA will seek termination of the Fund established by the 1986 Trust Agreement from the trust agreement trustee (now the U.S. Bank of St. Louis, Missouri) in writing, and, on behalf of the Estate of Chemetco, upon termination, request the deposit, in accordance with instructions to be provided by the Office of the U.S. Attorney, of any monies remaining in the Fund into the Chemetco Site Superfund Special Account within the EPA Hazardous Substance Superfund, to be retained and used by EPA to conduct or finance Response Actions at or in connection with the Chemetco Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.  In no instance shall any portion of the funds be directed to the Estate of Chemetco. This agreement to terminate and transfer the Fund shall not give rise to a claim that the Estate is in violation of the RCRA financial assurance requirements that the 1986 Trust Agreement addressed.

## XIX      QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

74.      All treatability, design, ARARs, compliance and monitoring samples taken by either the Trustee or Paradigm shall be in accordance with the quality assurance, quality control, and chain of custody procedures set forth in "EPA Requirements for Quality Assurance Project Plans (QA/R5)" (EPA/240/R-02/009), and subsequent amendments to such guidelines upon notification by EPA to the Trustee and Paradigm of such amendment.  Amended guidelines shall

apply only to samples collected more than fourteen (14) days after such notification.  If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with those standards and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this Consent Decree.

75.     The Trustee or Paradigm shall ensure that EPA and State personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by the Trustee or Paradigm in implementing this Consent Decree.  However, such access shall not limit Paradigm's right to have treated as CBI the information in such laboratories utilized by the Trustee or Paradigm in implementing the Consent Decree.  The Trustee or Paradigm shall ensure that the laboratories that they or their agents use for the analyses of samples taken pursuant to this Consent Decree perform all analyses according to accepted EPA methods unless other methods are approved under an approved Work Plan.  Accepted EPA methods consist of those methods which are documented in EPA "Test Methods for Solid Waste, Physical/Chemical Methods" SW-846, (Third Edition, updated January 2008), the "Contract Lab Program Statement of Work for Inorganic Analysis ILM05.4" (December 2006), or the "Contract Lab Program Statement of Work for Organic Analysis SOM01.2" (June 2007), and any amendment made thereto during the course of the implementation of this Consent Decree.

76.     The Trustee or Paradigm shall ensure that all laboratories that they or their agents use for the analyses of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent QA/QC program.  This refers to laboratories that have a documented Quality System that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), and "EPA Requirements for Quality

68

Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001, reissued May 2006) or equivalent documentation as determined by EPA. EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program ("NELAP") as meeting the Quality System requirements.

77.     Upon request, the Trustee or Paradigm shall allow split or duplicate samples to be taken by the Agencies or their authorized representatives.  The Trustee or Paradigm shall notify the Agencies not less than fourteen (14) days in advance of any sample collection activity on the Trustee's or Paradigm's behalf, unless EPA agrees to a shorter notification period.  In addition, the Agencies shall have the right to take any additional samples that they deem necessary.  Upon request, the Agencies shall allow the Trustee to take split or duplicate samples of any samples that they undertake as part of their oversight of the Trustee's or Paradigm's implementation of the Work.

78.     The Trustee and/or Paradigm shall submit to the Agencies copies of the results of all sampling and/or tests or other data obtained or generated by or on behalf of the Trustee and/or Paradigm with respect to the implementation of this Consent Decree unless EPA agrees otherwise.  Similarly, the Agencies shall submit to the Trustee and/or Paradigm copies of the results of all sampling and/or tests or other data obtained or generated by or on behalf of the Agencies with respect to the implementation of this Consent Decree unless the Trustee and Paradigm agree otherwise.

79.     Notwithstanding any provision of this Consent Decree, the Agencies hereby retain all information gathering and inspection authorities and rights, including the right to bring enforcement actions related to failure to comply with such information gathering and inspection

authorities and rights, under CERCLA, RCRA, the State Act, and any other applicable statutes or regulations.

**XX**     **ACCESS**

80.     Commencing upon the date of lodging of this Consent Decree, the Trustee and Paradigm agree to provide the Agencies and their officers, employees, representatives and contractors and all other persons performing Response Actions at the Site under the Agencies' oversight, an irrevocable right of access at all reasonable times to the Site and any other property to which access is required for the implementation of this Consent Decree or other required Response Actions, to the extent access to the property is controlled by the Trustee and Paradigm, for the purposes of conducting any activity related to this Consent Decree, as set forth below, and/or conducting Response Actions under federal and State law.  EPA agrees to provide reasonable notice to the Trustee and Paradigm of the timing of Response Actions to be undertaken at the Site.  The Agencies shall undertake activities at the Site, including, but not limited to:

    a.     monitoring the Work at the Site;

    b.     verifying any data or information submitted to the Agencies;

    c.     conducting investigations relating to contamination at or near the Site;

    d.     obtaining samples;

    e.     taking photographs and video subject to Paradigm's rights to have such information considered CBI;

    f.     assessing the need for, planning, or implementing additional Response Actions at or near the Site;

70

g.      inspecting and copying records, operating logs, contracts, or other documents, including documents relating to operating costs and revenues from the sale of Process Materials maintained or generated by the Trustee or the Trustee's agents, consistent with Section XXIX (Access to Information);

h.      assessing the Trustee's and Paradigm's compliance with this Consent Decree; and

i.      undertaking and/or overseeing response actions as determined to be required by EPA.

81.      Notwithstanding any provision of this Consent Decree, the Agencies retain all of their access authorities and rights, including enforcement authorities related to failure to comply with such access authorities and rights, under CERCLA, RCRA, the State Act, and any other applicable statute or regulations.

## XXI      RECORDKEEPING AND REPORTING REQUIRMENTS

82.      Paradigm shall keep a written operating record of its on-site processing operations in accordance with the Process Work Plan.

83.      a.      In addition to any other requirement of this Consent Decree, Paradigm shall submit to the Agencies, pursuant to the schedule below, written progress reports that:

(1)      Describe the actions which have been taken by Paradigm toward achieving compliance with this Consent Decree during the previous reporting period;

(2)      Include a summary of all results of sampling and tests and all other data received or generated by or on behalf of the Trustee or Paradigm, and Paradigm's contractors, or agents in the previous reporting period;

(3)     Identify all Work Plans, plans and other deliverables required by this Consent Decree that were completed and submitted during the previous reporting period;

(4)     Describe all actions, including, but not limited to, data collection and implementation of all Work Plans, which are scheduled for the next reporting period and provide other information relating to the progress of construction;

(5)     Describe any actual or anticipated increases to the quantity of process material, RMBM, and or waste beyond the quantity that was used to calculate the amount of the initial financial assurance;

(6)     Include information regarding percentage of completion, unresolved delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated delays; and

(7)     Include any modifications to the Work Plans or other schedules that Paradigm has proposed to EPA or that have been approved by EPA.

b.     For the period during which Paradigm is developing, installing, and building the processing plant, Paradigm shall submit all reports referred to in Paragraph 83 on a monthly basis. Once the processing plant has commenced operations, Paradigm shall submit all reports referred to in Paragraph 83 on a quarterly basis. Paradigm shall submit these progress reports to the Agencies beginning on the tenth day of the new reporting period following lodging of this Consent Decree until certification of completion by EPA under Section XXIII, Paragraph 93.c or d. If requested by EPA, Paradigm shall also provide briefings for the Agencies to discuss the progress of the Work.

84.     Paradigm may accelerate all actions, including data collection and implementation of approved Work Plans, described in the progress reports for the performance of any activity, provided that Paradigm gives notice to the Agencies no later than fourteen days prior to the performance of the activity and the Agencies do not object to such acceleration within seven (7) days of receiving such notice.

85.     Upon the occurrence of any event during performance of the Work that Paradigm is required to report pursuant to CERCLA Section 103, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11004, Paradigm, within twenty-four (24) hours of the onset of such event, shall orally notify EPA and State Project Coordinators (or the Alternate EPA and State Project Coordinators in the event of the unavailability of State Project Coordinators) or, in the event that either EPA and the State Project Coordinators or Alternate EPA and State Project Coordinators are not available, the Emergency Response Section of Illinois EPA (217-782-3637). These reporting requirements are in addition to the reporting required by CERCLA Section 103, 42 U.S.C. § 9603, and EPCRA Section 304, 42 U.S.C. § 11004.

86.     Within seven (7) days of the onset of an event as described in the preceding Paragraph, Paradigm shall furnish to the Agencies a written report, signed by Paradigm's Project Coordinator, setting forth the events that occurred and the measures taken, and to be taken, in response thereto. Within twenty-one (21) days of the conclusion of such event, Paradigm shall submit a report setting forth all actions Paradigm has taken in response thereto.

87.     Depending on which entity is primarily responsible under each individual Work Plan, the Trustee or Paradigm shall submit all plans, reports and data required by the Work Plans or any other approved plans to the Agencies in accordance with the schedules set forth in such

plans. The Trustee or Paradigm shall submit three (3) copies of all such plans, reports and data to the Agencies unless otherwise agreed to. Upon request by EPA, Paradigm and or the Trustee also shall submit in electronic form all or any portion of any deliverables that they are required to submit pursuant to the provisions of this Consent Decree.

88.     All reports and other documents submitted to the Agencies (other than the progress reports referred to in the preceding Paragraph) which purport to document compliance with the terms of this Consent Decree shall be signed by an authorized representative of the party on whose behalf the documentation is being submitted.

## XXII     EPA APPROVAL OF PLANS, REPORTS, AND OTHER DELIVERABLES

89.     **Initial Submissions.**

a.     After review of any Work Plan, report, or other deliverable that is required to be submitted for approval pursuant to this Consent Decree, EPA, after reasonable opportunity for review and comment by the State, shall: (1) approve, in whole or in part, the submission; (2) approve the submission upon specified conditions; (3) disapprove, in whole or in part, the submission; or (4) any combination of the foregoing.

b.     EPA also may modify the initial submission to cure deficiencies in the submission if: (1) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (2) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable plan, report, or deliverable.

90.     **Resubmissions.** Upon receipt of a notice of disapproval under Paragraph 89.a(3) or (4), or if required by a notice of approval upon specified conditions under Paragraph 89.a(2),

Trustee/Paradigm, within thirty (30) days or such longer time as specified by EPA in such notice, shall correct the deficiencies and resubmit the plan, report, or other deliverable for approval. After review of the resubmitted plan, report, or other deliverable, EPA may: (a) approve, in whole or in part, the resubmission; (b) approve the resubmission upon specified conditions; (c) modify the resubmission; (d) disapprove, in whole or in part, the resubmission, requiring Trustee/Paradigm to correct the deficiencies; or (e) any combination of the foregoing.

91.     **Material Defects.**  If an initially submitted or resubmitted plan, report, or other deliverable contains a material defect, and the plan, report, or other deliverable is disapproved or modified by EPA under Paragraph 89.b(2) or 90 due to such material defect, then the material defect shall constitute a violation of this  Consent Decree.

92.     **Implementation.**  Upon approval, approval upon conditions, or modification by EPA under Paragraph 89 (Initial Submissions) or Paragraph 90 (Resubmissions), of any plan, report, or other deliverable, or any portion thereof: (a) such plan, report, or other deliverable, or portion thereof, shall be incorporated into and enforceable under this Consent Decree; and (b) Trustee/Paradigm shall take any action required by such plan, report, or other deliverable, or portion thereof, subject only to their right to invoke the Dispute Resolution procedures set forth in Section XXVIII (Dispute Resolution) with respect to the modifications or conditions made by EPA.

## XXIII     CERTIFICATION OF COMPLETION

93.     **Completion of Work Plans.**

a.      **Work Plans.**  Within one-hundred and twenty (120) days after the Trustee and/or Paradigm believe that the Work has been performed consistent with the the approved Work Plan, the Trustee or Paradigm shall schedule and conduct a pre-certification

inspection to be attended by the Trustee, the Project Coordinator and/or the Supervising Contractor, the Agencies, and by Paradigm, if Paradigm implemented the Work Plan. If, after the pre-certification inspection, the Trustee and Paradigm, as applicable, still believe that the Work has been performed consistent with the approved Work Plan, the Trustee or Paradigm, as applicable, shall submit a written report to the Agencies requesting certification pursuant to Section XXII (EPA Approval of Plans, Reports and Other Deliverables) within sixty (60) days of the inspection. The report shall contain the following statement, signed by a responsible corporate official or representative of such entity:

> To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

b. If, after completion of the pre-certification inspection and receipt and review of the written report, EPA determines that the involved Work Plan(s) or any portion thereof (including any modification thereof pursuant to the terms of this Consent Decree) have not been completed in accordance with their terms or the ARARs in the Work Plan have not been achieved, EPA will notify the Trustee and Paradigm in writing by certified letter of the activities that must be undertaken to complete the Work Plan and achieve the ARARs contained within the approved Work Plans. EPA will set forth in the certified letter a schedule for performance of such activities consistent with this Consent Decree or require the Trustee or Paradigm, as appropriate, to submit a schedule to the Agencies pursuant to Section XXII (EPA Approval of Plans, Reports and Other Deliverables). The Trustee or Paradigm, as appropriate, shall perform all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to such person's or entity's right to invoke the dispute resolution procedures set forth in Section XXVIII (Dispute Resolution).

c.      If the Agencies conclude, based on the initial or any subsequent report requesting Certification of Completion, that Paradigm and/or the Trustee fully performed the Work Plans and ARARs, as set forth in approved Work Plans and in accordance with this Consent Decree, the Agencies will so certify in writing to the Trustee and Paradigm.  This certification shall constitute the Certification of Completion of the Work Plan for purposes of this Consent Decree.  The Certification of Completion of the Work Plan shall not affect the other obligations under this Consent Decree.  The Trustee shall file the Certification of Completion of the Work Plan with the Recorder of Deeds within thirty (30) days of issuance.

d.      **Completion or Cessation of Work Under Process Work Plan.**

(1)      Notwithstanding the foregoing, if Paradigm completes the Work in accordance with the approved Process Work Plan, Paradigm may submit a written request for a Certification of Completion from the Agencies.

(2)      Should Paradigm determine, at any time during Paradigm's Work under this Consent Decree, that the Process Work or the sale of Unprocessed Metal Bearing Materials is no longer technically or economically feasible, Paradigm may cease the processing activities set forth in the Process Work Plan, and/or operations associated with the sale of Unprocessed Metal Bearing Materials set forth in other Work Plans(s), provided that Paradigm provides an analysis showing that the Environmental Escrow Account and/or the Initial Financial Assurance contains sufficient funds to: (A) address any environmental harm determined by EPA to have been caused by Paradigm; and (B) undertake Closure Activities, *i.e.*, properly close, dispose of and/or decontaminate all units, equipment, and materials utilized or generated by Paradigm in the Process Work or in the sale of UMBM to the extent that Paradigm determines, in a "Closure Analysis," that such Closure Activities have not already been performed by

Paradigm.  In determining the scope of the Closure Activities addressed in the Closure Analysis, Paradigm, in consultation with EPA, will compare Facility conditions where Paradigm performed the Work to those contained in the baseline documentation (as defined below) to be provided to the Agencies.

(3)     The baseline documentation shall include a demonstration of the conditions at the Chemetco Facility prior to the start of Paradigm's Process Work and will consist of: (A) a report detailing a joint inspection of the Chemetco Facility by EPA, the Trustee, and Paradigm; and (B) detailed photographic documentation and descriptions of each area at the Chemetco Facility.   The Parties may agree to additional actions such as sampling, to include in the baseline documentation.   The joint inspection of the Chemetco Facility shall take place within thirty (30) days of the Effective Date of the Consent Decree.  Paradigm shall prepare the baseline documentation in consultation with EPA and the Trustee, and shall finalize the baseline documentation and submit it to the Agencies within sixty (60) days of the Effective Date of the Consent Decree in accordance with Section XXII of this Consent Decree (EPA Approval of Plans, Reports, and Other Deliverables).

(4)     In the event that Paradigm ceases the Process Work and/or sale of UMBM pursuant to Paragraph 93.d(2), Paradigm shall submit written notice to the Parties indicating Paradigm's intention to stop the Process Work or sale of UMBM.  Such notice shall include the analysis described in Paragraph 93.d(2) above, and the schedule for completion of all remaining Closure Activities.   Upon completion of those Closure Activities, Paradigm shall submit a written request to EPA for a Certification of Completion.

(5)     Upon receipt of a written request for a Certification of Completion from Paradigm, EPA may conduct a final inspection of the Chemetco Facility to ensure that

Paradigm properly closed, disposed of and/or decontaminated all units, equipment, and materials utilized or generated in Paradigm's performance of the Work or sale of UMBM and/or that sufficient funds to cover such Closure Activities are contained in the Environmental Escrow Account or the Initial Financial Assurance.   Once EPA is satisfied that Paradigm has satisfied its Closure Activities, EPA shall issue a Certificate of Completion to Paradigm.   This certification shall constitute the Certification of Completion of the Work Plan for purposes of this Consent Decree.   EPA shall not unreasonably delay or withhold such Certificate of Completion.

(6)   In the event that Paradigm ceases the Process Work or sale of Unprocessed Metal Bearing Materials pursuant to Paragraph 93.d(2), the Trustee shall be allowed under this Consent Decree to submit a new Work Plan for EPA approval identifying a new entity to perform any additional processing or sale of MBM, consistent with Section XXII of this Consent Decree and the provisions of the APPA.

e.   Should EPA, in consultation with the State, determine that Paradigm has not met its Closure Activities at the Chemetco Facility or that sufficient funds to cover such Closure Activities are not contained in the Environmental Escrow Account or the Initial Financial Assurance, EPA shall notify Paradigm in writing by certified letter of the activities that must be undertaken to complete closure.   Paradigm shall perform or fund all activities described in the notice in accordance with the specifications and schedules established pursuant to this Paragraph, subject to Paradigm's right to invoke the dispute resolution procedures set forth in Section XXVIII (Dispute Resolution).

94.   **Final Report.**  Within one hundred and twenty (120) days after completion of all Work required by this Decree, depending on which entity is primarily responsible under the Work Plan completed, the Trustee and Paradigm shall jointly submit for EPA review and

approval in accordance with this Section a final report summarizing the actions taken to comply with this Decree. The final report shall conform, at a minimum, to the requirements set forth in 40 C.F.R. § 300.165 of the NCP entitled "OSC Reports." The final report shall include a statement of actual costs incurred in complying with this Decree, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (e.g., manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by the Supervising Contractor who supervised or directed the preparation of said report:

> Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XXIV    EMERGENCY RESPONSE

95.    In the event of any action or occurrence during the performance of a Work Plan which causes or threatens a release of Hazardous Substances from the Facility that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, the entity responsible for the Work Plan, either the Trustee or Paradigm shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release, and shall immediately notify EPA and the State's Project Coordinator, or, if the Project Coordinator is unavailable, EPA and the State's Alternate Project Coordinator.  If neither of these persons is available, the Trustee or Paradigm, whichever is responsible for the Work Plan

being implemented, shall notify EPA and the State Emergency Response Unit and shall take such actions in consultation with EPA and the State Project Coordinator or other available authorized State officer and in accordance with all applicable provisions of the Health and Safety Plans, the Contingency Plans, and any other applicable plans or documents developed pursuant to this Consent Decree. In the event that the Trustee or Paradigm, as applicable, fails to take appropriate response action as required by this Section, and EPA and/or the State take(s) such action instead, the entity responsible for the Work Plan, either the Trustee or Paradigm, as appropriate, shall reimburse EPA and the State for all costs of the response action not inconsistent with the NCP, if applicable. To the extent that such emergency action addresses Existing Contamination, the Agencies shall not seek such costs from Paradigm or the Trustee unless such costs are the result of the actions of Paradigm or the Trustee after the Effective Date.

96.     Nothing in the preceding Paragraph or in this Consent Decree shall be deemed to limit any authority of EPA to direct or order all appropriate actions (including but not limited to issuing a Stoppage or Cessation of Work Order pursuant to Paragraph 97 below) or to seek an order from the Court to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Hazardous Substances on, at, or from the Site. EPA shall not issue such an Order against Paradigm or the Trustee to the extent it addresses Existing Contamination unless EPA determines, in its unreviewable discretion, that the need for such an Order is the result of the actions of Paradigm or the Trustee after the Effective Date.

97.     a.     EPA's Project Coordinator and Alternate Project Coordinator shall have the authority, consistent with the NCP, to halt any Work required by this Consent Decree and to take any necessary response actions when he or she determines that conditions at the Site constitute an emergency situation or may present an immediate threat to public health or welfare

81

or the environment due to a release or threatened release of Hazardous Substances. In an instance of such a work stoppage, EPA's Project Coordinator will make reasonable effort to consult with IEPA's Project Coordinator.

b.      The parties agree that stop work orders directed to the activities of the Trustee or Paradigm that will have an effect on investigative and/or implementation of response actions under CERCLA or the State Act but will not rise to the level of an imminent threat to human health or the environment and are not based on noncompliance with the terms of the consent decree will be subject to Dispute Resolution (Section XXVIII). The parties further agree that a stop work order will not take effect until after the time for Dispute Resolution has lapsed or, if Dispute Resolution is invoked, until the Dispute Resolution process has been completed.

## XXV      INDEMNIFICATION AND INSURANCE

98.      The United States and the State do not assume any liability by entering into this agreement, and neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of the Estate or Paradigm in carrying out activities pursuant to this Consent Decree. Neither the Trustee, nor Paradigm, nor any of their respective contractors or assigns shall be considered an agent of the United States and/or the State.

99.      The Estate, the Trustee and Paradigm shall indemnify, save and hold harmless the United States and the State, their officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of, negligent or wrongful acts or omissions of the Estate, the Trustee and Paradigm, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out the Work pursuant to this Consent Decree. In addition, the Estate, the Trustee and Paradigm agree to pay the United

States and the State, respectively, all costs incurred by the United States and the State, respectively, including but not limited to attorneys fees and other expenses of litigation, arising from or on account of claims made against the United States or the State based on negligent or wrongful acts or omissions of the Estate, the Trustee and Paradigm, their officers, directors, employees, agents, contractors, or subcontractors and any persons acting on behalf of the Estate, the Trustee and Paradigm, or under the control of the Estate, the Trustee and Paradigm, in carrying out the Work pursuant to this Consent Decree. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of the Estate, the Trustee and Paradigm in carrying out the Work pursuant to this Consent Decree. The Estate, the Trustee and Paradigm, or any of their officers, directors, employees, agents, contractors, or subcontractors shall not be considered agents of the United States or the State.

100.    The United States and the State shall give Paradigm and the Trustee written notice of any claim for which the United States or the State, respectively, plans to seek indemnification pursuant to this Section and shall consult with Paradigm and the Trustee prior to settling such claim.

101.    The Estate and Paradigm waive all claims against United States and the State for damages or reimbursement or for set-off of any payments made or to be made to United States and the State, arising from or on account of any contract, agreement, or arrangement between any one or more persons and the Estate for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

## XXVI    STIPULATED PENALTIES

102.    The parties agree that violations of the Consent Decree may result in the assessment of stipulated penalties for the matters set forth in this Section of the Consent Decree.

Stipulated penalties must be paid within thirty (30) days of demand by the government unless dispute resolution is invoked.

103.    Subject to the provisions of Paragraph 102, the Estate shall be liable to the United States and the State for stipulated penalties as set forth in the classifications provided in Paragraph 104 of this Consent Decree (50% of the penalty amount payable to the United States, 50% to the State) unless excused under Section XXVII (Force Majeure) or otherwise resolved under Paragraph 115 or Section XXVIII (Dispute Resolution).

104.    The following stipulated penalties shall accrue per day per violation for any noncompliance of the following specified violations from the date of entry of this Consent Decree:

## PENALTIES PER DAY OF VIOLATIONS

| Compliance | Up to 30 Days | Between 30 and 60 Days | Over 60 Days |
|---|---|---|---|
| Failure to Timely Submit Section XXI Reports: | $100 | $250 | $500 |
| Failure to file Memorandum Of Judgment: | $100 | $250 | $500 |
| Failure to Place Notice of Consent Decree on Land Records: | $100 | $250 | $500 |
| Failure to properly locate material as provided in the Process Work Plan: | $100 | $250 | $500 |
| Failure to Manage Process Waste as Required in the Approved Work Plan: | $100 | $250 | $500 |
| Failure to comply with the Operation and Maintenance Plan: | $100 | $250 | $500 |

| | | | |
|---|---|---|---|
| Failure to manage Process Material or RMBM as Required in any applicable Work Plan: | $100 | $250 | $500 |

105.    All penalties shall begin to accrue (a) on the day after complete performance is due, or (b) on the day that the Trustee or Paradigm, as appropriate, knew or should have known a violation occurred, but (c) no later than the date of a notice of violation/demand for penalties, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue:  (1) with respect to a deficient submission under Section XXII (EPA Approval of Plans, Reports and Other Deliverables), during the period, if any, beginning on the 31st day after the Agencies' receipt of such submission until the date that the Agencies notify the Estate of any deficiency; (2) the period of thirty (30) days from receipt of notice of a deficient submission if the deficiency is addressed within thirty days; and (3) with respect to judicial review by this Court of any dispute under Section XXVIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

106.    Following EPA's determination that the Trustee or Paradigm failed to comply with a requirement of this Consent Decree, EPA shall provide written notification of the same and describe the noncompliance.  EPA also may send the Trustee or Paradigm a written demand for the payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph 105 regardless of whether EPA has notified the Trustee or Paradigm of a violation or made a written demand for penalty.

a.      All penalties accruing under this Section and paid by the Trustee shall be an administrative expense of the Trustee and, pursuant to 28 U.S.C. § 157(d), the District Court shall retain jurisdiction for approval of such payments, and the Trustee shall petition the Court for leave to pay such administrative expenses within twenty-one (21) days of the date the period for cure of the non-compliance ends, and shall be due and payable as the Court directs, unless the Trustee invokes Dispute Resolution under Section XXVIII (Dispute Resolution) within that period.

b.      All payments to the United States under this Section shall be paid by certified Trustee's or cashier's check(s) made payable to "EPA Hazardous Substances Superfund," shall be mailed to EPA Region 5, Superfund Accounting, P.O. Box 70753, Chicago, IL 60673, shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site/Spill ID B5HB, the DOJ Case Number 90-5-1-1-4516/2, and the name and address of the party making payment.  Copies of all check(s) paid pursuant to this Section, and any accompanying transmittal letter(s), shall be sent to the United States as provided in Section XXXII (Notices and Submissions).

c.      All payments to the State under this Section shall be paid in accordance with the procedures set forth in Paragraph 32 of this Consent Decree.

d.      The payment of penalties shall not alter in any way the Trustee's or Paradigm's obligations to perform the Work under the terms of this Consent Decree.

107.    Penalties shall continue to accrue as provided in Paragraph 105 during any dispute resolution period, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by an EPA decision that is not appealed to the District Court, accrued penalties determined to be owing shall be paid to the Agencies within thirty (30) days of the agreement or the receipt of EPA's decision or order;

b.     If the dispute is appealed to this Court and EPA prevails in whole or in part, the Trustee or Paradigm, as appropriate, shall pay all accrued penalties determined by the Court to be owed to the Agencies within sixty (60) days of receipt of the Court's decision or order, except as provided in subparagraph c. below;

c.     If the District Court's decision is appealed by any Party, the Trustee or Paradigm, as appropriate, shall pay all accrued penalties determined by the District Court to be owing to the Agencies into the Administrative Court Registry Account within sixty (60) days of receipt of the Court's decision or order.  Penalties shall be paid into this account as they continue to accrue, at least every sixty (60) days.  Within fifteen (15) days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to either the Agencies or to the Trustee to the extent that they prevail.

108.    a.     If the Trustee or Paradigm, as appropriate, fails to pay stipulated penalties when due, the Agencies may institute proceedings to collect the penalties, as well as Interest. The Trustee or Paradigm, as appropriate, shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 105.

b.     Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the Agencies to seek any other remedies or sanctions available by virtue of the Trustee's or Paradigm's violation of this Consent Decree or of the statutes and regulations upon which it is based.  Provided, however, that the Agencies shall not seek civil penalties pursuant to any provision of law for any violation for which a

87

stipulated penalty is provided herein, except in the case of a willful violation of the Consent Decree.

109.    Notwithstanding any other provision of this Section, EPA, in its unreviewable discretion, may waive any portion of stipulated penalties that have accrued pursuant to this Consent Decree.

## XXVII    **FORCE MAJEURE**

110.    Force Majeure, for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Paradigm, the Trustee (either individually or in representative capacity as Trustee of the Estate), or of any entity controlled by Paradigm or the Trustee, including, but not limited to, Paradigm's or the Trustee's contractors and subcontractors, that delays or prevents performance of any obligation under this Consent Decree despite the best efforts of the Trustee and Paradigm to fulfill the obligation. The requirement that Paradigm or the Trustee exercise "best efforts to fulfill the obligation" includes using best efforts to address the effects of any potential Force Majeure event (1) as it is occurring and (2) following the potential Force Majeure event, such that the delay is minimized to the greatest extent reasonably possible. "Force Majeure" does not include financial inability to complete the Work, except as provided in Section XXXV (Termination of Trusteeship/Estate/Consent Decree), or a failure to attain the ARARs.

111.    If any event occurs or has occurred that may delay the performance of any obligations under this Consent Decree, whether or not caused by a Force Majeure event, Paradigm or the Trustee shall notify orally the Agencies' Project Coordinator or, in his or her absence, the Agencies' Alternative Project Coordinator or, in the event both of the Agencies' designated representatives are unavailable, the manager of EPA's Emergency Response Branch 1

within forty-eight (48) hours of when Paradigm or the Trustee first knew or should have known that the event might cause a delay.  Within ten (10) working days thereafter, Paradigm or the Trustee shall provide in writing to the Agencies:  (a) an explanation and description of the reasons for the delay; (b) the anticipated duration of the delay; (c) all actions taken or to be taken to prevent or minimize the delay; (d) a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; (e) Paradigm or the Trustee's rationale for attributing such delay to a Force Majeure event if Paradigm or the Trustee intends to assert such a claim; and (f) a statement as to whether, in the opinion of Paradigm or the Trustee, such event may cause or contribute to an endangerment to public health, welfare or the environment. Paradigm or the Trustee shall include with any notice all available documentation supporting Paradigm or the Trustee's claim that the delay was attributable to a Force Majeure.  Failure to comply with the above requirements shall preclude Paradigm or the Trustee from asserting any claim of Force Majeure for that event.  Paradigm or the Trustee shall be deemed to have notice of any circumstance of which Paradigm or the Trustee's contractors or subcontractors had or should have had notice.

112.    If EPA agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations and any subsequent obligations dependent on the completion of the delayed activity under this Consent Decree that are affected by the Force Majeure event will be extended by EPA, for such time as is necessary to compensate for the delay including, but not limited to, demobilization and remobilization time.  An extension of the time for obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation that does not depend solely on the delayed activity.  If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure

89

event, EPA will notify Paradigm or the Trustee in writing of such decision.  If EPA agrees that the delay is attributable to a Force Majeure event, EPA will notify Paradigm or the Trustee in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

113.    In the event that Paradigm or the Trustee object to a determination by EPA under the preceding paragraph, and Paradigm or the Trustee elect to invoke the dispute resolution procedures set forth in Section XXVIII (Dispute Resolution), Paradigm or the Trustee shall do so no later than fifteen (15) days after receipt of EPA's notice.  In any such proceeding, Paradigm or the Trustee shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effect of the delay, and that Paradigm or the Trustee complied with the requirements of Paragraphs 110 and 111 above.  If Paradigm or the Trustee carries this burden, the delay at issue shall be deemed not to be a violation by Paradigm or the Trustee of the affected obligation of this Consent Decree identified to EPA, the State and the Court.

114.    "Force Majeure" does not include financial inability to meet regulatory requirements set forth in Work Plans, or the requirements of this Consent Decree.

## XXVIII    **DISPUTE RESOLUTION**

115.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  However, the procedure set forth in this Section

shall not apply to actions by the Agencies to enforce obligations of Paradigm and the Trustee that have not been disputed in accordance with this Section.

116.    Any dispute which arises under or with respect to this Consent Decree shall be, in the first instance, the subject of informal negotiations between the Parties to the dispute. The period for informal negotiations shall not exceed twenty (20) days from the time the dispute arises unless it is modified by written agreement of the parties to the dispute. The dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute.

117.    **Dispute Resolution Schedule.**

a.    In the event that the Parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within fourteen (14) days after the conclusion of the informal negotiation period, Paradigm, or the Trustee, invoke the formal dispute resolution procedures of this Section by serving on EPA and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by the Trustee or Paradigm.

b.    Within fourteen (14) days after receipt of the Statement of Position, EPA will serve its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA.

c.    Within fourteen (14) days after receipt of EPA's Statement of Position, Paradigm, or the Trustee, may file a response including, but not limited to, any factual data, analysis or opinion supporting its position or refuting any position by EPA.

d.    Following receipt of the Statement of Position submitted pursuant to Paragraph 117.a., EPA will issue a final decision resolving the dispute. That decision shall be

91

binding, unless, within thirty (30) days after receipt of the decision, Paradigm, or the Trustee, files a notice of judicial appeal with the Court and serves such notice on the United States, setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this Consent Decree. The United States may file a response to the notice of judicial appeal.

e.    Applicable provisions of law shall govern the judicial review of any dispute governed by this Paragraph. The invocation of formal dispute resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation under this Consent Decree not directly in dispute, except those solely dependent on the completion of the disputed activity unless the Court so orders or EPA agrees otherwise.

118.   Nothing in this Consent Decree shall be construed as prohibiting, altering, or in any way limiting the ability of the Agencies to seek from the Trustee any other remedies or sanctions available by virtue of the Trustee's violation of this Decree or of the statutes and regulations upon which it is based arising from conduct occurring after entry of the Consent Decree, including, but not limited to, penalties pursuant to CERCLA, RCRA, CWA, or Section 42 of the State Act, 415 ILCS 5/42(f) (2002).

## XXIX    ACCESS TO INFORMATION

119.   The Trustee and/or Paradigm shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within their possession or control, or that of their contractors or agents, relating to activities at the Site or to the implementation of this Consent Decree, including, but not limited to, sampling,

analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. The Trustee and/or Paradigm shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

120.   **Business Confidential and Privileged Documents.**

a.      The Trustee and/or Paradigm may assert business confidentiality claims covering part or all of the Records submitted to Plaintiffs under this Consent Decree to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Records determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified the Trustee or Paradigm that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Trustee.

b.      The Trustee and Paradigm may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Trustee or Paradigm assert such a privilege in lieu of providing Records, the Trustee or Paradigm shall provide Plaintiffs with the following:  (1) the title of the Record; (2) the date of the Record; (3) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (4) the name and title of each addressee and recipient; (5) a description of the contents of the Record; and (6) the privilege asserted by Trustee. If a claim of privilege applies only to a portion of a Record, the Record shall be provided to the United States and the State in

93

redacted form to mask the privileged portion only.  The Trustee and Paradigm shall retain all Records that the Trustee or Paradigm claim to be privileged until the United States and the State have had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in Paradigm's or the Trustee' favor.

c.      Except as provided in subparagraph b. of this Paragraph, no Records created or generated pursuant to the requirements of this Consent Decree shall be withheld from the United States or the State on the grounds that they are privileged or confidential.

121.   No claim of confidentiality or privilege shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XXX     RETENTION OF RECORDS

122.   For a period of five (5) years following the Trustee's receipt of the Agencies' notification pursuant to Paragraph 93.d (relating to Certificates of Completion), the Trustee and Paradigm shall preserve and retain all records and documents now in their possession or control or which come into their possession or control that relate in any manner to the performance of the Work or liability of any person for response actions conducted and to be conducted at the Site, regardless of any corporate retention policy to the contrary.  For a period of five (5) years following the Trustee's receipt of the Agencies' notification pursuant to Section XXIII (Certification of Completion), the Trustee and Paradigm shall also instruct their contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to the performance of the Work.  Nothing herein shall require the Trustee or Paradigm to retain records beyond the time of closure of the Estate.  If no request for delivery of

94

documents is received within ninety (90) days of notice of closure of the Estate, documents may be destroyed.

123.   At the conclusion of this document retention period or at the close of the Estate, the Trustee and Paradigm shall notify the Agencies at least ninety (90) days prior to the proposed destruction of any such records or documents and, upon request by the Agencies, the Trustee and Paradigm shall make any such records or documents available to the Agencies.  The Trustee and Paradigm may assert that certain documents, records, and other information are privileged under the attorney-client privilege or any other privilege recognized by state and federal law, in accordance with Section XXIX (Access to Information).  The Trustee and Paradigm certify on behalf of themselves only that since the filing of the Petition for Relief by Chemetco, neither the Trustee nor Paradigm has altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information relating to their potential liability regarding the Site and that they individually fully complied with any and all of the Agencies' requests for information.

## XXXI   EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION

124.   Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this Decree may have under applicable law.  The Parties expressly reserve against any person not a party hereto any and all rights (including, but not limited to, any right to contribution), defenses, claims, demands, and causes of action which each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site.

125.   The Parties agree, and by entering this Consent Decree this Court finds, that the Trustee and Paradigm are entitled, as of the date of entry of this Consent Decree, to protection

from contribution actions or other claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2), or other applicable law, for "matters addressed" in this Consent Decree.  For the purpose of this Section, the "matters addressed" in this Consent Decree are all Response Actions taken or to be taken and Response Costs incurred or to be incurred by the United States or the State or any other person at or in connection with the Site with respect to the Existing Contamination, as well as the Work to be undertaken by the Estate, Trustee, and Paradigm, and all Future Oversight Costs to be incurred by the United States in connection with such Work. Provided, however, that if the United States exercises rights against the Estate, Trustee, or Paradigm under the reservations in Section XIII.B  (Reservation of Rights as to the Estate, the Trustee, and Paradigm), other than in Paragraphs 44.a (claims for failure to meet a requirement of the Consent Decree), 44.b (criminal liability), or 44.d (violations of federal/state law during or after implementation of the Work), the "matters addressed" in this Consent Decree will no longer include those Response Costs or response actions.

126.    Paradigm and the Trustee also agree that with respect to any suit or claim for contribution brought against them for matters related to this Consent Decree they will notify the United States in writing within ten (10) days of service of the complaint.

## XXXII    NOTICES AND SUBMISSIONS

127.    Whenever, under the terms of this Consent Decree, written or electronic notice is required or allowed to be given or a report or other document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other parties in writing.  All notices and submissions shall be considered effective upon receipt, unless otherwise provided.  Written

notice as specified herein shall constitute complete satisfaction of any written notice requirement of this Consent Decree with respect to EPA, the State, and the Estate, respectively.

### As to the State:

Erin Rednour
State Project Coordinator
Illinois EPA
Bureau of Land
1021 North Grand Avenue East
Springfield, IL 62794-9276
erin.rednour@illinois.gov
(five copies)

James L. Morgan
Assistant Attorney General
Environmental Bureau
500 South Second Street
Springfield, IL 62706
jmorgan@atg.state.il.us
(one copy)

### As to the United States:

U.S. Department of Justice Environmental Enforcement Section

[By U.S. Mail]

Chief
Environmental Enforcement Section
U.S. Department of Justice
Re: No. 90-5-1-1-4516/2
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

[By Courier]

Chief
Environmental Enforcement Section
Re: No. 90-5-1-1-4516
U.S. Department of Justice
ENRD Mailroom (Room 2121)
601 D Street NW
Washington, DC 20004

[By U.S. Mail]

Chief, Environmental Defense Section
Re:  No. 90-5-1-1-4517
U.S. Department of Justice
P.O. Box 23986
L'Enfant Plaza Station
Washington, D.C.  20026-3986

**As to EPA:**

Thomas Martin
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard (Mail Code C-14J)
Chicago, Illinois 60604-3590
martin.thomas@epa.gov

Kevin Turner
On-Scene Coordinator
Superfund Division
U.S. Environmental Protection Agency, Region 5
8588 Rt. 148
Marion, IL 62959
Telephone: (618) 525-3665
Email: turner.kevin@epa.gov

Nefertiti DiCosmo
Remedial Project Manager
Superfund Division
U.S. Environmental Protection Agency
Region 5
77 West Jackson Boulevard (mail Code SRF-6J)
Chicago, IL 60604-3590
dicosmo.nefertiti@epa.gov

**As to the Estate:**

Donald Samson, Trustee
226 West Main Street
Suite 102
Belleville, IL 62220
donsam47@yahoo.com

Penni S. Livingston
Livingston Law Firm
5701 Perrin Road
Fairview Heights, IL 62208
penni@livingstonlaw.biz

**As to Paradigm:**

Elliott Stegin
Paradigm Minerals & Environmental Services LLC
3754 Chemetco Lane
Hartford, IL  62048
egstegin@paradigm-minerals.com

Steven J. Poplawski
Bryan Cave LLP
211 North Broadway
Suite 3600
St. Louis, MO  63102
sjpoplawski@bryancave.com

## XXXIII   EFFECTIVE DATE

128.   The effective date of this Consent Decree shall be the date upon which this
Consent Decree is entered by the Court, and noted on the Court's records by the Clerk.

## XXXIV   CONTINUING JURISDICTION

129.   This Court retains jurisdiction over both the subject matter of this Consent Decree
and the Estate for the duration of the performance of the terms and provisions of this Consent
Decree for the purpose of enabling any of the Parties to apply to the Court at any time for such
further Decree, direction, and relief as may be necessary or appropriate, for the construction or
modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to
resolve disputes in accordance with Section XXVIII (Dispute Resolution) hereof.

## XXXV   TERMINATION OF TRUSTEESHIP/ESTATE/CONSENT DECREE

130.   The Trustee shall not abandon any portion of the Facility or any of the
surrounding real estate in the absence of an Order by the Bankruptcy Court authorizing such
action.  Nothing herein shall limit the Trustee's authority, in the Trustee's sole discretion, to
apply to the Bankruptcy Court to abandon the Facility or any of the surrounding real estate
owned by the Estate.  The Agencies and Paradigm reserve the right to object to any such

application to abandon.  If the Trustee abandons the entire Chemetco Facility and Paradigm has completed processing of or otherwise sold the Slag and Scrubber Sludge, any remaining Escrowed Funds shall be distributed to EPA for use at the Site or the surrounding real estate owned by or previously owned by Chemetco.  If Paradigm is still processing MBM at the time of abandonment of the Chemetco Facility by the Trustee, then only the amount in the Escrowed Funds above the Initial Financial Assurance Costs shall be distributed to EPA for use at the Site or the surrounding real estate owned by or previously owned by Chemetco.  The Trustee's right to abandon shall not affect Paradigm's contract rights under the APPA.

131.    At least twenty (20) days prior to filing a Notice of Motion to Abandon any portion of the Site for which a Certification of Completion has not been issued pursuant to Section XXIII of this Consent Decree, the Trustee will provide notice to the Agencies of the Trustee's intent to file such motion, together with a description of that portion of the Facility proposed to be abandoned.  Following receipt of such notice, the Agencies will jointly survey the area proposed for abandonment, and EPA will determine what Work required under this Consent Decree remains to be accomplished in accordance with the approved Work Plans. EPA shall provide to the Trustee the results of the survey and EPA's determination.

132.    a.    This Consent Decree may be terminated following the issuance of a Certification of Completion (pursuant to Paragraph 93.d) for all Work Plans that the Trustee implements, provided that the Trustee certifies to the Agencies that the Trustee has:  (1) made all payments required by this Consent Decree and the APPA; and (2) fulfilled the other requirements of this Consent Decree.  Within sixty (60) days following such certification, any Party may move for termination of this Consent Decree.  An objection to the Trustee's certification shall be subject to the Dispute Resolution provisions of this Consent Decree.

b.      Consistent with Paragraph 93.d, this Consent Decree may be terminated with respect to Paradigm when Paradigm concludes, in its sole discretion, that the Process Work is no longer technically or economically feasible, provided that Paradigm certifies to the Agencies that Paradigm has performed all necessary Closure Activities, or certifies that either the Environmental Escrow Account or the Initial Financial Assurance contain sufficient funds (1) to address any environmental harm caused by Paradigm and (2) to perform Closure Activities.

133.   Termination of this Consent Decree shall release the Trustee from all obligations under this Consent Decree, except for access obligations under Section XX (Access), notice obligations under Paragraph 131 (regarding notices of abandonment), and any document retention obligation under Section XXX (Retention of Records).  The covenants not to sue and reservations of rights in Sections XII, XIII, XIV, and XV of this Consent Decree shall survive termination of this Consent Decree.

134.   Termination of this Consent Decree shall release Paradigm from all obligations under this Consent Decree, except for access obligations under Section XX (Access) (if applicable), and document retention obligations under Section XXX (Retention of Records).  The covenants not to sue and reservations of rights in Sections XII, XIII, XIV, and XV of this Consent Decree shall survive termination of this Consent Decree.

### XXXVI      APPENDICES

135.   The following appendices are attached to and incorporated into this Consent Decree:

| Appendix A: | Asset Purchase and Processing Agreement |
| Appendix B: | Map of the Chemetco Hartford Property |
| Appendix C: | Interim Order, Sept. 16, 2008 |
| Appendix D: | Operation and Maintenance Plan |

| Appendix E | Process Work Plan |
| Appendix F: | Map of Paradigm Processing Facility and Source Areas within the Chemetco Site |
| Appendix G: | Map of Long Lake |
| Appendix H | Map of Wetlands and Unpermitted Fill Area |
| Appendix I: | Furnace Removal Work Plan |
| Appendix J: | Unprocessed Metal Bearing Materials Work Plan |
| Appendix K: | Copper Furnace Clean Up Solids Work Plan |
| Appendix L: | North Polishing Pond and Sump Work Plan |
| Appendix M: | Circuit Board and Shredded Circuitry Board Materials Work Plan |
| Appendix N: | Scrap Metal Work Plan |
| Appendix O: | 1986 Trust Agreement |

## XXXVII   MODIFICATION

136.   All modifications and additional Work Plans, whether material or non-material, shall be deemed an enforceable part of this Consent Decree.

137.   There shall be no material modification of this Consent Decree or the Appendices hereto, without written approval by all of the Parties and the Court.

138.   Any non-material modification of this Consent Decree or its Appendices shall be in writing and signed by the Parties and shall not require Court approval but shall be reduced to a writing to which all the Parties agree, and shall be filed with the Court via a joint filing to be undertaken by the United States and the Trustee or Paradigm, as appropriate.

139.   By mutual agreement of the Trustee, Paradigm and EPA, the schedules specified in this Consent Decree for performance of the Work may be modified. All such modifications shall be made in writing and shall be considered non-material.

140.   Any modifications to the Appendices that are specifically allowed under terms of the Appendices may be made in accordance terms of the Appendices.  The Trustee, Paradigm and EPA shall file all such non-material modifications and additional Work Plans with the Court.

141.   Nothing in this Consent Decree shall be deemed to limit the Court's power to enforce, supervise or approve modifications to this Consent Decree.

102

## XXXVIII   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

142.    The Trustee's entry into this Consent Decree shall be conditioned on obtaining the approval of the Bankruptcy Court.   The Trustee shall promptly seek such approval under Bankruptcy Rule 9019 or applicable provisions of the Bankruptcy Code.

143.    This Consent Decree shall be lodged with the District Court for a period not less than thirty (30) days for public notice and comment.   In addition, in accordance with RCRA Section 7003(d), 42 U.S.C. § 6973(d), members of the public also may request an opportunity for a public meeting in the affected area to discuss the proposed covenants not to sue under RCRA Section 7003, 42 U.S.C. § 6973.

144.    After the conclusion of the public comment period, the United States will file with the District Court any comments received, as well as the United States' responses to the comments, and at that time, if appropriate, the District Court will be requested by joint motion of the United States and the State of Illinois to approve the Consent Decree, as it relates to the Complaints.

145.    The United States and the State reserve the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclose facts or considerations which indicate that the Consent Decree is inappropriate, improper or inadequate.

146.    If for any reason this Consent Decree is either withdrawn by the United States as provided in the preceding Paragraph, or not approved by either the Bankruptcy Court or the District Court:  (a) this Consent Decree shall be null and void and the Parties shall not be bound hereunder or under any documents executed in connection herewith; (b) the Parties shall have no liability to one another arising out of or in connection with this Consent Decree or under any documents executed in connection herewith; (c) this Consent Decree and any documents

prepared in connection herewith shall have no residual or probative effect or value, and it shall be as if they had never been executed; and (d) this Consent Decree, any statements made in connection with settlement discussions, and any documents prepared in connection herewith may not be used as evidence in any litigation between the Parties. This Consent Decree is without prejudice to, and nothing in this Consent Decree shall be construed to waive, any of the Parties' legal contentions in the Pleadings.

## XXXIX   SIGNATORIES

147.    Each undersigned representative of the Estate, Paradigm, the Attorney General of the State of Illinois or her designee, the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice or his designee, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind such party to this document.

148.    The Trustee, both individually and in his representative capacity as Trustee of the Estate, and Paradigm hereby agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless the United States and the State have notified the Trustee in writing that they no longer support entry of this Consent Decree.

So Ordered this ___ day of _____, 2013.

United States District Court Judge

The Undersigned Parties enter into this Consent Decree in the matter of *United States and People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Chemetco, Inc.*, Civil Nos. 00-670-DRH, 00-677-DRH (S.D. Ill.):

UNITED STATES OF AMERICA

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division

RANDALL M. STONE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-514-1308/616-6584 (FAX)

The Undersigned Parties enter into this Consent Decree in the matter of *United States and People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Chemetco, Inc.*, Civil Nos. 00-670-DRH, 00-677-DRH (S.D. Ill.):

UNITED STATES OF AMERICA


_____

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division


RANDALL M. STONE
Senior Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-514-1308/616-6584 (FAX)

The Undersigned Parties enter into this Consent Decree in the matter of *United States and People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Chemetco, Inc.*, Civil Nos. 00-670-DRH, 00-677-DRH (S.D. Ill.):

U.S. ENVIRONMENTAL PROTECTION AGENCY


SUSAN HEDMAN
Regional Administrator
U.S. Environmental Protection Agency
Region 5


THOMAS J. MARTIN
Associate Regional Counsel
U.S. Environmental Protection Agency
Region, 5 (C-14J)
77 West Jackson Boulevard
Chicago, Illinois 60604-3507
(312) 886-4273

The Undersigned Parties enter into this Consent Decree in the matter of *United States and People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Chemetco, Inc.*, Civil Nos. 00-670-DRH, 00-677-DRH (S.D. Ill.):

STATE OF ILLINOIS

ON BEHALF OF THE PEOPLE
OF THE STATE OF ILLINOIS
LISA MADIGAN
ATTORNEY GENERAL

MATTHEW DUNN
Chief, Environmental Enforcement
Asbestos Litigation Division

_____

THOMAS E. DAVIS
Chief, Environmental Bureau
ILLINOIS ENVIRONMENTAL
PROTECTION AGENCY

JOHN J. KIM
Chief Legal Counsel
Illinois Environmental
Protection Agency

The Undersigned Party enters into this Consent Decree in the matter of *United States and People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Chemetco, Inc.*, Civil Nos. 00-670-DRH, 00-677-DRH (S.D. Ill.):

ON BEHALF OF THE DEFENDANT CHEMETCO, INC., AND ON BEHALF OF CHEMETCO, INC., A DEBTOR.


DONALD SAMSON
Trustee
Belleville, IL 62220


PENNI S. LIVINGSTON
Environmental Counsel
Livingston Law Firm
5701 Perrin Road
Fairview Heights, IL 62208

The Undersigned Party enters into this Consent Decree in the matter of *United States and People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Chemetco, Inc.*, Civil Nos. 00-670-DRH, 00-677-DRH (S.D. Ill.):

ON BEHALF OF PARADIGM MINERALS & ENVIRONMENTAL SERVICES LLC.

ELLIOTT G. STEGIN
Paradigm Minerals & Environmental Services LLC
3714 Chemetco Lane
Hartford, IL 62048

STEVEN J. POPLAWSKI
Bryan Cave LLP
211 North Broadway
Suite 3600
St. Louis, MO 63102